# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

Stacia Hall, *et al.*,

Plaintiffs-Appellants, Cross-Appellees

v.

District of Columbia Board of Elections,

Defendant-Appellee, Cross-Appellant

On appeal from an order entered in the
United States Court below for the District of Columbia
No. 1:23-cv-1261
The Hon. Amy Berman Jackson

## PRINCIPAL BRIEF OF PLAINTIFFS-APPELLANTS

Christopher J. Hajec
IMMIGRATION REFORM LAW INSTITUTE
25 Massachusetts Ave., NW, Suite 335
Washington, DC 20001
(202) 232-5590
chajec@irli.org

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

**A. Parties and *Amici***

1. Stacia Hall, Ralph Chittams, Suzzanne Keller, Ken McClenton, Kimberly Epps, Dick A. Heller, and Nicolle S.A. Lyon were the plaintiffs in the court below and are the Plaintiffs-Appellants, Cross-Appellees in this Court.

2. The District of Columbia Board of Elections was the defendant in the court below and is the Defendant-Appellee, Cross-Appellant in this Court.

3. The Lawyers' Committee for Civil Rights Under Law and the Washington Lawyers' Committee for Civil Rights and Urban Affairs appeared as *amici curiae* in the court below in support of defendant. No *amici curiae* have appeared before this Court.

**B. Ruling under review**

Plaintiffs-Appellants seek review of the court below's order (App. 100) and memorandum opinion (App. 101), dated March 20, 2024, which granted Defendant-Appellee's motion to dismiss. The opinion and order are included in the appendix.

**C. Related cases**

Undersigned counsel is unaware of any other case related to these consolidated cases.

# TABLE OF CONTENTS

**Page**

Certificate as to Parties, Rulings, and Related Cases .................................................i

Table of Authorities ......................................................................... iii

Glossary........................................................................................ix

Jurisdictional Statement ...................................................................1

Statement of the Issues....................................................................1

Pertinent Statute ............................................................................2

Statement of the Case.....................................................................5

Summary of the Argument...............................................................6

Standard of Review.........................................................................8

Argument......................................................................................8

I.    Plaintiffs allege an injury-in-fact on their claim of a violation of their
      right to citizen self-government.......................................................9

II.   Plaintiffs allege an injury-in-fact on their Fifth Amendment claims.............21

III.  Standing and the merits may merge in this case...........................................27

IV.   Plaintiff Stacia Hall has standing to vindicate her interest in being a
      candidate in an election with an accurate vote count ....................................28

Conclusion ...................................................................................31

Certificate of Compliance

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Adarand Constructors v. Pena,*
515 U.S. 200 (1995)..................................................................................29

*AFGE v. OPM (In re United States OPM Data Sec. Breach Litig.),*
928 F.3d 42 (D.C. Cir. 2019)...............................................................11, 12

*AICPA v. IRS,*
804 F.3d 1193 (D.C. Cir. 2015).................................................................8

*Albence v. Higgin,*
295 A.3d 1065 (Del. 2022)........................................................................29

*Alden v. Maine,*
527 U.S. 706 (1999)..................................................................................15

*Ambach v. Norwick,*
441 U.S. 68 (1979).......................................................................10, 11, 12

*Baker v. Carr,*
369 U.S. 186 (1962)..................................................................................17

*Brackeen v. Haaland,*
994 F.3d 249 (5th Cir. 2021) ....................................................................14

*Brown v. Bd. of Comm'rs,*
722 F. Supp. 380 (E.D. Tenn. 1989).....................................................23, 24

*Cabell v. Chavez-Salido,*
454 U.S. 432 (1982)..................................................................................10

*Campaign Legal Ctr. v. FEC,*
860 F. App'x 1 (D.C. Cir. 2021)................................................................8

*Carney v. Adams,*
592 U.S. 53 (2020)....................................................................................29

*Carson v. Simon*,
978 F.3d 1051 (8th Cir. 2020) ....................................................28, 29

*Chaiffetz v. Robertson Research Holding Ltd.*,
798 F.2d 731 (5th Cir. 1986) ................................................................22

*Chisholm v. Georgia*,
2 U.S. (2 Dall.) 419 (1793) ...................................................................13

*City of Cleburne v. Cleburne Living Ctr.*,
473 U.S. 432 (1985)..............................................................................25

*Committee on Judiciary of U.S. House of Representatives v. McGahn*,
968 F.3d 755 (D.C. Cir. 2020) (en banc).................................................8

*Comm. to Recall Robert Menendez From the Office of U.S. Senator v. Wells*,
204 N.J. 79, 7 A.3d 720 (N.J. 2010) ....................................................14

*Daughtrey v. Carter*,
584 F.2d 1050 (D.C. Cir. 1978)...........................................19, 20, 23

*Espinoza v. Farah Mfg. Co.*,
414 U.S. 86 (1973)................................................................................21

*Estate of Boyland v. Department of Agric.*,
913 F.3d 117 (D.C. Cir. 2019)........................................................8, 12

*Foley v. Connelie*,
435 U.S. 291 (1978)..............................................10, 11, 12, 15, 17

*Food & Water Watch, Inc. v. Vilsack*,
808 F.3d 905, 914 (D.C. Cir. 2015)........................................................9

*Ga. Ass'n of Latino Elected Offs., Inc. v. Gwinnett Cty. Bd. of Registration &
Elections*, 36 F.4th 1100 (11th Cir. 2022) ..........................................23

*Gill v. Whitford*,
585 U.S. 48 (2018)................................................................................23

iv

*Gordon v. Haas,*
    828 F. Supp. 2d 13 (D.D.C. 2011)......................................................24

*Graham v. Richardson,*
    403 U.S. 365 (1971)........................................................................24

*Gratz* v. *Bollinger,*
    539 U. S. 244 (2003)........................................................................29

*Haaland v. Brackeen,*
    143 S. Ct. 1609 (2023)....................................................................14

*Harper* v. *Virginia Bd. of Elections,*
    383 U.S. 663 (1966)........................................................................17

*Jana-Rock Constr., Inc. v. N.Y. State Dep't of Econ. Dev.,*
    438 F.3d 195 (2d Cir. 2006) ...........................................................25

*Juarez v. Nw. Mut. Life Ins. Co.,*
    69 F. Supp. 3d 364 (S.D.N.Y. 2014) ...............................................25

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992)..........................................................................8

*Lyman v. Baker,*
    954 F.3d 351 (1st Cir. 2020)...........................................................23

*Malina v. Makitso United States LLC,*
    No. 4:19-01808, 2019 U.S. Dist. LEXIS 213113 (S.D. Tex. Oct. 18, 2019).....22

*McCulloch v. Maryland,*
    17 U.S. (4 Wheat.) 316 (1819) ........................................................14

*McGowan* v. *Maryland,*
    366 U.S. 420 (1961)........................................................................17

*Michel v. Anderson,*
    14 F.3d 623 (D.C. Cir. 1994)...........................................................18

*Northeastern Fla. Chapter, Associated Gen. Contractors of America* v.
   *Jacksonville*, 508 U.S. 656 (1993).........................................30

*Nyquist v. Mauclet*,
   432 U.S. 1 (1977)...............................................................25

*Reynolds v. Sims*,
   377 U.S. 533 (1964)...........................................................15

*Richmond v. United States*,
   422 U.S. 358 (1975)...........................................................19

*San Antonio Indep. Sch. Dist. v. Rodriguez*,
   411 U.S. 1 (1973)...............................................................24

*Shaw v. Reno*,
   509 U.S. 630 (1993)...........................................................19

*Thomas v. Rohner-Gehrig & Co.*,
   582 F. Supp. 669 (N.D. Ill. 1984).......................................22

*Tippie v. Spacelabs Medical, Inc.*,
   180 Fed. App'x 51 (11th Cir. 2006) ...................................22

*Torres v. Madrid*,
   592 U.S. 306 (2021)...........................................................13

*Trump v. Wis. Elections Comm'n*,
   983 F.3d 919 (7th Cir. 2020)..............................................28

*United States v. Students Challenging Regulatory Agency Procedures*,
   412 U.S. 669 (1973)...........................................................17

*United States v. Texas*,
   599 U.S. 670 (2023)...........................................................27

*United States Term Limits v. Thornton*,
   514 U.S. 779 (1995)...........................................................14

*Valley Forge Christian College v. Americans United for Separation of Church &
    State*, 454 U.S. 464 (1982) ...................................................................................12

*Washington Post v. Robinson*,
    935 F.2d 282 (D.C. Cir. 1991) ..........................................................................16

## CONSTITUTION

U.S. Const. Art, VI, cl. 2 ...........................................................................................13

U.S. Const., Preamble ..........................................................................................13, 14

## STATUTES

28 U.S.C. § 1291 ..........................................................................................................1

28 U.S.C. § 1331 ..........................................................................................................1

28 U.S.C. § 1653 ........................................................................................................16

D.C. Official Code § 1-1001.02(2) .............................................................................3

D.C. Code § 1-1001.07(c)(1)(D) .................................................................................4

D.C. Code § 1-1001.07(d)(14)(C) ...............................................................................4

Section 2 of D.C. Law 24-242
    (Local Resident Voting Rights Amendment Act of 2022) .....................................3

## MISCELLANEOUS

Harper-Ho, Virginia, *Noncitizen Voting Rights: The History, the Law and
    Current Prospects for Change*, 18(2) Law & Ineq. 271 (2000) .........................21

Kennedy-Shaffer, Alan, *Voters in a Foreign Land: Alien Suffrage and
    Citizenship in the United States, 1704-1926*, W&M ScholarWorks,
    https://dx.doi.org/doi:10.21220/s2-115t-9130 (2009) ........................................21

Porter, Kirk H., *A History of Suffrage in the United States* (1918) .........................21

Raskin, Jamin B., *Legal Aliens, Local Citizens: The Historical,
   Constitutional and Theoretical Meanings of Alien Suffrage*,
   141 U Penn Law Review 1391 (1993) ...........................................................21

## GLOSSARY

| | |
|---|---|
| Plaintiffs | Plaintiffs-Appellants, Cross-Appellees |
| The District | Defendant-Appellee, Cross-Appellant, DC Board of Elections |
| NCVL | D.C. Law 24-242. Local Resident Voting Rights Amendment Act of 2022 |

## JURISDICTIONAL STATEMENT

The court below had federal question jurisdiction over this action under 28 U.S.C. § 1331. The court below entered its final order on March 20, 2024, and Plaintiffs-Appellants notice of appeal was timely filed on April 18, 2024.

This court has jurisdiction over appeals from final decisions of a court below under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1.     Whether U.S. citizens have a cognizable and legally protected interest for purposes of Article III of the U.S. Constitution in protecting their votes from dilution by the votes of noncitizens.

2.     Whether voters of U.S. birth and national origin have a cognizable and legally protected interest for purposes of Article III of the U.S. Constitution in protecting their votes from dilution by the votes of noncitizens of foreign birth and national origin.

3.     Whether U.S. citizens have a cognizable and legally protected interest for purposes of Article III of the U.S. Constitution in citizen self-government that includes protection from noncitizen voting.

4.     Whether Plaintiffs-Appellants have Article III and prudential standing not only as citizen voters but also—with respect to appellants Hall and Chittams—

as candidates to challenge noncitizen voting under the District of Columbia's Local Resident Voting Rights Amendment Act of 2022.

5.    Whether the issue of standing merges with the merits.

6.    Whether the Court should address the merits issues briefed in the court below, notwithstanding that the court below dismissed the case exclusively on jurisdictional grounds.

7.    If the Court considers the merits, whether Plaintiffs-Appellants state a claim on which relief can be granted.

8.    If the Court considers the merits, whether noncitizen voting under the District of Columbia's Local Resident Voting Rights Amendment Act of 2022 per se unconstitutionally dilutes the votes of U.S. citizens.

9.    If the Court considers the merits, whether noncitizen voting under the District of Columbia's Local Resident Voting Rights Amendment Act of 2022 per se unconstitutionally dilutes the votes of voters of U.S. birth and national origin.

10.    If the Court considers the merits, whether noncitizen voting under the District of Columbia's Local Resident Voting Rights Amendment Act of 2022 per se violates U.S. citizens' right to citizen self-government.

**PERTINENT STATUTE**

The pertinent parts of the challenged statute consist of the following:

**D.C. Law 24-242. Local Resident Voting Rights Amendment Act of 2022.**

AN ACT

*To amend the District of Columbia Election Code of 1955 to expand the definition of the term qualified elector for the purpose of local elections to include otherwise eligible non-citizen residents.*

BE IT ENACTED BY THE COUNCIL OF THE DISTRICT OF COLUMBIA, That this act may be cited as the "Local Resident Voting Rights Amendment Act of 2022".

**Sec. 2.** The District of Columbia Election Code of 1955, approved August 12, 1955 (69 Stat. 699; D.C. Official Code § 1-1001.01 et seq.), is amended as follows:

**(a)** Section 2 (D.C. Official Code § 1-1001.02) is amended as follows:

    **(1)** Paragraph (2) is amended as follows:

      **(A)** Subparagraph (B) is amended to read as follows:

        "(B) Is a citizen of the United States; except, that this subparagraph shall not apply in a local election;".

      **(B)** Subparagraph (C) is amended by striking the phrase "any state or territory" and inserting the phrase "any state, territory, or country" in its place.[1]

    **(2)** A new paragraph (34) is added to read as follows:

      "(34) The term "local election" means:

      "(A) An election for:

      "(i) Mayor;

---

[1] **D.C. Code § 1-1001.02(2) (as amended) reads, in relevant part:**

(2) The term "qualified elector" means a person who:

(A) Is at least 17 years of age and who will be 18 years of age on or before the next general election;

(B) Is a citizen of the United States; except, that this subparagraph shall not apply in a local election;

(C) Has maintained a residence in the District for at least 30 days preceding the next election and does not claim voting residence or right to vote in any state, territory, or country; and

(D) Repealed.

(E) Has not been found by a court of law to be legally incompetent to vote.

"(ii) Chairman or member of the Council;

"(iii) Attorney General;

"(iv) Member of the State Board of Education; or

"(v) Advisory Neighborhood Commissioner; or

"(B) An initiative, referendum, recall, or charter amendment measure on a District ballot.".

**(b)** Section 7 (D.C. Official Code § 1-1001.07) is amended as follows:

**(1)** The lead-in language of subsection (c)(1)(D) is amended by striking the phrase "this paragraph and stated that the applicant is a citizen of the United States," and inserting the phrase "this paragraph," in its place. [2]

**(2)** Subsection (d)(14)(C) is amended by striking the phrase "that citizens" and inserting the phrase "that residents" in its place. [3]

---

[2] **D.C. Code § 1-1001.07(c)(1)(D) (as amended) reads, in relevant part:**
For each applicant who did not decline to register to vote under subparagraph (B) of this paragraph, the automatic voter registration agency shall provide to the Board electronic records containing the applicant's:

(i) Legal name;

(ii) Date of birth;

(iii) Residence;

(iv) Mailing address;

(v) Previous voter registration address;

(vi) DMV-issued identification number or social security number;

(vii) Party affiliation (if any);

(viii) Response as to whether the applicant would like information on serving as a poll worker in the next election;

(ix) Citizenship information; and

(x) Electronic signature.

[3] **D.C. Code § 1-1001.07(d)(14)(C) (as amended) reads, in relevant part:**
These mail-in voter registration applications shall be placed in each office or substation of the agency in an accessible location and in clear view so that residents may easily obtain a mail-in voter registration application.

## STATEMENT OF THE CASE

Plaintiffs filed the complaint in this action in the District of Columbia Superior Court on March 14, 2023. App. 1-17. Plaintiffs, who are U.S. citizens registered to vote in the District of Columbia, claimed that DC's noncitizen voting law, the Local Resident Voting Rights Amendment Act of 2022 ("NCVL"), by letting noncitizens vote in municipal elections, infringed Plaintiffs' rights to due process, to equal protection of the laws, and to citizen self-government. App. 14-16.

Defendant, the District of Columbia Board of Elections ("the District"), removed the case to the court below on May 4, 2023. App. 101. On June 7, 2023, the District moved to dismiss the complaint for lack of standing and failure to state a claim upon which relief can be granted. App. 18-43.

On March 20, 2024, the court below granted the District's motion to dismiss on grounds of lack of standing. App. 100, 107-11. In essence, the court below concluded that the NCVL did not injure Plaintiffs, because, after its enactment, the power of Plaintiffs' individual votes did not stand to be diminished at all, since their votes were to be weighed equally with those of all other DC voters, including the new noncitizen voters. App. 101-12; *id.* at 108-09 ("[Plaintiffs'] votes will not receive less weight or be treated differently than noncitizens' votes; they are not losing representation in any legislative body; nor have citizens as a group been discriminatorily gerrymandered, 'packed,' or 'cracked' to divide, concentrate, or

devalue their votes. At bottom, they are simply raising a generalized grievance which is insufficient to confer standing.").

## SUMMARY OF THE ARGUMENT

On Plaintiffs' view of the merits—reflecting both binding Supreme Court holdings and the popular sovereignty presupposed by the Constitution—there exists a constitutional right to citizen self-government. This constitutional right of citizens to govern themselves entails that citizens have a right to vote in elections in which only citizens vote. By allowing noncitizens to vote in DC municipal elections, the NCVL infringes, to a measurable degree, Plaintiffs' own rights, as citizen voters in DC, to vote in such elections. Under precedent of this Circuit, this infringement of Plaintiffs' constitutional rights constitutes a concrete and particularized injury that is sufficient for standing, and the fact that this infringement is suffered by all citizen voters in DC does not make it a general grievance, as opposed to a concrete and particularized injury.

Plaintiffs also have standing for their claims under the Due Process Clause of the Fifth Amendment. Their claims under the equal protection component of that Clause are that they are members of two protected classes, U.S. citizens and persons of American national origin, and that the NCVL dilutes the votes of both classes on its face, necessitating strict scrutiny that the NCVL, in light of the compelling governmental interest in maintaining popular sovereignty, cannot pass. If such a vote

dilution as this does not injure Plaintiffs sufficiently for standing—or, as the court below concluded, such a vote dilution does not injure them at all—absurd consequences follow. For example, black voters in DC would lack standing to challenge an expansion of the DC electorate that, on its face, was racially discriminatory.

In this case, moreover, this Court could with propriety go beyond standing and reach the merits of these claims. Standing and the merits could merge here in the following way. This Court could conclude that Plaintiffs' injury to their right to citizen self-government is legally cognizable because, based on Supreme Court holdings, the right to citizen self-government exists, and, on undisputed facts, the NCVL has infringed Plaintiffs' own rights to citizen self-government. But if this Court decides as much, it will have already decided the merits of this claim. Similarly, if this Court concludes, in determining standing on the Fifth Amendment claims, that Plaintiffs have suffered a legally cognizable injury because they are members of protected classes whose votes are diluted—without sufficient justification—by the NCVL, that conclusion would also be a decision on the merits of these claims.

Finally, Plaintiff Stacia Hall is a declared candidate for an at-large seat on the DC Board of Education. She was the Republican candidate for DC Mayor in 2022, and, at the time the Complaint was filed, intended to run, and was planning to run,

either for an at-large seat on the DC Council or for an at-large seat on the DC Board of Education, deciding eventually on the latter. Hall, therefore, both now and when the Complaint was filed, had standing to vindicate her interest in running in an election in which there would be an accurate vote count. The operative inquiry is not whether she was already an officeholder, or had already declared her candidacy, but whether she had an intention, and a capability, to run sufficient to create a concrete interest in such a vote count.

## STANDARD OF REVIEW

This Court reviews dismissals for lack of standing *de novo*. *AICPA v. IRS*, 804 F.3d 1193, 1196 (D.C. Cir. 2015).

## ARGUMENT

To establish Article III standing, plaintiffs must plausibly allege the requirements of injury-in-fact, causation, and redressability. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *Campaign Legal Ctr. v. FEC*, 860 F. App'x 1, 3 (D.C. Cir. 2021). In conducting the standing analysis, "the court must assume that the [plaintiff] will prevail on the merits." *Committee on Judiciary of U.S. House of Representatives v. McGahn*, 968 F.3d 755, 762 (D.C. Cir. 2020) (en banc); *Estate of Boyland v. Department of Agric.*, 913 F.3d 117, 123 (D.C. Cir. 2019). To be cognizable, a plaintiff's claimed injury must be

> (1) concrete, (2) particularized, and (3) actual or imminent. A concrete injury is direct, real, and palpable—not abstract. A

> particularized injury is personal, individual, distinct, and differentiated—not generalized or undifferentiated. An actual or imminent injury is certainly impending and immediate—not remote, speculative, conjectural, or hypothetical.

*Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 914 (D.C. Cir. 2015) (internal citations omitted).

The NCVL expands the electorate of DC. To those formerly eligible to vote—U.S. citizens exclusively—it adds noncitizens. In doing so, according to Plaintiffs' view of the merits, it both infringes Plaintiffs' constitutional rights to citizen self-government, which entails their right to vote in an election in which only citizens vote, and on its face dilutes their votes as members of protected classes—*viz.*, U.S. citizens and persons of American national origin—without sufficient justification.

Because these claims must be assumed to be meritorious, the court below erred in concluding that, since Plaintiffs' votes would be weighed equally with those of noncitizens, Plaintiffs were not injured at all. Unless absurd consequences are to follow, expansions of the franchise that violate a plaintiff's own constitutional rights, or that facially dilute a plaintiff's vote as a member of a protected class, cause a concrete and particularized injury that is sufficient for standing.

## I. PLAINTIFFS ALLEGE AN INJURY-IN-FACT ON THEIR CLAIM OF A VIOLATION OF THEIR RIGHT TO CITIZEN SELF-GOVERNMENT.

In a series of unmistakable holdings, the Supreme Court has recognized what can aptly be called the constitutional right to citizen self-government.

When faced with claims that municipal laws barring aliens from governmental functions—such as being police officers or public schoolteachers, or voting—offended the Equal Protection Clause, the Court repeatedly held that, because there was a right to citizen self-government, barring aliens from these functions did not offend the Equal Protection Clause. *Foley v. Connelie*, 435 U.S. 291 (1978) (police officers); *Cabell v. Chavez-Salido*, 454 U.S. 432 (1982) (probation officers); *Ambach v. Norwick*, 441 U.S. 68 (1979) (public schoolteachers).

In recognizing the right to citizen self-government, the Court declared: "The exclusion of aliens from basic governmental processes is not a deficiency in the democratic system but a *necessary consequence* of the community's process of political self-definition." *Cabell*, 454 U.S. at 439-440. The Court held that American citizens (including, of course, foreign-born American citizens) comprise the body politic of the United States. "Self-government, whether direct or through representatives, begins by defining the scope of the community of the governed and thus of the governors as well: Aliens are by definition those outside of this community." *Id. See also Foley*, 435 U.S. at 295-96 ("The act of becoming a citizen is more than a ritual with no content beyond the fanfare of ceremony. A new citizen has become a member of a Nation, part of a people distinct from others. The individual, *at that point*, belongs to the polity and is entitled to participate in the processes of democratic decisionmaking. Accordingly, we have recognized a State's

historical power to exclude aliens from participation in its democratic political institutions as part of the sovereign's *obligation* to preserve the basic conception of a political community.") (internal citation omitted) (emphases added). "[A] democratic society is *ruled by its people*. *Thus*, it is clear that a State may deny aliens the right to vote, or to run for elective office, for these lie at the heart of our political institutions." *Id.* at 296 (emphasis added). Such restrictions "represent[] the choice, and *right, of the people to be governed by their citizen peers*." *Id.* (emphasis added). "[A]lthough we extend to aliens the right to education and public welfare, along with the ability to earn a livelihood and engage in licensed professions, the right to govern is reserved to citizens." *Id.* at 297. *See also Ambach*, 441 U.S. at 73-74 ("Some state functions are so bound up with the operation of the State as a governmental entity as to permit the exclusion from those functions of all persons who have not become part of the process of self-government [by naturalizing]").

Under the jurisprudence of standing, if one's own constitutional rights have been infringed, one has suffered a concrete and particularized injury. *See, e.g., AFGE v. OPM (In re United States OPM Data Sec. Breach Litig.)*, 928 F.3d 42, 54-55 (D.C. Cir. 2019) ("[T]he loss of a constitutionally protected privacy interest itself would qualify as a concrete, particularized, and actual injury in fact"). Thus, if there is such a right as the right to citizen self-government, and a plaintiff personally suffers an infringement of it, that infringement constitutes an injury requisite for standing.

*Compare AFGE v. OPM, supra, with Valley Forge Christian College v. Americans United for Separation of Church & State*, 454 U.S. 464, 486-488 (1982) (holding that plaintiff advocacy organization did not suffer a requisite injury from a claimed violation of the Establishment Clause that occurred in another state because the organization alleged merely a constitutional violation, not a "distinct and palpable injury" to itself).

Thus, on the right to citizen self-government claim, Plaintiffs' standing depends on whether there is such a right, and whether the NCVL deprives, to some degree, at least one Plaintiff of that right.

The answer to the first question should be assumed to be "yes," of course, because Plaintiffs' view of the merits is to be assumed in determining standing. *Estate of Boyland,* 913 F.3d at 123 ("[W]hen considering whether a plaintiff has Article III standing, a federal court must assume, *arguendo*, the merits of his or her legal claim.") (internal quotation marks omitted).

Apart from that, the Supreme Court has clearly recognized this right, with that recognition being a necessary part of its reasoning. *See Foley*, 435 U.S. at 296 (finding that the Court's theory of citizen self-government had the "practical consequence" that restricting municipal jobs involving governing functions to citizens did not offend the Equal Protection Clause); *Ambach*, 441 U.S. at 73-74 (explaining that the Court found exclusions of aliens from governing functions did

not violate equal protection because the aliens had not "become part of the process of self-government" through naturalization). Indeed, it is hard to see how any substitute principle—perhaps some narrower substitute principle—other than the principle that aliens are by definition outside of the process of self-government constitutionally reserved for citizens, could have been both true and entailed the conclusions the Court reached, even if any court other than the Supreme Court were at liberty to replace the principle the Court relied on. The Court's repeated explications of the right to citizen self-government were holdings, binding on this Court. *See, e.g., Torres v. Madrid*, 592 U.S. 306, 329 (2021) (defining dicta, as opposed to holdings, as "passage[s] unnecessary to the outcome" of a case).

Apart from these Supreme Court holdings, the right to citizen self-government is set forth, with the Declaration of Independence as a backdrop, in the text of the Constitution. In the first sentence of the Constitution, "We the People of the United States" "ordain and establish" the Constitution. U.S. Const., Preamble. Later, that Constitution is proclaimed to be "the supreme Law of the Land." U.S. Const. Art, VI, cl. 2. In the Constitution, then, the people ordained and established the supreme law of the land. Only the sovereign of an independent United States had the authority to do such a thing. Thus, the Constitution proclaims, with no need of a more explicit statement, the sovereignty of the people over this nation. *Chisholm v. Georgia*, 2 U.S. (2 Dall.) 419, 454 (1793) ("To the Constitution of the United States the term

SOVEREIGN, is totally unknown. There is but one place where it could have been used with propriety. But, even in that place it would not, perhaps, have comported with the delicacy of those, who ordained and established that Constitution. They might have announced themselves 'SOVEREIGN' people of the United States: But serenely conscious of the fact, they avoided the ostentatious declaration.") (alterations in original) (superseded, on other grounds, by statute). *See also Brackeen v. Haaland*, 994 F.3d 249, 274 n.2 (5th Cir. 2021) ("The Constitution rooted its legitimacy in the consent of those whom it would come to govern, declaring that the system it outlined was 'ordained and established' by 'We the people,' U.S. Const. Preamble."), *rev'd on unrelated grounds by Haaland v. Brackeen*, 143 S. Ct. 1609 (2023); *United States Term Limits v. Thornton*, 514 U.S. 779, 849 (1995) (Thomas, J., dissenting) (discussing "the notion of popular sovereignty that undergirds the Constitution."); *Comm. to Recall Robert Menendez From the Office of U.S. Senator v. Wells*, 204 N.J. 79, 149, 7 A.3d 720, 763 (N.J. 2010) (dissenting opinion) (discussing the "fundamental notions of popular sovereignty, that is, that all power resides with the people and that it is only by their consent that the people may be governed. That doctrine finds its most familiar expression in the Declaration of Independence"); *id.* at 150, 763 ("That the doctrine of popular sovereignty is infused in our deepest historical traditions cannot be ignored."). *See also McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 404-05 (1819) ("The government of the Union

. . . is, emphatically, and truly, a government of the people. In form and in substance it emanates from them. Its powers are granted by them, and are to be exercised directly on them, and for their benefit."); *Reynolds v. Sims*, 377 U.S. 533, 565 (1964) ("But representative government is in essence self-government through the medium of elected representatives of the people, and each and every citizen has an inalienable right to full and effective participation in the political processes of his State's legislative bodies."); *Alden v. Maine*, 527 U.S. 706 (1999) ("By splitting the atom of sovereignty, the founders established two orders of government, each with its own direct relationship, its own privity, its own set of mutual rights and obligations to the people who sustain and are governed by it.").

The Supreme Court merely assumed the obvious when it equated the people with United States citizens. *E.g., Foley*, 435 U.S. at 296 (recognizing the "right[] of *the people* to be governed by their *citizen peers*.") (emphases added). Indeed, there is no basis for saying that the "People" referred to in the Preamble include noncitizens. If noncitizens formed part of the sovereign people, it could hardly be the case that they have no fundamental right to vote, and can freely be excluded from the franchise and any other role in governing this country. Yet, of course, only citizens have a fundamental right to vote, and noncitizens are and have been almost universally excluded from voting and governing. This of course is no invidious

exclusion, but an obvious consequence of the basic theory of a self-governing democracy.

Given the existence of this right, the question of whether Plaintiffs suffered an injury sufficient for standing depends on whether the NCVL infringes their own rights to citizen self-government. Plaintiffs are all U.S. citizens registered to vote in DC. App. 4. The NCVL, for the first time, allows noncitizens to vote in DC municipal elections. Thus, when Plaintiffs vote, their votes will be diluted by the votes of noncitizens to some degree. That degree can even be quantified. According to a spokeswoman of appellee, 523 noncitizens were registered to vote in DC as of May 29, 2024. Danielle Wallace, *More than 500 noncitizens registered to vote in DC Council elections Tuesday despite House reckoning,* Fox News (June 4, 2024), https://www.foxnews.com/politics/more-than-500-noncitizens-registered-vote-dc-council-elections-tuesday-despite-house-reckoning. As of April 30, 2024, there were 450,750 voters registered in DC. *Id.* Thus, roughly 0.1%, at least, of voters registered in DC are noncitizens.[4] On the reasonable assumption that the noncitizen registered voters will not vote at markedly lower rates than citizen registered voters,

---

[4] This Court may take judicial notice of these facts, which include an admission against interest. *Cf. Washington Post v. Robinson*, 935 F.2d 282, 291 (D.C. Cir. 1991). In the alternative, Plaintiffs allege these facts "on information and belief" pursuant to 28 U.S.C. § 1653.

each citizen voter's vote will thus be diluted by roughly 0.1%, at least.[5] Such a degree of injury suffices for standing. *See, e.g., United States v. Students Challenging Regulatory Agency Procedures*, 412 U.S. 669, 689 (1973) (observing that the requirement of an injury in fact "serves to distinguish a person with a direct stake in the outcome of a litigation—even though small—from a person with a mere interest in the problem. We have allowed important interests to be vindicated by plaintiffs with no more at stake in the outcome of an action than *a fraction of a vote*, see *Baker* v. *Carr*, 369 U.S. 186; a $ 5 fine and costs, see *McGowan* v. *Maryland*, 366 U.S. 420; and a $ 1.50 poll tax, *Harper* v. *Virginia Bd. of Elections*, 383 U.S. 663.") (emphasis added).

If Plaintiffs enjoy a right to citizen self-government, they have the right, as voters, to vote in elections in which only citizens vote. *Foley*, 435 U.S. at 296 (recognizing the "right[] of the people to be governed by their citizen peers."). By voting in an election in which noncitizens vote, Plaintiffs' right to citizen self-government will thus be infringed, to a measurable degree. That measurable infringement of a constitutional right is a "concrete and particularized" injury sufficient for standing.

---

[5] This exercise in quantification is illustrative, but not necessary, provided that there are indeed hundreds of noncitizens registered to vote in DC, as the District admits. Even if the degree of dilution will only be exactly quantifiable after the election, the existence of appreciable vote dilution, of at least "a fraction of a vote," is clear now.

That all DC citizen voters share this injury does not defeat standing. In *Michel v. Anderson*, 14 F.3d 623 (D.C. Cir. 1994), this Court held that every voter in all 50 states had standing to challenge a measure that would have added the votes of five persons—delegates from DC and U.S. territories—to those of members of the House of Representatives in votes of the House's Committee of the Whole. *Id.* at 624–25. On the ground that this measure weakened the vote of every state voter by reducing it from a vote for a representative who would cast one in 435 votes to a vote for a representative who would cast 1 in 440 votes, this Court concluded that all voters for House members had standing. *Id.* at 626.

In a footnote, the court below only attempted to distinguish this precedent by claiming that, here, *no* Plaintiff suffered a particularized injury. App. 111 n.6. As the court below had stated, "[h]ere, the power of plaintiffs' individual votes was not diminished in any way [when the NCVL was passed]: plaintiffs' votes will be counted and weighted exactly as they were before." App. 111.

The conclusion by the court below that the "power" of Plaintiffs' votes is not reduced at all by the NCVL, since citizens' votes will be weighted equally with those of the new noncitizen voters, and each others', has absurd consequences. For example, on that reasoning, DC could pass a law allowing all white residents of DC suburbs (and only the white residents of these suburbs) to vote in DC elections, and no black voters in DC would have standing to challenge this unlawful racial dilution

of their votes on the face of that law. *See, e.g., Richmond v. United States*, 422 U.S. 358, 378-379 (1975) ("An official action, whether an annexation or otherwise, taken for the purpose of discriminating against Negroes on account of their race has no legitimacy at all under our Constitution"); *Shaw v. Reno*, 509 U.S. 630, 632, 643 (1993) ("No inquiry into legislative purpose is necessary when the racial classification appears on the face of the statute."). After all, the power of black DC voters' votes would not be diminished, on this logic, since their votes would be weighed equally with those of the white suburbanites. There may be a difference between *Michel* and this case—in *Michel*, the injury consisted of the weakening of the votes of all voters for House members, whereas here, assuming Plaintiffs' merits, the injury consists in the measurable infringement of the constitutional right of all citizen voters in DC to vote in an election in which only citizens vote—but this difference is hardly to the prejudice of Plaintiffs' standing. And *Michel*, of course, still stands for the proposition that voting injuries can be shared by very large groups of voters and still be "concrete and particularized" under Article III.

The court below relied heavily on this Court's statement in *Daughtrey v. Carter*, 584 F.2d 1050, 1055 (D.C. Cir. 1978) that "not … every alleged dilution of voting rights [is] a sufficient injury to confer standing." App. 109. But the deficiency this Court found in *Daughtrey*—the lack of a "discrete factual context" in which a "concrete injury" occurred, *Daughtrey*, 584 F.2d at 1056—is not a deficiency here.

In *Daughtrey*, the plaintiffs, who objected to a Proclamation and an Executive Order by President Carter allowing the return to this country, with full civil rights restored, of those who had left the country to avoid the draft, were few in number, and did not even allege that their votes would be diluted in any particular election. *Id.* at 1056. The identity and places of residence of those allowed back into the country, and to vote, by President Carter's actions were unknown. *Id.* Thus, there was no allegation that any plaintiff would likely vote in any election in which even one returning voter would vote. In those circumstances, the "discrete factual context" this Court held was required for an alleged dilution of voting rights to be a sufficient injury to confer standing was lacking. Indeed, it could not be concluded that any plaintiffs' own right to vote in an election free of the illegal votes of those returning—the right plaintiffs claimed existed—would likely be infringed. Here, by contrast, all Plaintiffs are registered to vote in a jurisdiction in which hundreds of noncitizens are known to be registered, too. On the reasonable assumption that noncitizens will vote at rates not markedly below those of citizens, it can be concluded that Plaintiffs' votes will be diluted by those of citizens to an appreciable, ultimately-measurable degree.

In sum, Plaintiffs' constitutional rights to vote in elections in which only citizens vote is infringed, in a measurable way, by allowing noncitizens to vote. The NCVL therefore causes Plaintiffs a concrete and particularized injury that will be redressed by an injunction against the NCVL.

## II. PLAINTIFFS ALLEGE AN INJURY-IN-FACT ON THEIR FIFTH AMENDMENT CLAIMS.

In Plaintiffs' substantive due process claim, they assert the same right as in their citizen self-government claim: to vote in an election in which only citizens vote. App. 15-16. Sporadic contrary history notwithstanding, most of which from a time before there was a clear standard about who was an American citizen,[6] this right is deeply rooted in our nation's history and tradition, because its basis—popular sovereignty—is, as discussed above, clearly evident in the Constitution itself.

Plaintiffs are all U.S. citizens, App. 4, and it is undisputed that they are all of American national origin, App. 57. *See Espinoza v. Farah Mfg. Co.*, 414 U.S. 86, 88 (1973) ("The term 'national origin' on its face refers to the country where a person

---

[6] Scholars have referred to "the 'spasmodic' nature of alien suffrage," in American history. Kennedy-Shaffer, Alan, *Voters in a Foreign Land: Alien Suffrage and Citizenship in the United States, 1704-1926*, W&M ScholarWorks, https://dx.doi.org/doi:10.21220/s2-115t-9130 (2009) (quoting Kirk H. Porter, *A History of Suffrage in the United States* 112 (1918)). This haphazard quality is likely due to the fact that "'the line between national and state citizenship during the eighteenth and early nineteenth centuries was not clearly demarcated[.]'" *Id.* (quoting Virginia Harper-Ho, *Noncitizen Voting Rights: The History, the Law and Current Prospects for Change*, 18(2) Law & Ineq. 271, 274 (2000)). In any event, states began requiring citizenship as a voter qualification following the War of 1812. *Id.* (quoting Jamin B. Raskin, *Legal Aliens, Local Citizens: The Historical, Constitutional and Theoretical Meanings of Alien Suffrage*, 141 U Penn Law Review 1391, 1403 (1993)). States admitted to the Union beginning in 1812 "confined the franchise to citizens. Meanwhile, a number of early states" that had not required citizenship for voting "during this same period[] chang[ed] the constitutional definition of voters from 'inhabitants' to 'citizens.'" Raskin, 141 U Penn Law Review at 1404.

was born, or more broadly, the country from which his or her ancestors came."). Their equal protection claims are that U.S. citizens and persons of American national origin are both protected classes, and that the NCVL, on its face, dilutes the votes of both. App. 15. On its face, the NCVL dilutes the votes of citizen voters in DC by allowing noncitizens to vote. Also on its face, the NCVL, because it adds only foreign-born persons to the voter rolls, dilutes the votes of American-born persons— a national origin group. *See, e.g., Tippie v. Spacelabs Medical, Inc*., 180 Fed. App'x 51, 55 (11th Cir. 2006) (finding a prima facie case of national origin discrimination where American citizen plaintiff was denied employment in favor of a non-American citizen); *Chaiffetz v. Robertson Research Holding Ltd*., 798 F.2d 731, 733 (5th Cir. 1986) ("We agree that employment discrimination based only on one's country of birth, whether that birthplace is the United States or elsewhere, contradicts the purpose and intent of Title VII."); *Malina v. Makitso United States LLC*, No. 4:19-01808, 2019 U.S. Dist. LEXIS 213113, at *7-8 (S.D. Tex. Oct. 18, 2019) (permitting plaintiff to "assert Title VII discrimination and harassment claims based on her 'American' national origin."); *Thomas v. Rohner-Gehrig & Co*., 582 F. Supp. 669, 675 (N.D. Ill. 1984) (holding that an employment discrimination claim based on American national origin was legally cognizable).

These equal protection claims are analogous to those made by plaintiffs challenging other expansions of the franchise, such as laws allowing nonresident

owners of property in a city to vote in city elections. *See, e.g., Brown v. Bd. of Comm'rs*, 722 F. Supp. 380, 398 (E.D. Tenn. 1989) (striking down an expansion of the franchise to nonresidents of a city under the Equal Protection Clause of the Fourteenth Amendment). In all such cases, the voting power of the original voters is reduced from 100% to some lower percentage by the expansion, and the voting power of the newly-enfranchised voters is increased, from 0% to a higher percentage. This difference in the treatment of the two groups, benefitting the one and harming the other, and occurring in a "discrete factual context," *Daughtrey*, 584 F.2d at 1056, is a cognizable, concrete, and particularized injury to plaintiffs who belong to the injured group.

Indeed, vote dilution has long been recognized as a particularized injury for standing purposes. As Justice Kagan explained in *Gill v. Whitford*, "[t]he harm of vote dilution . . . is individual and personal in nature." *Gill v. Whitford*, 585 U.S. 48, 75 (2018) (Kagan, J., concurring). *See also Ga. Ass'n of Latino Elected Offs., Inc. v. Gwinnett Cty. Bd. of Registration & Elections*, 36 F.4th 1100, 1114 (11th Cir. 2022) ("The Supreme Court has 'long recognized that a person's right to vote is individual and personal in nature' and 'voters who allege facts showing disadvantage to themselves as individuals have standing to sue' as they have alleged a concrete and particularized injury.") (quoting *Gill*, 585 U.S. at 65-66) (opinion of the Court); *Lyman v. Baker*, 954 F.3d 351, 362 (1st Cir. 2020) (finding standing based on a claim

of vote dilution and explaining that "[t]he voter, after all, is presumptively the best person to bring a challenge to an alleged infringement of her constitutionally protected voting rights."). *Cf. Gordon v. Haas*, 828 F. Supp. 2d 13, 19 (D.D.C. 2011) (rejecting standing because plaintiff failed to allege dilution of his own vote: "Gordon remains a voter only in the District of Columbia. The allegation that he suffers injury from alleged minority vote dilution in the five states does not save his claim. For his claim to survive, Gordon must aver that *his* vote has been diluted. He does not and cannot make such an allegation in this action and therefore suffers no cognizable injury for purposes of constitutional standing".) (emphasis in original).

In any event, a key difference between Plaintiffs' claims and those challenging other franchise expansions is that the other expansions are typically scrutinized under a rational basis standard, *e.g., Brown*, 722 F. Supp. at 398, since the plaintiffs do not belong to a protected category. Facial classifications based on citizenship, and also national origin, however, being suspect, receive strict scrutiny.

Classifications based on citizenship status are suspect, with the single exception, not operative here, of when *aliens* are barred from voting or governing. *See Graham v. Richardson*, 403 U.S. 365, 371-72 (1971) ("[T]he Court's decisions have established that classifications based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny."); *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 105 (1973) ("The highly

suspect character of classifications based on race, nationality, or alienage is well established.") (Brennan, J., dissenting); *Nyquist v. Mauclet*, 432 U.S. 1, 7 (1977) ("Alienage classifications by a State that do not withstand this stringent examination cannot stand."); *Juarez v. Nw. Mut. Life Ins. Co*., 69 F. Supp. 3d 364, 372 (S.D.N.Y. 2014) ("[T]he Court has repeatedly applied strict scrutiny to statutes discriminating on the basis of alienage."). Classifications based on national origin also receive strict scrutiny, as do facial classifications based on either citizenship or national origin. *City of Cleburne v. Cleburne Living Ctr*., 473 U.S. 432, 440 (1985) (explaining that facial classifications based on race, alienage, and national origin "are so seldom relevant to the achievement of any legitimate state interest," that they "are subjected to strict scrutiny and will be sustained only if they are suitably tailored to serve a compelling state interest.") (internal citations omitted), *superseded by statute on other grounds*; *Jana-Rock Constr., Inc. v. N.Y. State Dep't of Econ. Dev*., 438 F.3d 195, 204 (2d Cir. 2006) (explaining that facial discrimination occurs "[w]hen the government expressly classifies persons on the basis of race or national origin."). Whether or not all factually discrete expansions of the franchise create an injury-in-fact in original voters, laws that on their face dilute the votes of a protected class certainly do.

Indeed, the facial dilution of American national-origin voters' votes not only treats the American-born differently from non-citizens, it also treats two groups of

citizens—the American-born and the foreign-born—differently. Since the NCVL adds only foreign-born voters, American-born, U.S. citizen DC voters see their share of the vote decrease, while foreign-born, U.S. citizen DC voters experience no decrease. This difference in the weight of different groups of *citizens'* votes introduced by the NCVL surely means, even if nothing else does, that the NCVL on its face dilutes the votes of Plaintiffs based on a protected characteristic—being of American national origin—and thus gives rise to a concrete, particularized injury. To be placed at a disadvantage *vis a vis* other citizens, based on a protected characteristic, is an injury clearly cognizable under the equal protection component of the Due Process Clause of the Fifth Amendment.

As discussed above, the district court's observation that the individual original voters (citizens) and individual new voters (noncitizens) have their votes weighted equally does not mean that standing is lacking. On that logic, as discussed above, if DC passed a law allowing white, and only white, residents of DC suburbs to vote in DC elections, no black DC voters would be injured by this shrinking of their racial group's voting power on the face of this law, even though each black voter's vote would be diluted by the illegal addition of white voters.

Whatever the level of scrutiny, the NCVL cannot pass it. Even if the right to citizen self-government somehow does not exist, the Supreme Court, in the holdings discussed above, at least recognized a compelling governmental *interest* in citizen

self-government, since, for the Court, self-government by citizens is an integral part of the basic theory of democratic self-government. Not only is an interest in giving noncitizen residents a share of governmental power not compelling, it can never outweigh the compelling governmental interest, which the District ignores, in maintaining self-government by citizens, and upholding the popular sovereignty that is the very basis of our constitutional system.

In sum, Plaintiffs allege that the NCVL dilutes their votes based on protected characteristics, and therefore violates their rights to equal protection. If they are correct in these claims, both this dilution and this infringement of their constitutional rights constitute a concrete and particularized injury sufficient for standing.

## III. STANDING AND THE MERITS MAY MERGE IN THIS CASE.

This Court may find that Plaintiffs have suffered a legally cognizable injury by finding that the right to citizen self-government exists, and that Plaintiffs personally suffered an infringement of it. *See, e.g., United States v. Texas*, 599 U.S. 670, 681-82 (2023) (finding that a state's *de facto* injury from the federal executive's failure to arrest persons was not legally cognizable). But if this Court determines that the claimed right exists, and if it also determines that, on the facts alleged by Plaintiffs, their own rights to citizen self-government have been infringed, and thus they have a requisite injury for standing, this Court will have already decided the merits, since the facts alleged by Plaintiffs are undisputed. The standing

determination that Plaintiffs, on undisputed facts, have suffered an abridgement of an existing constitutional right would constitute a merits determination in Plaintiffs' favor.

As with the right to citizen self-government claim, Plaintiffs' standing on their claims of a violation of their rights to equal protection also may merge with the merits. If this Court finds this injury legally cognizable because, on undisputed facts, Plaintiffs' votes have been diluted, based on protected characteristics, on the face of the NCVL—without a compelling justification—the Court will have already found that these claims are meritorious. As with the right to citizen self-government claim, the standing determination would also be a determination of the merits.

## IV.   PLAINTIFF STACIA HALL HAS STANDING TO VINDICATE HER INTEREST IN BEING A CANDIDATE IN AN ELECTION WITH AN ACCURATE VOTE COUNT.

Finally, Plaintiff Stacia Hall, as an office-seeker, has standing to vindicate her interest in an accurate vote count. Since "[a]n inaccurate vote tally is a concrete and particularized injury to candidates," candidates have "a cognizable interest in ensuring that the final vote tally accurately reflects the legally valid votes cast." *Carson v. Simon*, 978 F.3d 1051, 1058 (8th Cir. 2020)); *Trump v. Wis. Elections Comm'n*, 983 F.3d 919, 924 (7th Cir. 2020) ("On the injury prong of standing, the President has alleged concrete and particularized harm stemming from the allegedly unlawful manner by which Wisconsin appointed its electors. As a candidate for

elected office, the President's alleged injury is one that affects him in a personal and individual way.") (citing *Carson*, 978 F.3d at 1058) (other citations, quotation marks, and alterations omitted); *Albence v. Higgin*, 295 A.3d 1065, 1087 (Del. 2022) ("It seems nearly self-evident that a candidate who runs the risk of defeat because of the casting of ballots that are the product of an extra-constitutional statute has standing to challenge that statute.").

The key question in determining whether office-seekers have this kind of standing is simply how likely they are to run for office. For example, in *Carney v. Adams*, the Supreme Court found that the plaintiff did not have standing to challenge qualifications for judicial selections because he did not make a showing that he was "likely to apply to become a judge in the reasonably foreseeable future," and thus was not "able and ready to apply" for a judgeship. *Carney v. Adams*, 592 U.S. 53, 63-66 (2020). The Court found this lack of likelihood in part because "Adams' words 'I would apply . . .' stand alone without any actual past injury, without reference to an anticipated timeframe, without prior judgeship applications, without prior relevant conversations, without efforts to determine likely openings, without other preparations or investigations, and without any other supporting evidence." *Id.* at 63. The Court contrasted this lack of demonstrated likelihood to other cases in which it had found that plaintiffs were likely to apply for a given benefit. *Id.* at 65 (citing *Adarand Constructors v. Pena*, 515 U.S. 200 (1995), *Gratz* v. *Bollinger*, 539 U. S.

244 (2003), *Northeastern Fla. Chapter, Associated Gen. Contractors of America* v. *Jacksonville*, 508 U.S. 656 (1993)).

Hall is a declared candidate for an at-large seat on the DC Board of Education, the election for which is to be held on November 5, 2024. App. 94-95. She was the Republican candidate for DC Mayor in 2022, App. 94, and, at the time the Complaint was filed, intended to run, and was planning to run, either for an at-large seat on the DC Council (as she was then pressed to do by other Republicans) or for an at-large seat on the DC Board of Education, deciding eventually on the latter. App. 95.

In concluding that Hall lacked standing under this theory, the court below relied on the facts that, when the Complaint was filed, Hall was neither an officeholder nor a declared candidate for office. App. 109 n.4. But standing cannot be reserved for officeholders when the clear basis for their standing is simply that they intend to run, and are capable of running, for reelection. Officeholder and non-officeholder candidates both have the same interest in an accurate vote count. Nor is it dispositive whether a plaintiff who intends and is able to run has already declared his or her candidacy; there may be reasons affecting the time of declaring that do not reflect the degree of interest the office-seeker has. Rather, under *Carney*, the operative inquiry is not whether Hall was already an officeholder, or had already declared her candidacy, but whether she had an intention, and a capability, to run

that created a likelihood of her running, and thus gave her a concrete interest in such a vote count.

When the Complaint was filed, Hall clearly had both the intention and the capability of running. She had already been the Republican candidate for DC mayor, and, when the Complaint was filed, was planning to run for another office, merely being undecided about which one. Her previous run establishes her ability to run, and her later declaration of her candidacy shows that her intention was genuine. And both her ability and her intention made her participation as a candidate on Election Day highly likely. Hall, therefore, had a concrete interest in an accurate vote count sufficient for standing.

## CONCLUSION

For the foregoing reasons, this Court should reverse the judgment of the court below.

Dated: August 22, 2024

Respectfully submitted,

/s/ Christopher Hajec
Christopher J. Hajec
IMMIGRATION REFORM LAW INSTITUTE
25 Massachusetts Ave., NW, Suite 335
Washington, DC 20001
(202) 232-5590
chajec@irli.org

*Attorney for Plaintiffs-Appellants*

**CERTIFICATE OF COMPLIANCE**

1.      This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2)(A)(i) because it contains 7,681 words, excluding the parts of the motion exempted by Fed. R. App. 32(f) and Cir. R. 32(e)(1).

2.      This brief also complies with the typeface requirements of Fed. R. App. 32(a)(5) and the typestyle requirements of Fed. R. App. 32(a)(6) because it has been prepared in proportionally spaced typeface using Microsoft Word in fourteen-point Times New Roman.

 /s/ Christopher J. Hajec