Nos. 24-7050, 24-7065

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

Stacia Hall, *et al.*,

Plaintiffs-Appellants, Cross-Appellees

v.

District of Columbia Board of Elections,

Defendant-Appellee, Cross-Appellant

On appeal from an order entered in the
United States District Court for the District of Columbia
No. 1:23-cv-1261
The Hon. Amy Berman Jackson

## JOINT APPENDIX

Christopher J. Hajec
IMMIGRATION REFORM LAW INSTITUTE
25 Massachusetts Ave., NW, Suite 335
Washington, DC 20001
(202) 232-5590
chajec@irli.org

# **TABLE OF CONTENTS**

**Page**

Complaint............................................................................................................1

Defendant's Motion to Dismiss Plaintiffs' Complaint and Memorandum of
Points and Authorities in Support...........................................................................18

Plaintiffs' Memorandum of Points and Authorities in Opposition to Motion
to Dismiss........................................................................................................44

Reply Brief in Further Support of Defendant's Motion to Dismiss Plaintiffs'
Complaint........................................................................................................70

Declaration of Stacia Hall ...............................................................................94

Defendant's Combined Response to Plaintiff's Notice of Supplemental
Authority and Declaration of Stacia Hall ..............................................................97

Order ............................................................................................................100

Memorandum Opinion .........................................................................................101

eFiled
03/14/2023 3:47:05 PM
Superior Court
of the District of Columbia

## IN THE DISTRICT OF COLUMBIA SUPERIOR COURT

| | |
|---|---|
| STACIA HALL<br>3726 Connecticut Ave., NW<br>Apt. 109<br>Washington, DC 20008,<br><br>RALPH CHITTAMS<br>2936 M St., SE<br>Washington, DC 20019,<br><br>SUZZANNE KELLER<br>2331 Chester St., SE<br>Washington, DC 20020,<br><br>KEN MCCLENTON<br>1307 44th Pl., SE<br>Washington, DC 20019,<br><br>KIMBERLY EPPS<br>116 T St., NE<br>Apt. 344<br>Washington, DC 20002,<br><br>DICK A. HELLER<br>263 Kentucky Ave., SE<br>Washington, DC 20003,<br><br>NICOLLE S. A. LYON<br>5900 3rd St., NE<br>Washington, DC 20011.<br><br>       *Plaintiffs*<br>v.<br><br>DISTRICT OF COLUMBIA BOARD OF<br>ELECTIONS<br>1015 Half St., SE<br>Suite 750<br>Washington, DC 20003<br><br>       *Defendant*. | Civil Action No. <u>2023</u>-CAB-001544 |

App.1

**COMPLAINT**

The above-named Plaintiffs, STACIA HALL, RALPH CHITTAMS, SUZZANNE KELLER, KEN MCCLENTON, KIMBERLY EPPS, DICK A. HELLER, and NICOLLE S. A. LYON (collectively, "Plaintiffs"), by and through the undersigned counsel, bring this action against the District of Columbia Board of Elections ("Defendant"), and allege as follows:

**NATURE OF ACTION**

1.   It follows from our national independence that United States citizens have a right to govern, and be governed by, themselves. The constitutional right to citizen self-government, moreover, has been recognized in repeated holdings of the Supreme Court of the United States. The fundamental right of citizens to vote has also been recognized, and protected against infringement, in multiple precedents of the Supreme Court.

2.   Noncitizens do not have a fundamental right to vote in the United States. Nor does any noncitizen have a constitutional right to govern the United States.

3.   In 2022, the D.C. Council passed D.C. Act 24-620, entitled the "Local Resident Voting Rights Amendment Act of 2022" (hereinafter the "D.C. Noncitizen Voting Act"). The D.C. Noncitizen Voting Act eliminates the prior citizenship requirement for voting in municipal elections, thus allowing noncitizens residing in D.C. to vote in those elections.

4.   In combination with other laws, the D.C. Noncitizen Voting Act also permits noncitizen D.C. residents to be elected Mayor and to the D.C. Council, and to serve on the District of Columbia Board of Elections.

5.   By necessary operation, the D.C. Noncitizen Voting Act dilutes the vote of every U.S. citizen voter in the District. Because it does so, the D.C. Noncitizen Voting Act is subject to review

App.2

under both the equal protection and the substantive due process components of the Due Process Clause of the Fifth Amendment to the U.S. Constitution.

6. Whatever governmental interest may be asserted to justify this law in such a review, that interest cannot stand against the right of American citizens to self-government, a right that the D.C. Noncitizen Voting Act infringes by its necessary operation.

7. In addition, because it dilutes the votes of all U.S. citizen voters in D.C., and also because it allows noncitizens to hold public office in D.C., the D.C. Noncitizen Voting Act violates the constitutional right of citizens to govern, and be governed by, themselves, and should be struck down on that basis.

8. Plaintiffs accordingly bring this action against Defendant, the District of Columbia Board of Elections, under the Constitution, including the Due Process Clause of the Fifth Amendment. Plaintiffs request that this Court enjoin Defendant from implementing and enforcing the D.C. Noncitizen Voting Act.

## JURISDICTION AND VENUE

9. This Court has jurisdiction under § 11-921(a)(6) of the District of Columbia Official Code.

10. This Court has the power to issue permanent or preliminary injunctions. *Ifill v. District of Columbia*, 665 A.2d 185, 187-88 (D.C. 1995); D.C. Super. Ct. R. Civ. P. 65.

11. This Court is authorized to grant declaratory relief under Rule 57 of the District of Columbia Superior Court Rules of Civil Procedure.

12. Venue is proper in the District of Columbia because Defendant, as an agency of the government, operates in the District of Columbia, because Plaintiffs all live in the District of Columbia, and because the events giving rise to this Complaint took place in the District of Columbia.

App.3

## PARTIES

13. Plaintiff Stacia Hall is a U.S. citizen and resident of the District of Columbia. Ms. Hall is a registered voter in the District of Columbia. In 2022, Ms. Hall was the Republican candidate for Mayor of the District of Columbia.

14. Plaintiff Ralph Chittams is a U.S. citizen and resident of the District of Columbia. Mr. Chittams is a registered voter in the District of Columbia. In 2018, Mr. Chittams was the Republican candidate for an at-large seat on the District of Columbia Council.

15. Plaintiff Suzzanne Keller is a U.S. citizen and resident of the District of Columbia. Ms. Keller is a registered voter in the District of Columbia.

16. Plaintiff Ken McClenton is a U.S. citizen and resident of the District of Columbia. Mr. McClenton is a registered voter in the District of Columbia.

17. Plaintiff Kimberly Epps is a U.S. citizen and resident of the District of Columbia. Ms. Epps is a registered voter in the District of Columbia.

18. Plaintiff Richard Heller is a U.S. citizen and resident of the District of Columbia. Mr. Heller is a registered voter in the District of Columbia.

19. Plaintiff Nicolle S. A. Lyon is a U.S. citizen and resident of the District of Columbia. Ms. Lyon is a registered voter in the District of Columbia.

20. Defendant, the District of Columbia Board of Elections, is responsible for administering elections in the District of Columbia.

## BACKGROUND

21. The U.S. Constitution provides for a national capital city over which Congress has ultimate legislative authority. U.S. Const. art. I, § 8, cl. 17.[1]

---

[1] "To exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become

App.4

22. In 1955, Congress enacted the D.C. Election Act "to regulate the election of delegates representing the District of Columbia in national political conventions." (hereinafter, the "D.C. Election Act") Pub. L. 84-376; 69 Stat. 699; title I, ch. 11, D.C. Code, 1951 ed. The D.C. Election Act defined a "qualified elector" in D.C. elections as "a citizen of the United States," *id*. Sec. 2(2), and provided that "no person shall vote in any election in the District unless he is a qualified elector[.]" *Id*. Sec. 7(a).

23. Congress amended the D.C. Election Act in 1961, rewriting the qualification requirement: "A person shall be entitled to vote in an election in the District of Columbia only if he is a qualified elector[.]" Pub. L. 87-389; 75 Stat. 817. The amendment did not change the definition of qualified elector, thereby preserving the citizenship requirement.

24. In 1973, Congress passed the District of Columbia Home Rule Act (hereinafter "D.C. Home Rule Act" or "Home Rule Act"). Pub. L. 93-198; 87 Stat. 774; D.C. Official Code § 1-201.01 *et seq* (1974).

25. The Home Rule Act provides:

> Subject to the retention by Congress of the ultimate legislative authority over the nation's capital granted by article I, § 8, of the Constitution, the intent of Congress is to delegate certain legislative powers to the government of the District of Columbia; authorize the election of certain local officials by the registered qualified electors in the District of Columbia; grant to the inhabitants of the District of Columbia the powers of local self-government; modernize, reorganize, and otherwise improve the governmental structure of the District of Columbia; and, to the greatest extent possible, consistent with the constitutional mandate, relieve Congress of the burden of legislating upon essentially local District matters.

---

the Seat of the Government of the United States, and to exercise like Authority over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful buildings."

App.5

D.C. Home Rule Act Sec. 102, D.C. Official Code § 1-201.02(a). Nothing in the Home Rule Act changed the definition of "qualified elector."

26. The D.C. Home Rule Act, however, did amend the D.C. Election Law, providing: "[n]otwithstanding any other provision of this Act or of any other law, the Council shall have authority to enact any act or resolution with respect to matters involving or relating to elections in the District." D.C. Home Rule Act Sec. 752, D.C. Official Code § 1-207.52.

27. On October 18, 2022, the D.C. Council passed the D.C. Noncitizen Voting Act (available online at https://lims.dccouncil.gov/Legislation/B24-0300). The D.C. Noncitizen Voting Act made amendments to the D.C. Election Law that enable noncitizens to vote in local elections and run for local office.

28. The D.C. Noncitizen Voting Act was transmitted to Mayor Bowser for signature on November 4, 2022, and was subsequently enacted, without her signature, on November 21, 2022.

29. The D.C. Home Rule Act requires that legislation passed by the Council be reviewed by Congress. D.C. Home Rule Act Sec. 602, D.C. Official Code § 1-206.02(10)(c). According to the Council's Legislative Information Management System ("LIMS"), the D.C. Noncitizen Voting Act was transmitted to Congress on January 10, 2023. *See* District of Columbia Legislative Information Management System,  https://lims.dccouncil.gov/Legislation/B24-0300.

30. The House of Representatives passed a resolution disapproving of the D.C. Noncitizen Voting Act on February 9, 2023. *See* H.J. Res. 24, https://www.congress.gov/bill/118th-congress/house-joint-resolution/24/actions?s=3&r=3. The Senate failed to pass a resolution of disapproval within the time prescribed by the D.C. Home Rule Act.

31. LIMS reflects that the D.C. Noncitizen Voting Act went into effect on February 23, 2023. *See* https://lims.dccouncil.gov/Legislation/B24-0300.

App.6

32. The D.C. Noncitizen Voting Act amended the definition of "qualified elector":

> [A] person who (A) [i]s at least 17 years of age and who will be 18 years of age on or before the next general election; (B) [i]s a citizen of the United States; *except, that this subparagraph shall not apply in a local election*; (C) [h]as maintained residence in the District for at least 30 days preceding the next election and does not claim voting residence or right to vote in *any state, territory, or country*; and (D) [r]epealed; (E) [h]as not been found by a court of law to be legally incompetent to vote.

D.C. Official Code § 1-1001.02(2) (emphasis added to reflect changes made by the D.C. Noncitizen Voting Act).

33. The D.C. Noncitizen Voting Act was intended to include illegal immigrants. The Committee Report reflects that, when first introduced, only lawful permanent residents were considered in the new definition of qualified elector. Council of the District of Columbia, Committee on the Judiciary and Public Safety, Committee Report on B24-300, the "Local Resident Voting Rights Amendment Act of 2021," at 3, (Sep. 28, 2022), chrome-extension://efaidnbmnnnibpcajpcglclefindmkaj/https://lims.dccouncil.gov/downloads/LIMS/473 74/Committee_Report/B24-0300-Committee_Report1.pdf. The committee removed "arbitrary immigration statuses" from consideration in voter eligibility. *Id.*

34. A primary motive for removing "arbitrary immigration statuses" (that is, those found in federal immigration law) from consideration, and for allowing noncitizens to vote, was to aid those whom Council members called "immigrants"—meaning, generally, persons of foreign birth living in this country, irrespective of such statuses—as a class, by giving many more of them the power of the ballot box. Council of the District of Columbia, Committee on the Judiciary and Public Safety, Committee Mark-Up of B24-300, the "Local Resident Voting Rights Amendment Act of 2021," Statement of Council Member Allen, at 15:40, (Sep. 27, 2022), http://video.oct.dc.gov/VOD/DCC/2022_09    /09_27_22_Judici.html ("Immigrants, whether

7

naturalized citizens, legal permanent residents, asylum seekers, DACA recipients, undocumented residents, or otherwise are valued members of our community. They are us. . . . Immigrants care deeply about issues affecting their communities and families like gun control, climate change, healthcare, affordable housing, quality schools, access to healthy food—issues that affect all residents and are directly influenced by our local government. Our noncitizen neighbors, many of whom have lived, worked, and raised a family in the District for decades deserve the opportunity to have a stake in their government and determine their own leaders just as we all do."); *id*. at 18:40 ("The Committee Print is a strong statement in support of the fundamental principle that all people should have a say in the government that makes decisions affecting their lives. It's in line with the District's commitment to making our local government more accessible to those who aren't traditionally represented rather than restricting it to those who already hold power."); Council of the District of Columbia, Committee on the Judiciary and Public Safety, Public Hearing on B24-300, the "Local Resident Voting Rights Amendment Act of 2021, at 7:25 (July 7, 2022) Statement of Council Member Nadeau, http://video.oct.dc.gov/VOD/DCC/2022_07/07_07_22 Judici.html ("Every day elected officials are making decisions about affordable housing, education, human services and more. People who've made their permanent homes in the District should have a hand in who represents them in government. The District has long been a place that has welcomed immigrants into our community and it's time to allow for their full participation in our institutions."); *id.* at 10:40, Statement of Council Member Lewis-George ("Voting and civic engagement is part of how we demonstrate our investment in advancing our city's collective interest and so we have a unique opportunity with this bill to engage our immigrant neighbors as valued voting members of our city."). This intentional expansion of the voting power of foreign-

App.8

born persons automatically decreases the voting power of D.C. residents, including all Plaintiffs, who were born in the United States.

35. The D.C. Noncitizen Voting Act added the term "local election" to the defined terms, providing:

> The term 'local election' means (A) an election for (i) Mayor; (ii) Chairman or member of the Council; (iii) Attorney General; (iv) Member of the State Board of Education; or (v) Advisory Neighborhood Commissioner; or (B) [a]n initiative, referendum, recall, or charter amendment measure on a District ballot.

D.C. Official Code § 1-1001.02(34).

36. The D.C. Election Law contains three other definitional terms related to voter eligibility and the eligibility to hold public office. It defines "duly registered voter" as "a registered voter who resides at the address listed on the Board's records." D.C. Official Code § 1-1001.02(19). It defines "registered qualified elector" as "a registered voter who resides at the address listed on the Board's records." D.C. Official Code § 1-1001.02(20). Finally, it defines "qualified registered elector" as "a registered voter who resides at the address listed on the Board's records." D.C. Official Code § 1-1001.02(21). A noncitizen voter fits all of these definitions.

37. The D.C. Council was established by the Home Rule Act. D.C. Home Rule Act Sec. 401, D.C. Official Code § 1-204.01(a). Members of the Council are "elected by the registered qualified electors of the District." *Id*. Among the required qualifications for a resident wishing to serve on the Council is that the person "[i]s a qualified elector." D.C. Official Code § 1-204.02. Because citizenship is not specifically enumerated as a qualification, a noncitizen is now a "qualified elector" for purposes of local elections, which include elections for D.C. Council, and therefore is eligible to serve on the Council.

App.9

38. The Office of the Mayor was established by the Home Rule Act. D.C. Home Rule Act Sec. 421, D.C. Official Code § 1-204.21(a). "[T]he Mayor shall be elected by the registered qualified electors of the District." *Id*. Among the required qualifications for a resident wishing to serve as Mayor, is that the person "[i]s a qualified elector." D.C. Official Code § 1-204.21(c)(1). Because citizenship is not specifically enumerated as a qualification for office, a noncitizen is now a "qualified elector" for purposes of local elections, which includes elections for Mayor, and therefore is eligible to serve as Mayor.

39. The D.C. Board of Elections was established by the Home Rule Act. D.C. Home Rule Act Sec. 491, D.C. Official Code § 1-1001.03(a). Board members are required to be "duly registered voter[s]." D.C. Official Code § 1-1001.04(a)(1). Because citizenship is not specifically enumerated as a qualification for office, a noncitizen is now a "duly registered voter" and is eligible to serve on the Board of Elections.

40. The D.C. Board of Elections is responsible for the implementation and enforcement of the D.C. Noncitizen Voting Act. Under D.C. law, the Board of Elections is required, among other things, "accurately [to] maintain . . . the official voter registration list for all elections in the District;" "actively locate, identify, and register qualified voters; conduct elections; provide for recording and counting votes;" "[p]ublish. . . the total number of qualified electors registered to vote;" "[o]perate polling places;" and "[c]ertify nominees and the results of elections[.]" D.C. Official Code §1-1001.05(a)(Perm.). The Board of Elections will be responsible for registering noncitizen voters and ensuring that they are not registered to vote in another city, state, or country.

41. Certain rights of U.S. citizens are considered fundamental despite not being explicitly enumerated in the Constitution. *See Ex parte Yarbrough*, 110 U.S. 651, 658 (1884) (explaining "the doctrine universally applied to all instruments of writing, that what is implied is as much a

App.10

part of the instrument as what is expressed. This principle, in its application to the Constitution of the United States, more than to almost any other writing, is a necessity, by reason of the inherent inability to put into words all derivative powers[.]").

42. Accordingly, "[t]he Due Process Clause guarantees more than fair process, and the 'liberty' it protects includes more than absence of physical restraint. The Clause also provides heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 719-20 (1997) (citations omitted).

43. This substantive due process "specially protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Id*. (internal citations omitted).

44. Also required is "a careful description of the asserted fundamental liberty interest." *Id*. Such description can be found in "[o]ur Nation's history, legal traditions, and practices [which] provide[] the crucial guideposts for responsible decisionmaking, that direct and restrain our exposition of the Due Process Clause." *Id*. (internal citations omitted).

45. The right to vote has long been recognized among these fundamental liberty interests. As explained by the Supreme Court in *Reynolds v. Sims*, "[u]ndeniably the Constitution of the United States protects the right of all qualified citizens to vote, in state as well as in federal elections. A consistent line of decisions by this Court in cases involving attempts to deny or restrict the right of suffrage as made this indelibly clear. It has been repeatedly recognized that all qualified voters have a constitutionally protected right to vote, and to have their votes counted." *Reynolds v. Sims*, 377 U.S. 533, 554 (1964).

46. Infringement on the right to vote can be through "a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Id*. at 555.

47. Claims of vote dilution caused by expansions of the franchise, such as those made by residents of a city challenging the expansion of the franchise to nonresident property owners, have been analyzed under the Equal Protection Clause of the Fourteenth Amendment, on the ground that they discriminate against an identifiable group by harming that group while benefitting another. *See, e.g., Brown v. Bd. of Comm'rs*, 722 F. Supp.380, 398 (E.D. Tenn. 1989) (striking down an expansion of the franchise to nonresidents of a city under the Equal Protection Clause).

48. While the Fourteenth Amendment is only applicable to the states, U.S. citizens living in the District of Columbia are still entitled to the equal protection of the laws under the Fifth Amendment Due Process Clause, which provides: "No person shall . . . be deprived of life, liberty, or property, without due process of law[.]" U.S. Const. amend. V.

49. "In *Bolling v. Sharpe*, 347 U.S. 497 (1954), the Court began in earnest to fold an 'equal protection' guarantee into the concept of 'due process.'" *United States v. Vaello-Madero*, 142 S. Ct. 1539, 1544 (2022) (Thomas, J., concurring). *See also Washington v. Davis*, 426 U.S. 229, 239 (1976) ("It is also true that the Due Process Clause of the Fifth Amendment contains an equal protection component prohibiting the United States from invidiously discriminating between individuals or groups.") (citation omitted); *Adams v. Clinton*, 90 F. Supp. 2d 35, 100 (D.D.C. 2000), *aff'd per curiam*, 531 U.S. 941 (2000) ("The Supreme Court has held that the principles embodied in this clause apply equally to the federal government, for the benefit of persons residing in the District of Columbia, by virtue of the due process clause of the Fifth Amendment.").

App.12

50. Accordingly, equal protection analysis under the Fifth Amendment mirrors that applied to the states under the Fourteenth Amendment. *See, e.g., Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n.2 (1975) (explaining that "this Court's approach to Fifth Amendment equal protection claims has always been precisely the same as to equal protection claims under the Fourteenth Amendment."); *Buckley v. Valeo*, 424 U.S. 1, 93 (1976) ("Equal protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment").

51. Discrimination based on national origin is also prohibited under the Due Process Clause of the Fifth Amendment. *Hirabayashi v. United States*, 320 U.S. 81, 100 (1943) ("Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality."). When there is conflict between the rights of U.S. citizens and the rights of the government, "the rights of a citizen may not be subordinated merely because of his father's country of origin." *Oyama v. California*, 332 U.S. 633, 647 (1948). Intentionally, and on its face, the D.C. Noncitizen Voting Act dilutes the votes of U.S.-born residents by allowing noncitizens (none or virtually none of whom were born in the United States) to vote in the District of Columbia.

52. Because the D.C. Noncitizen Voting Act is facially discriminatory against identifiable classes, no inquiry into its legislative purpose is needed. *Azam v. D.C. Taxicab Comm'n*, 43 F. Supp. 3d 38, 49 (D.D.C. 2014) ("Where the government's action or policy is facially neutral, a plaintiff must plead and prove that the defendant acted with discriminatory purpose.").

53. The Supreme Court has repeatedly recognized the constitutional right of citizen self-government. "The exclusion of noncitizens from basic governmental processes is not a deficiency in the democratic system but a *necessary consequence* of the community's process of political self-definition." *Cabell v. Chavez-Salido*, 454 U.S. 432, 439-440 (1982) (emphasis added).

App.13

American citizens comprise the body politic of the United States. *See id.* ("Self-government, whether direct or through representatives, begins by defining the scope of the community of the governed and thus of the governors as well: Noncitizens are by definition outside of this community."); *Foley v. Connelie*, 435 U.S. 291, 295-96 (1978) ("The act of becoming a citizen is more than a ritual with no content beyond the fanfare of ceremony. A new citizen has become a member of a Nation, part of a people distinct from others. The individual, at that point, belongs to the polity and is entitled to participate in the processes of democratic decisionmaking. Accordingly, we have recognized a State's historical power to exclude noncitizens from participation in its democratic political institutions as part of the sovereign's *obligation* to preserve the basic conception of a political community.") (internal citation omitted) (emphasis added); *id.* at 296 ("[A] democratic society is ruled by its people. Thus, it is clear that a State may deny noncitizens the right to vote, or to run for elective office, for these lie at the heart of our political institutions."); *id.* (holding that such restrictions represent[] the choice, and *right*, of the people to be governed by their citizen peers.") (emphasis added); *id.* at 297 ("[A]lthough we extend to noncitizens the right to education and public welfare, along with the ability to earn a livelihood and engage in licensed professions, the right to govern is reserved to citizens.").

54. In review under the Fifth Amendment, no interest that may be asserted to justify the D.C. Noncitizen Voting Act can stand against the compelling governmental interest, recognized in these holdings, that U.S. citizens have in governing themselves.

## CAUSES OF ACTION

### I.      Violation of Substantive Due Process.

55. Plaintiffs re-allege and incorporate by reference the allegations set forth in all prior paragraphs of this Complaint.

App.14

56. Substantive due process under the Fifth Amendment to the Constitution prohibits the government from infringing on the fundamental rights of U.S. citizens.

57. Diluting the votes of U.S. citizens by enfranchising noncitizens infringes on Plaintiffs' fundamental right to vote.

58. Plaintiffs suffer a constitutional injury because of the direct and proximate actions of Defendant.

## II.   Violation of the Equal Protection Component of the Fifth Amendment's Due Process Clause—Citizenship.

59. Plaintiffs re-allege and incorporate by reference the allegations set forth in all prior paragraphs of this Complaint.

60. The equal protection component of the Fifth Amendment's Due Process Clause prohibits the government from discriminating based on citizenship.

61. By enfranchising noncitizens in D.C. elections, and thus necessarily diluting the votes of U.S. citizens living in D.C., the D.C. Noncitizen Voting Act, on its face, unlawfully discriminates against U.S. citizens living in D.C., such as Plaintiffs, based on their citizenship.

62. Plaintiffs suffer a constitutional injury because of the direct and proximate actions of Defendants.

## III.   Violation of the Equal Protection Component of the Fifth Amendment's Due Process Clause—National Origin.

63. Plaintiffs re-allege and incorporate by reference the allegations set forth in all prior paragraphs of this Complaint.

64. The equal protection component of the Fifth Amendment's Due Process Clause prohibits the government from discriminating based on national origin.

App.15

65. By enfranchising noncitizens in D.C. elections, the D.C. Noncitizen Voting Act, both intentionally and on its face, dilutes the votes of native-born U.S. citizens living in D.C., and thus unlawfully discriminates against native-born U.S. citizens living in D.C., such as Plaintiffs, based on their national origin.

66. Plaintiffs suffer a constitutional injury because of the direct and proximate actions of Defendants.

**IV.      Violation of the Right to Citizen Self-Government.**

67. Plaintiffs re-allege and incorporate by reference the allegations set forth in all prior paragraphs of this Complaint.

68. Each and every American citizen, including Plaintiffs, has a constitutional "right . . . to be governed by [his or her] citizen peers." *Foley*, 435 U.S. at 296.

69. By enfranchising noncitizens, and also by allowing noncitizens to hold public office, the D.C. Noncitizen Voting Law allows noncitizens to govern citizens in D.C., and thus violates Plaintiffs' constitutional right to citizen self-government.

70. Plaintiffs suffer a constitutional injury because of the direct and proximate actions of Defendants.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request:

1. A declaratory judgment that the D.C. Noncitizen Voting Act violates Plaintiffs' rights under the Fifth Amendment to the U.S. Constitution and their constitutional right to citizen self-government;

App.16

2.  A preliminary and permanent injunction prohibiting Defendant from spending funds to implement the D.C. Noncitizen Voting Act, from registering noncitizens to vote, and from counting votes cast by noncitizens;

3.  A judgment awarding reasonable attorneys' fees, costs, disbursements, and other allowances of this proceeding; and

4.  A judgment awarding Plaintiffs any other relief that this Court deems just, proper, and equitable.


Dated: March 14, 2023                    Respectfully submitted,

                                          /s/ Christopher J. Hajec

                                         Christopher J. Hajec, D.C. Bar No. 492551
                                         Gina M. D'Andrea, D.C. Bar No. 1673459
                                         Immigration Reform Law Institute
                                         25 Massachusetts Ave NW, Suite 335
                                         Washington, DC 20001
                                         202.232.5590
                                         202.464.3590
                                         chajec@irli.org
                                         gdandrea@irli.org

App.17

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **STACIA HALL**, *et al.*, | |
| **Plaintiffs,** | |
| **v.** | **No. 1:23-cv-01261-ABJ** |
| **DISTRICT OF COLUMBIA BOARD OF ELECTIONS,** | |
| **Defendant.** | |

## <u>DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT</u>

The District of Columbia (District) on behalf of Defendant District of Columbia Board of

Elections moves this Court under Federal Rules of Civil Procedure 12(b)(1) and (6) to dismiss

Plaintiffs' Complaint [1-1] for lack of jurisdiction or failure to state a claim.  A memorandum of

points and authorities and proposed order are attached.  Because this Motion is dispositive, the

District has not sought Plaintiffs' consent.  *See* LCvR 7(m).

Date: June 7, 2023.                    Respectfully submitted,

                                       BRIAN L. SCHWALB
                                       Attorney General for the District of Columbia

                                       STEPHANIE E. LITOS
                                       Deputy Attorney General
                                       Civil Litigation Division

                                       */s/ Matthew R. Blecher*
                                       MATTHEW R. BLECHER [1012957]
                                       Chief, Civil Litigation Division, Equity Section

                                       */s/ Adam J. Tuetken*
                                       ADAM J. TUETKEN [242215]
                                       PAMELA A. DISNEY [1601225]
                                       Assistant Attorneys General
                                       Civil Litigation Division

400 6th Street, NW
Washington, D.C. 20001
Phone: (202) 735-7474
Email: adam.tuetken@dc.gov

*Counsel for Defendant*

2

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **STACIA HALL,** *et al.*, | |
| **Plaintiffs,** | |
| **v.** | No. 1:23-cv-01261-ABJ |
| **DISTRICT OF COLUMBIA BOARD OF ELECTIONS,** | |
| **Defendant.** | |

<u>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S
MOTION TO DISMISS PLAINTIFFS' COMPLAINT**</u>

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 2

LEGAL STANDARDS ....................................................................................... 3

ARGUMENT ...................................................................................................... 4

    I.     Plaintiffs Lack Standing............................................................................ 4

    II.    The Complaint Fails to State a Claim. ..................................................... 7

          A.    All Claims Fail Because Non-Citizen Voting Has Long Been
               Accepted as Constitutional. ......................................................... 8

          B.    The Substantive Due Process Claim Fails. ............................... 12

               1.    Plaintiffs Have Not Invoked a Carefully Defined
                     Fundamental Right.......................................................... 13

               2.    The Act Withstands Any Form of Scrutiny. ................. 15

          C.    The Equal Protection Claims Fail. ............................................ 17

                1.    The Act Is Facially Neutral........................................... 17

               2.    Plaintiffs Have Not Plausibly Alleged Facts Suggesting
                     That the Act Has a Discriminatory Purpose. ................ 18

          D.    The "Right to Citizen Self-Government" Claim Fails............................ 20

CONCLUSION.................................................................................................... 22

## INTRODUCTION

Since the dawn of the Republic, federal, state, and local governments have extended the franchise to otherwise qualified residents—not just citizens.  Like many jurisdictions before it, the District recently amended its election laws so all qualified residents, regardless of citizenship, may vote in elections for District offices and measures.  Casting aside the historical pedigree of this legislation, Plaintiffs (U.S. citizens) attack the constitutionality of the District's extension of the franchise under a smattering of ahistorical and unsound theories.  In doing so, Plaintiffs urge this Court to strip the right to vote from tens of thousands of qualified Washingtonians.

The Court should reject Plaintiffs' challenge.  At the threshold, Plaintiffs lack standing because their only alleged injury—that the votes of citizens will be "diluted" by expanding the electorate—is a classic generalized grievance and, in any event, not the type of vote dilution courts recognize as sufficient for standing.  On the merits, all claims fail—as a matter of constitutional history and constitutional law.  For starters, the long history of unquestioned enfranchisement of non-citizens makes it highly doubtful that the practice is somehow now unconstitutional, and governing precedent only reinforces the point.  Plaintiffs' vote dilution theory is not the stuff of substantive due process as it does not rest on a carefully defined "fundamental right," and Plaintiffs have alleged no facts suggesting that non-citizen voting fails rational basis review.  Plaintiffs' equal protection claims fare no better because the District's facially neutral election laws do not discriminate against anyone, and nothing in Plaintiffs' Complaint suggests that the legislature acted with discriminatory intent.  Finally, Plaintiffs' "right to citizen self-government" claim lacks merit for myriad reasons, not the least of which is that no such judicially enforceable right exists.  Thus, the Court should dismiss the Complaint for lack of standing or failure to state a claim.

## BACKGROUND

District law prescribes qualifications to vote.  D.C. Code §§ 1-1001.07(a), 1-1001.02(2).

Those qualifications had included, as relevant here, that the voter was a U.S. citizen, had resided

in the District prior to the election, and did not claim voting residence or the right to vote in any

state or territory.  *Id.* § 1-1001.02(2)(B), (C) (2022).  Recently, the Council of the District of

Columbia (Council) unanimously passed (save one absent vote) the Local Resident Voting

Rights Amendment Act of 2022 (the Act), D.C. Law 24-242, 69 D.C. Reg. 14,601 (Dec. 2,

2022), which amends these voter qualifications.  Namely, the Act removes a citizenship

requirement for "local election[s]," *i.e.*, elections for District government positions (like the

Mayor) as well as initiatives, referenda, recalls, or charter amendment measures.  *Id.* § 2

(codified at D.C. Code § 1-1001.02(2)(B), (34)).  The Act further provides that District voters

may not claim voting residence or the right to vote in another country.  *Id.* (codified at D.C. Code

§ 1-1001.02(2)(C)).  In sum, District law now allows all residents to vote in local elections, if

they meet other existing requirements.

In passing the Act, the Council explained that its purpose was "to expand voting rights in

local elections."  Council of the Dist. of Columbia, Comm. on the Jud. & Pub. Safety, *Report on

B24-0300, the "Local Resident Voting Rights Amendment Act of 2022"* 2 (Sept. 27, 2022)

(Comm. Rep.).  The Council found that "[n]on-citizen residents are neighbors, friends,

colleagues, classmates, business owners, and District taxpayers, and they are impacted by local

laws just as much as citizen residents are."  *Id.* at 3.  Accordingly, the Council concluded that

"[n]on-citizens, like citizens, deserve the opportunity to have a voice in the issues that affect

them and to participate in electing the representatives who make decisions on their behalf."  *Id.*

The Council also considered whether the District's Board of Elections (Board) could

effectively administer the Act.  *Id.* at 8–9; *see* D.C. Code § 1-1001.05 (delegating responsibility

App.23

for administering elections to the Board).  In particular, the Council considered whether only legal permanent residents should be allowed to vote.  Comm. Rep. 7.  The Council decided, however, to extend the right to vote to all non-citizens, regardless of specific immigration status. *Id.*  The Council reasoned that doing so was "easier to administer" for the Board because the Board would not need to verify complex or changing immigration statuses.  *Id.* at 8.  Further, the Council explained that extending the vote to all non-citizens prevented the Council "from having to distinguish between 'worthy' and 'unworthy' noncitizens based on immigration status, an arbitrary category as it relates to participation and investment in the community."  *Id.*

All said, the Council heard from more than 50 members of the public when considering the bill.  *Id.*, Attach. C.  But Plaintiffs were not among them.  *Id.*  Plaintiffs are seven U.S. citizens who reside and are registered to vote in the District, two of which were one-time, unsuccessful candidates for District office.  Compl. ¶¶ 13–19.  Instead of participating in the democratic process, Plaintiffs sued the Board to challenge the Act in the Superior Court of the District of Columbia.  *Id.* ¶¶ 1–8.

Plaintiffs allege that the Act violates (1) the substantive due process guarantee of the Fifth Amendment, (2) the equal protection guarantee of the Fifth Amendment by discriminating based on citizenship, (3) the equal protection guarantee of the Fifth Amendment by discriminating based on national origin, and (4) the right of citizens to self-government of an unspecified constitutional provision.  Compl. ¶¶ 55–70.  Plaintiffs seek declaratory and injunctive relief.  *Id.*, Prayer.  The District removed to this Court.  Notice of Removal [1].

## LEGAL STANDARDS

A complaint must be dismissed for "lack of subject-matter jurisdiction."  Fed. R. Civ. P. 12(b)(1), (h)(3).  To survive a Rule 12(b)(1) motion, the plaintiff bears the burden of establishing jurisdiction.  *Bronner on Behalf of Am. Stud. Ass'n v. Duggan*, 962 F.3d 596, 602 (D.C. Cir.

App.24

2020).  Generally, the Court accepts "well-pled factual allegations" while "disregard[ing] any legal conclusions, legal contentions couched as factual allegations, and unsupported factual allegations." *Gulf Coast Mar. Supply, Inc. v. United States*, 867 F.3d 123, 128 (D.C. Cir. 2017). If, however, the defendant disputes the complaint's factual allegations, "the court must go beyond the pleadings and resolve any disputed issues of fact the resolution of which is necessary to a ruling upon the motion to dismiss." *Feldman v. FDIC*, 879 F.3d 347, 351 (D.C. Cir. 2018) (internal quotation marks omitted) (quoting *Phoenix Consulting v. Republic of Angola*, 216 F.3d 36, 40 (D.C. Cir. 2000)).

A complaint also must be dismissed for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  To survive a Rule 12(b)(6) motion, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Courts need not accept as true conclusory "assertions devoid of further factual enhancement," *Iqbal*, 556 U.S. at 679, or "legal conclusions," *Pueschel v. Chao*, 955 F.3d 163, 166 (D.C. Cir. 2020).

## ARGUMENT

### I.  <u>Plaintiffs Lack Standing.</u>

Plaintiffs fail at the threshold to establish standing.  *See Gill v. Whitford*, 138 S. Ct. 1916, 1923 (2018) ("[A] plaintiff seeking relief in federal court must first demonstrate that he has standing to do so . . . .").  "A plaintiff has standing only if he can 'allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.'"  *California v. Texas*, 141 S. Ct. 2104, 2113 (2021) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006)).  Plaintiffs here allege only one theory of standing: by allowing non-citizen residents to vote in future District elections, the Act dilutes the voting

power of citizen-residents like Plaintiffs.  Compl. ¶¶ 34, 46–47, 51.  That theory is defective for several reasons.

Most obviously, the Complaint lacks basic allegations required for standing to seek prospective relief, as it does not have "any allegation or showing as to, at a bare minimum, whether any of the plaintiffs intend to vote" in a future election.  *Yazzie v. Hobbs*, 977 F.3d 964, 967 (9th Cir. 2020) (per curiam).  Nor does the Complaint have any allegation that any plaintiff intends to run for District office in a future election.  *See Carney v. Adams*, 141 S. Ct. 493, 500 (2020) (holding that plaintiff lacked standing to challenge judicial selection system when he did not show that he intended to apply).  Plaintiffs cannot challenge an electoral system when their Complaint does not even allege that they intend to participate in elections.

But even were that fatal deficiency cured, Plaintiffs would still lack standing as they have not alleged "a personal stake in the outcome [of this case], distinct from a generally available grievance about government."  *Gill*, 138 S. Ct. at 1923 (internal quotation marks and citations omitted).  Plaintiffs must allege a harm that is "concrete and particularized" to *them*, not "harm to [their] and every citizen's interest in proper application of the Constitution and laws."  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560, 573 (1992).  Every citizen-voter in the District has the same interest as Plaintiffs, and all could press the same theory.  As a result, Plaintiffs' allegations are "precisely the kind of undifferentiated, generalized grievance" that fails to establish standing.  *Lance v. Coffman*, 549 U.S. 437, 442 (2007) (per curiam).

Cases surrounding the 2020 election are illustrative.  In those cases, plaintiff voters and candidates from across the map challenged changes in election laws allowing for more mail-in ballots to be counted.  *E.g.*, *Wood v. Raffensperger*, 981 F.3d 1307, 1311–12 (11th Cir. 2020); *Bognet v. Sec'y Commonwealth of Pa.*, 980 F.3d 336, 353, 356 (3d Cir. 2020), *vacated as moot*

App.26

*sub nom. Bognet v. Degraffenreid*, 141 S. Ct. 2508 (2021); *Martel v. Condos*, 487 F. Supp. 3d 247, 248–49, 253 (D. Vt. 2020).  The plaintiffs alleged that these changes injured them because the allegedly unlawful or potentially fraudulent mail-in votes would dilute their votes.  *E.g.*, *Wood*, 981 F.3d at 1314; *Bognet*, 980 F.3d at 353; *Martel*, 487 F. Supp. 3d at 253.  Courts held that these plaintiffs lacked standing because "'no single voter is specifically disadvantaged' if a vote is counted improperly, even if the error might have a 'mathematical impact on the final tally and thus on the proportional effect of every vote.'"  *Wood*, 981 F.3d at 1314 (quoting *Bognet*, 980 F.3d at 356).  As these courts explained, "[i]f every voter suffers the same incremental dilution of the franchise caused by some third-party's fraudulent vote, then these voters have experienced a generalized injury."  *Martel*, 487 F. Supp. 3d at 253.

Plaintiffs' theory here faulters for similar reasons.  In the 2020 election cases and here, the government expanded the electorate (there, by allowing for more mail-in votes, here, by allowing votes by all residents), the plaintiffs alleged that this expansion was unconstitutional or unlawful, and the plaintiffs alleged that their injury was vote dilution by the additional votes.  So the theory here should fail as previous ones did because Plaintiffs' votes will not be diluted in any particularized way.

Moreover, Plaintiffs misunderstand when vote dilution gives rise to a cognizable injury.  "[V]ote dilution in the one-person, one-vote cases refers to the idea that each vote must carry equal weight."  *Rucho v. Common Cause*, 139 S. Ct. 2484, 2501 (2019).  For example, the Supreme Court has recognized that vote dilution may occur when a state draws legislative maps to either "pack" a minority population into one district (thus depriving them of influence in other districts) or "crack" a minority population across several districts (thus depriving them of majorities in a district).  *Voinovich v. Quilter*, 507 U.S. 146, 153–54 (1993).  "[H]arm arises

App.27

from the particular composition of the voter's own district, which causes his vote—having been packed or cracked—to carry less weight than it would carry in another, hypothetical district." *Gill*, 138 S. Ct. at 1931.

Plaintiffs, however, do not suffer similar harm to voters in packed or cracked districts. Under the Act, votes of citizens weigh the same as votes of non-citizens.  The Act does not classify citizens' votes differently or place them at a disadvantage like in packed or cracked districts.  *See Baker v. Carr*, 369 U.S. 186, 207–08 (1962) (recognizing an injury where a "classification disfavors the voters in the counties in which they reside, placing them in a position of constitutionally unjustifiable inequality vis-à-vis voters in irrationally favored counties"); *Daughtrey v. Carter*, 584 F.2d 1050, 1056 (D.C. Cir. 1978) ("*Baker v. Carr* does not make every alleged dilution of voting rights a sufficient injury to confer standing."); *id.* (holding that plaintiffs lacked standing to bring vote-dilution claim against nationwide expansion of voting rights for draft evaders who had been granted amnesty).  "Although [citizens], under Plaintiffs' theory, should make up 100% of the total votes counted and [non-citizens] 0%, there is simply no differential weighing of the votes." *Bognet*, 980 F.3d at 358–59.  Absent such differential weighing, "this is not the sort of vote dilution theory that courts have found to support standing." *Hudson v. Haaland*, 843 F. App'x 336, 338 (D.C. Cir. 2021) (per curiam).  This Court should dismiss for lack of jurisdiction.

## II.    The Complaint Fails to State a Claim.

If the Court reaches the merits, the Complaint fails to state a claim.  The long, accepted practice of non-citizen enfranchisement should foreclose any claim that the practice is unconstitutional.  If history were not enough, Plaintiffs' claims lack merit under governing law.

7

### A.   All Claims Fail Because Non-Citizen Voting Has Long Been Accepted as Constitutional.

Plaintiffs allege that non-citizen voting in local elections is unconstitutional, but a long history of non-citizen voting refutes their claims. "When faced with a dispute about the Constitution's meaning or application, '[l]ong settled and established practice is a consideration of great weight.'" *Houston Cmty. Coll. Sys. v. Wilson*, 142 S. Ct. 1253, 1259 (2022) (quoting *The Pocket Veto Case*, 279 U.S. 655, 689 (1929)); *see also Chiafalo v. Washington*, 140 S. Ct. 2316, 2326–39 (2020) (relying on history and tradition to uphold the constitutionality of states penalizing faithless electors who break their pledge to vote for the state's preferred candidate). For example, the Supreme Court last Term unanimously rejected a First Amendment challenge to a college board's censure of a member largely "because elected bodies in this country have long exercised the power to censure their members." *Houston Cmty. Coll. Sys.*, 142 S. Ct. at 1259. Similarly, here, it cannot be right that non-citizen voting is unconstitutional, under any of the constitutional provisions invoked by Plaintiffs, because non-citizen voting "has been open, widespread, and unchallenged since the early days of the Republic." *NLRB v. Noel Canning*, 573 U.S. 513, 572 (2014) (Scalia, J., concurring in judgment).

At the Founding, non-citizens voted in American elections in most jurisdictions. *E.g.*, Ron Hayduk, *Democracy for All: Restoring Immigrant Voting Rights in the United States* 16–17 (2006), https://tinyurl.com/5aepa5bd. "The practice of noncitizen voting first appeared in the colonies, which generally required only that voters be local inhabitants or residents, and not British citizens." Jamin B. Raskin, *Legal Aliens, Local Citizens: The Historical, Constitutional and Theoretical Meanings of Alien Suffrage*, 141 U. Pa. L. Rev. 1391, 1399 (1993) (internal quotation marks and citation omitted). "Alien suffrage survived the Revolution in 1776 as many states granted foreigners state 'citizenship,' . . . ." *Id.* at 1400.

App.29

The Founders themselves wrote the voting rights of residents, regardless of citizenship, into the first state constitutions. These constitutions inform the federal Constitution's meaning today. *See, e.g.*, *District of Columbia v. Heller*, 554 U.S. 570, 603 (2008) (stating that right-to-bear-arms provisions in seven early state constitutions were "strong evidence" of "how the founding generation conceived of the right"). The 1780 Massachusetts Constitution, written by John Adams, provided:

> Every male person being twenty-one years of age, and resident in any particular town in this commonwealth, for the space of one year next preceding, having a freehold estate within the same town, of the annual income of three pounds, or any estate of the value of sixty pounds, shall have a right to vote in the choice of a representative or representatives for the said town.

Mass. Const. pt. 2, ch. I, § 3, art. IV (1780). This constitution thus granted the franchise based on residency, gender, age, and property ownership—not citizenship.[1] A majority of the original states had near identical constitutional provisions. N.J. Const. art. IV (1776); Md. Const. art. II (1776); N.C. Const. art. VII–IX (1776); N.Y. Const. art. VII (1777); S.C. Const. art. I, § 4 (1790); Del. Const. art. IV, § 1 (1792); N.H. Const. pt. 2, art. 27 (1792). Further, several of the first states to enter the Union had such provisions. Ky. Const. art. III, § 1 (1792); Tenn. Const. art. III, § 1 (1796); Ohio Const. art. IV, § 1 (1802); Ill. Const. art. II, § 27 (1818).

---

[1]     Of course, some of these conditions, like gender and age, would be unconstitutional today. *See, e.g.*, U.S. Const. amend. XV, XIX, XXVI. And it cannot be overlooked that states for much of the Nation's history conditioned the franchise on race. Hayduk, *supra*, at 16. It took years, war, constitutional amendments, popular movements, and legislation to extend the franchise to all races; and the project continues today. *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2351–54 (2021) (Kagan, J., dissenting). By citing the provisions above, the District does not condone their unconstitutional and abhorrent conditions. But what is important for this case is that none of these provisions conditioned voting on citizenship, as Plaintiffs suggest is constitutionally required. *Cf. Kanter v. Barr*, 919 F.3d 437, 458 & n.7 (7th Cir. 2019) (Barrett, J., dissenting) (relying on laws disarming slaves and Native Americans to determine the meaning of the Second Amendment while noting that such laws would be unconstitutional under other amendments today); *United States v. Jackson*, --- F.4th ----, ----, No. 22-2870, 2023 WL 3769242, at *5 (8th Cir. June 2, 2023) (same).

Some early constitutions exalted attachment to the community as the important qualification for voting—not citizenship status.  The Virginia Constitution's Declaration of Rights, written principally by George Mason, proclaimed that "all men, having sufficient evidence of permanent common interest with, and attachment to, the community, have the right of suffrage."  Va. Decl. of Rts. § 6 (1776).  Other early states had nearly identical provisions.  Pa. Decl. of the Rts. of the Inhabitants of the Commw. art. VII (1776); Vt. Const. ch. 1, art. 8 (1793). George Washington echoed these sentiments, writing that "[t]he bosom of America is open to receive not only the opulent & respectable Stranger, but the oppressed & persecuted of all Nations & Religions; whom we shall wellcome to a participation of all our rights & previleges." *Letter from G. Washington to J. Holmes* (Dec. 2, 1783), *in* Founders Online, Nat'l Archives, https://tinyurl.com/2c9995kb.  All said, twelve of the original thirteen states allowed non-citizen voting in the Founding period.  Hayduk, *supra*, at 19–20.  Thus, it is implausible that the Founding generation would have thought non-citizen enfranchisement unconstitutional when the Founders themselves voted alongside non-citizens.

The early federal government also allowed non-citizen voting.  Raskin, *supra*, at 1402–03.  For example, the Northwest Ordinance enacted by the first Congress provided for elections in the Northwest Territory and that "[1] a freehold in fifty acres of land in the district, having been a citizen of one of the states, and being resident in the district, or [2] the like freehold and two years residence in the district, shall be necessary to qualify a man as an elector of a representative."  Act of Aug. 7, 1789, ch. 8, 1 Stat. 50, 51 n.(a) (1789).  The Ordinance thus "gave freehold aliens who had been residents for two years the right to vote for representatives to territorial legislatures."  Raskin, *supra*, at 1402.  To take another example, "[i]n the various congressional acts authorizing the election of representatives to statewide constitutional

App.31

conventions in Ohio, Indiana, Michigan and Illinois, Congress deliberately extended the right to vote to aliens." *Id.* Such actions by the first and early Congresses "provide[ ] contemporaneous and weighty evidence of the Constitution's meaning." *Seila L. LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2197 (2020) (internal quotation marks omitted) (quoting *Bowsher v. Synar*, 478 U.S. 714, 723 (1986)); *see also Nev. Comm'n on Ethics v. Carrigan*, 564 U.S. 117, 122 (2011) (holding that evidence of early congressional enactments adopting recusal rules was "dispositive" against claim that recusal rules were unconstitutional).

Over the next two centuries, non-citizen enfranchisement's prevalence fluctuated, but its constitutionality was never questioned. "During the long history of alien suffrage, neither the Supreme Court nor any lower federal court or state court ever found the practice unconstitutional." Raskin, *supra*, at 1417. Rather, courts in the early Republic recognized and enforced the right of non-citizens to vote, as prescribed by local or state law. *E.g.*, *Stewart v. Foster*, 2 Binn. 110 (Pa. 1809); *Spragins v. Houghton*, 3 Ill. 377, 408 (1840).

In fact, and contrary to Plaintiffs' suggestion, Compl. ¶ 53, the Supreme Court has suggested at several points that the practice *is* constitutional, *see* Raskin, *supra*, at 1417 (noting the Court had "explicitly and repeatedly signalled its acceptance" of "noncitizen voting"). In 1874, the Court observed that "citizenship has not in all cases been made a condition precedent to the enjoyment of the right of suffrage," and in at least ten states, "persons of foreign birth, who have declared their intention to become citizens of the United States, may under certain circumstances vote." *Minor v. Happersett*, 88 U.S. 162, 177 (1874). In the 20th century, the Court explained:

> the privilege to vote in a state is within the jurisdiction of the state itself, to be exercised as the state may direct, . . . provided, of course, no discrimination is made between individuals, in violation of the Federal Constitution. The state might provide that persons of foreign birth could vote without being naturalized . . . .

*Pope v. Williams*, 193 U.S. 621, 632 (1904) (internal citation omitted).  More recently, the Court stated that citizenship is a "*permissible* criterion," thus implying that citizenship is not a *necessary* criterion to voting.  *Sugarman v. Dougall*, 413 U.S. 634, 649 (1973) (emphasis added).  These statements from the Supreme Court cannot be squared with any theory of Plaintiffs.

In sum, local, state, and federal governments have enfranchised non-citizens since the Founding and throughout American history.  All the while, courts—including the Supreme Court—have either endorsed non-citizen voting or at least never questioned its constitutionality.  And in recent years, localities have reinvigorated the practice.  As of April 2023, more than a dozen municipalities across the country have allowed noncitizens to vote in local elections, including many in neighboring Maryland.  Ballotpedia, *Laws Permitting Noncitizens to Vote in the United States*, https://tinyurl.com/2kzfpfvp.  The District is just the latest jurisdiction to continue the trend.  Comm. Rep. 5–6.  Given this "[l]ong settled and established practice," Plaintiffs are wrong to contend that the Constitution, via any provision, prohibits non-citizen enfranchisement laws.  *Houston Cmty. Coll. Sys.*, 142 S. Ct. at 1259 (internal quotation marks omitted) (quoting *The Pocket Veto Case*, 279 U.S. at 689).  Even "[i]f this longstanding practice does not 'put at rest' the question of the Constitution's meaning for the dispute before [the Court], it surely leaves a 'considerable impression.'"  *Id.* at 1260 (quoting *McCulloch v. Maryland*, 4 Wheat. 316, 401 (1819)).

### B.  The Substantive Due Process Claim Fails.

In addition to having no historical foothold, Plaintiffs' claims lack merit under settled judicial precedent, starting with substantive due process.  Plaintiffs' substantive due process claim relies on the theory that "diluting the votes of U.S. citizens by enfranchising noncitizens infringes on Plaintiffs' fundamental right to vote."  Compl. ¶ 57.  But that is the same as their Equal Protection Clause claim, *id.* ¶ 61, and when one constitutional provision already covers a

App.33

particular theory, plaintiffs cannot invoke "the more generalized notion of 'substantive due process,'" *Conn v. Gabbert*, 526 U.S. 286, 293 (1999) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)); *see also Elkins v. District of Columbia*, 690 F.3d 554, 562 (D.C. Cir. 2012). The Court should thus dismiss this claim as duplicative.

In any event, Plaintiffs have not alleged a substantive due process violation.  *See, e.g.*, *Fraternal Ord. of Police v. District of Columbia*, 45 F.4th 954, 962 (D.C. Cir. 2022) ("The doctrine of substantive due process is narrow.").  Substantive due process protects fundamental rights—that is, liberty interests "deeply rooted in this Nation's history and tradition." *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997).  Laws infringing such rights must satisfy strict scrutiny, but laws implicating other assertedly unenumerated rights need only pass rational basis review.  *Id.* at 728.  Here, Plaintiffs' claim fails at every turn.

### 1.   <u>Plaintiffs Have Not Invoked a Carefully Defined Fundamental Right.</u>

Plaintiffs cannot establish that a right is fundamental, much less that it has been infringed, without first providing a sufficiently "careful description" of the asserted right.  *Glucksberg*, 532 U.S. at 720.  This "threshold requirement of a carefully described right" is critical to ensuring "responsible decisionmaking" in the "uncharted area" of substantive due process.  *Abigail All. for Better Access to Dev. Drugs v. von Eschenbach*, 495 F.3d 695, 701 n.5, 702 (D.C. Cir. 2007) (en banc) (internal quotation marks omitted).  Under this framework, a "broad generalization" will not suffice.  *Id.* at 701 n.5.  The right instead must be defined with specific reference to the concrete circumstances of the case in which it is invoked.  *See Reno v. Flores*, 507 U.S. 292, 300, 302 (1993); *Hedgepeth ex rel. Hedgepeth v. WMATA*, 386 F.3d 1148, 1155–56 (D.C. Cir. 2004) (Roberts, J.) (refusing to "ignore" a "plainly pertinent fact" in defining "the asserted fundamental right").  Otherwise, plaintiffs cannot hope to show the violation of a fundamental

constitutional right.  *See Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2258 (2022) (rejecting "appeals to a broader right" "at a high level of generality").

Several cases help to illustrate this careful description requirement.  In *Glucksberg*, the plaintiffs challenged a state law prohibiting physician-assisted suicide on the theory that it violated the fundamental "right to die."  521 U.S. at 722.  But the Supreme Court rejected that formulation and instead defined the interest more narrowly as "a right to commit suicide with another's assistance."  *Id.* at 724.  Likewise, in *Flores*, the plaintiffs argued that detaining undocumented juvenile-arrestees who have no domestic guardians violated the fundamental "right to 'freedom from physical restraint.'"  507 U.S. at 299–300.  Yet the Court rejected that definition, too, in favor of the narrower "right of a child who has no available parent, close relative, or legal guardian, and for whom the government is responsible, to be placed in the custody of a willing-and-able private custodian rather than of a government-operated or government-selected child-care institution."  *Id.* at 302.  As these decisions make clear, the right asserted in a substantive due process case must be defined with precision in light of the nature of the challenged law and the specific facts alleged.  *See, e.g.*, *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992) (focusing "on the allegations in the complaint to determine how petitioner describes the constitutional right at stake").

Plaintiffs here cannot pass this threshold test.  They appear to invoke a "right to vote." Compl. ¶ 45.  But that abstract description of their asserted interest ignores the context of this suit and thus is too broad to satisfy the "careful description" requirement.  *Glucksberg*, 521 U.S. at 720–24; *Flores*, 507 U.S. at 302; *see Hedgepeth*, 386 F.3d at 1155–56 (rejecting plaintiff's broad "right to freedom from restraint" in favor of "the right of freedom of movement when there is probable cause for arrest").  It is also plainly meritless, as "the right to vote, *per se*, is not

App.35

a constitutionally protected right." *Rodriguez v. Popular Democratic Party*, 457 U.S. 1, 9 (1982)

(internal quotation marks omitted) (quoting *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S.

1, 35 n.78 (1973)).  Properly formulated, the right underlying Plaintiffs' due process claim

cannot be, simply, the right to vote, but must instead be defined more narrowly as, for example, a

purported right to have one's vote counted without the presence of non-citizens' votes.  *See*

Compl. ¶¶ 45–46, 57 (alleging that non-citizens' votes will "dilute" the weight of citizens'

votes).

That novel interest, however, has little basis in American history or tradition, and

certainly lacks the pedigree needed to be deemed "fundamental."  *See Dist. Att'y's Off. for Third*

*Jud. Dist. v. Osborne*, 557 U.S. 52, 72 (2009) (emphasizing that "the mere novelty" of "a claim

is reason enough to doubt that 'substantive due process' sustains it" (quoting *Flores*, 507 U.S. at

303)).  As discussed, non-citizen voting has occurred in this country since its founding, and the

practice has been recognized as one that the Constitution permits for more than a century.  *See*

Argument § II.A, *supra*.  Given that extensive history, Plaintiffs cannot plausibly claim to

possess a deeply rooted individual right to exclude non-citizens from the franchise and therefore

cannot plausibly allege a substantive due process violation.  *See Osborne*, 557 U.S. at 72

(rejecting substantive due process claim where "no long history" supported the asserted right);

*Fox v. District of Columbia*, 851 F. Supp. 2d 20, 32 (D.D.C. 2012) (Berman Jackson, J.)

(rejecting the argument that a "post-and-forfeit policy" violated "plaintiffs' substantive due

process rights" given "the policy's history and prevalence").

## 2. The Act Withstands Any Form of Scrutiny.

Because the Act does not burden any fundamental right, it need only satisfy rational basis

review.  *Glucksberg*, 521 U.S. at 721; *see May v. Town of Mountain Village*, 132 F.3d 576, 580

(10th Cir. 1997) (applying "rational basis test" in upholding "nonresident voting provisions");

App.36

*Duncan v. Coffee County*, 69 F.3d 88, 94 (6th Cir. 1995) (similar, agreeing with the Fifth and Eleventh Circuits).  Under that standard, laws are presumptively constitutional and challengers have the "burden 'to negative every conceivable basis which might support' the law."  *Gordon v. Holder*, 721 F.3d 638, 656 (D.C. Cir. 2013) (quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 315 (1993))).  In other words, rational basis review provides that a challenged law "must be upheld 'if there is any reasonably conceivable state of facts that could provide a rational basis' for the legislative choice."  *Sanchez v. Off. of State Superint. of Educ.*, 45 F.4th 388, 396 (D.C. Cir. 2022) (quoting *Beach Commc'ns*, 508 U.S. at 313), *cert. denied*, 143 S. Ct. 579 (2023).

The Act here easily clears this low bar, and nothing in Plaintiffs' Complaint suggests otherwise.  As the legislative history makes clear, the Council reasonably concluded that "expand[ing] voting rights in local elections" and granting non-citizens "the opportunity to have a voice in the issues that affect them" would improve democracy in the District.  Comm. Rep. 3, 7.  That egalitarian choice was eminently rational and unquestionably related to the legitimate government interest in expanding democratic participation.  *See Duncan*, 69 F.3d at 94 (finding that the expansion of the franchise "is not irrational" if the newly included voters have "a substantial interest" in the pertinent elections).  Nor is there anything fundamentally unfair about the Council's considered judgment to enfranchise non-citizens given that the Act preserves Plaintiffs' ability to cast their own ballots as they wish.  *See Bennett v. Yoshina*, 140 F.3d 1218, 1227 (9th Cir. 1998) (holding that a method of counting ballots caused no "disenfranchisement or meaningful vote dilution" or "fundamental unfairness" when "every ballot submitted was counted and no one was deterred from going to the polls"); *Partido Nuevo Progresista v. Perez*, 639 F.2d 825, 828 (1st Cir. 1980) (per curiam) (similar).

App.37

Indeed, even were a fundamental right at stake, the Act would also satisfy strict scrutiny. *See, e.g.*, *Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 454 (2015) (holding that strict scrutiny requires a law "be narrowly tailored, not that it be 'perfectly tailored'" (quoting *Burson v. Freeman*, 504 U.S. 191, 209 (1992) (plurality op.))). The District has a compelling interest in democratic self-government, *i.e.*, defining its political community and ensuring that members of that community have a voice in their government. *See Utah Republican Party v. Cox*, 892 F.3d 1066, 1085 (10th Cir. 2018) ("How could it not be true in a representative democracy such as ours that the State has a strong—even compelling—interest in ensuring that the governed have an effective voice in the process of deciding who will govern them?"). And the Act is narrowly tailored to achieve that interest by extending the franchise to Washingtonians who live in and contribute to the District community, particularly considering immigration status is not determinative of whether an individual has an interest in the governance of the community, and given that distinguishing voter eligibility based on immigration statuses (which are complex and changing) would be difficult for the Board to administer. *See* Comm. Rep. 3–4, 7–8. For these reasons, Plaintiffs cannot state a substantive due process claim.

## C.      The Equal Protection Claims Fail.

Plaintiffs' claims that the Act discriminates against them based on citizenship or national origin in violation of equal protection fail because the Act is facially neutral and has no discriminatory purpose. *See* Compl. ¶¶ 59–66.

### 1.      The Act Is Facially Neutral.

Nothing on the face of the Act treats citizens differently or worse than non-citizens. "[F]acially neutral" actions that "serve legitimate government purposes" "do not run afoul of the Equal Protection Clause." *Kingman Park Civic Ass'n v. Bowser*, 815 F.3d 36, 42 (D.C. Cir. 2016). A law is facially neutral when it does not, on its face, treat one class better or differently

17

from another.  *See In re Navy Chaplaincy*, 738 F.3d 425, 428 (D.C. Cir. 2013) (treating policies

as facially neutral when none "on its face prefers any religious denomination").  These principles

apply with full force to equal protection claims premised on alleged vote dilution.  *See, e.g.*,

*May*, 132 F.3d at 580 & n.8 (applying rational basis review where legislation expands the right to

vote without weighing votes differently); *Duncan*, 69 F.3d at 94 n.3 (explaining that "mere

expansion of the class of persons eligible to vote does not, *per se*, imply unconstitutional vote

dilution").

Here, all the Act says is that a qualified voter "[i]s a citizen of the United States; except,

that this subparagraph shall not apply in a local election."  Act § 2.  This provision does not

single out citizens for disfavored treatment or non-citizens for preferential treatment.  The Act

did not change citizens' voting rights at all, and it says nothing about national origin.  In fact,

citizens still receive *more* favorable treatment than non-citizens because they are allowed to vote

in local *and* federal elections.[2]  Plaintiffs therefore cannot plausibly allege that the Act is facially

discriminatory against citizens.  As a result, because the Act satisfies rational basis review (as

well as strict scrutiny), *see* Argument § II.B.2, *supra*, Plaintiffs cannot claim any violation of

equal protection.

**2.**      **<u>Plaintiffs Have Not Plausibly Alleged Facts Suggesting That the Act Has a Discriminatory Purpose.</u>**

Nor can Plaintiffs plausibly allege that the Act has a discriminatory purpose.  When

challenging a facially neutral law under equal protection principles, plaintiffs must show that the

law is discriminatory in both its effect and purpose.  *United States v. Holton*, 116 F.3d 1536,

1548 (D.C. Cir. 1997) (citing *Washington v. Davis*, 426 U.S. 229, 242 (1976)).  The same

---

[2]      Under federal law, the District cannot allow non-citizens to vote in federal elections.  18 U.S.C. § 611.

principles govern vote dilution claims.  As the Supreme Court has explained, equal protection

"prohibits *intentional* 'vote dilution.'"  *Abbott v. Perez*, 138 S. Ct. 2305, 2314 (2018) (emphasis

added) (quoting *City of Mobile v. Bolden*, 446 U.S. 55, 66–67 (1980) (plurality op.)).  Claimants

asserting vote dilution therefore cannot simply allege that a law has the effect of diluting their

votes; they must plausibly allege facts showing that the *purpose* of the law was to dilute their

votes.  *See id.*; *Rogers v. Lodge*, 458 U.S. 613, 617–18 (1982) (requiring vote-dilution plaintiffs

to show that the challenged laws were "'conceived or operated as purposeful devices to further

[invidious] discrimination'" (quoting *Whitcomb v. Chavis*, 403 U.S. 124, 149 (1971))); *Bolden*,

446 U.S. at 67 (rejecting notion that "disproportionate effects alone may establish a claim of

unconstitutional racial voter dilution").

Plaintiffs in this case, accordingly, cannot allege a viable equal protection claim simply

by asserting that the Act may lead to vote dilution for citizens.  Compl. ¶¶ 51–52.  They must

also plausibly allege that the Council acted with discriminatory intent.  Yet nothing in the

legislative history—nor anything Plaintiffs put forth in the Complaint—suggests that a purpose

of the Act was to dilute citizens' votes or otherwise disadvantage citizens.  Indeed, it strains

reason to think that the District's popularly elected legislative body intended to harm the vast

majority of the District's population, citizens and natural born-Americans.  *See* Comm. Rep. 3

(estimating that 15% of the District's population are immigrants).  Instead, the Council's purpose

was to "expand[ ] voting rights and improve[ ] access to democracy for all District residents," *id.*

at 2—a goal of equal treatment for all qualified Washingtonians, which is the exact opposite of

an equal protection violation.  Although Plaintiffs allege that the "primary motive" "was to aid"

immigrants, Compl. ¶ 34, aiding immigrants is not the same as discriminating against non-

immigrants.  Considering the clear legislative history and "spare facts and allegations" in the

Complaint, the Court cannot infer that the Council was "motivated by discriminatory intent or purpose," so the equal protection claims should be dismissed for this reason too. *Atherton v. D.C. Off. of the Mayor*, 567 F.3d 672, 688 (D.C. Cir. 2009).

Plaintiffs' reliance on *Brown v. Board of Commissioners*, 722 F. Supp. 380 (E.D. Tenn. 1989), is misplaced. Compl. ¶ 47. *Brown* agreed that expansions of the franchise receive only rational basis review. 722 F. Supp. at 398. But *Brown* found that a city charter allowing non-resident property owners to vote in municipal elections lacked a rational basis because "it contain[ed] no limitation of the number of people who can 'vote' on a piece of property or no limitation as to any minimum property value required for the exercise of the franchise." *Id.* at 399. For example, "as many as 23 nonresidents have been registered to vote on a single piece of property." *Id.* As a result, the charter "permit[ted] a nonresident who owns a trivial amount of property to vote in municipal elections," and because such non-residents lacked a "substantial interest" in municipal affairs, the charter did "not further any rational governmental interest." *Id.* Such irrationality is not present here. As the Council found based on empirical data, non-citizen residents have a substantial interest in District elections because, among other things, they reside in the District, pay taxes to the District, work jobs in the District, and send their children to District schools. Comm. Rep. 3–4. Plaintiffs' only case does not support them. The Court should dismiss Plaintiffs' equal protection challenges.

### D. The "Right to Citizen Self-Government" Claim Fails.

Finally, Plaintiffs allege that the Act violates their "constitutional right to citizen self-government." Compl. ¶ 68. But Plaintiffs fail to identify any source in the Constitution—or elsewhere—that provides for such a right. Such an omission flunks the most basic test of pleading, failing to provide a "short and plain statement of the claim" or otherwise give the

District "fair notice of what the . . . claim is and the grounds upon which it rests."  *Twombly*, 550 U.S. at 555 (internal quotation marks and citations omitted).

Besides, there is no such thing as a freestanding, judicially enforceable "right to citizen self-government."  Historically, "popular sovereignty in the United States has been a flexible notion, which has not restricted political power by a rigid definition of the People, and certainly not by the legal category of national citizenship."  Gerald E. Neuman, *Strangers to the Constitution: Immigrants, Borders, and Fundamental Law* 145 (1996).  And legally, nothing in the Constitution "precludes the states from granting the franchise to noncitizens."  Christopher L. Eisgruber, *Birthright Citizenship and the Constitution*, 72 N.Y.U. L. Rev. 54, 57 (1997); *see* Michael C. Dorf, *Equal Protection Incorporation*, 88 Va. L. Rev. 951, 977 n.78 (2002) (observing that "alien disenfranchisement" is not "constitutionally required"); David A. Martin, *Graduated Application of Constitutional Protections for Aliens: The Real Meaning of Zadvydas v. Davis*, 2001 Sup. Ct. Rev. 47, 85 & n.104 (recognizing that "[n]one" of the "constitutional amendments that touch on voting rights" "requires that the franchise be restricted to citizens").

Plaintiffs nonetheless allege that the "'right to citizen self-government' has been recognized in repeated holdings of the Supreme Court."  Compl. ¶ 1.  Yet they can muster only two inapposite cases to support their revisionist account—*Foley v. Connelie*, 435 U.S. 291 (1978), and *Cabell v. Chavez-Salido*, 454 U.S. 432 (1982)—both of which involved *equal protection* challenges to state laws governing law-enforcement appointments.  *Foley*, 435 U.S. at 300; *Cabell*, 454 U.S. at 444.  Neither case references an independent constitutional right to "citizen self-government," and neither case suggests that allowing non-citizens to vote in local elections would be unconstitutional.  Plaintiffs' inability to cite a single case, statute, or constitutional provision to support their claim confirms that it should be dismissed.

## CONCLUSION

For these reasons, the Court should dismiss the Complaint for lack of jurisdiction or

failure to state a claim.

Date: June 7, 2023.                              Respectfully submitted,

                                                 BRIAN L. SCHWALB
                                                 Attorney General for the District of Columbia

                                                 STEPHANIE E. LITOS
                                                 Deputy Attorney General
                                                 Civil Litigation Division

                                                 */s/ Matthew R. Blecher*
                                                 MATTHEW R. BLECHER [1012957]
                                                 Chief, Civil Litigation Division, Equity Section

                                                 */s/ Adam J. Tuetken*
                                                 ADAM J. TUETKEN [242215]
                                                 PAMELA A. DISNEY [1601225]
                                                 Assistant Attorneys General
                                                 Civil Litigation Division
                                                 400 6th Street, NW
                                                 Washington, D.C. 20001
                                                 Phone: (202) 735-7474
                                                 Email: adam.tuetken@dc.gov

                                                 *Counsel for Defendant*

App.43

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **STACIA HALL,** *et al.*,<br><br>　　　*Plaintiffs*,<br><br>　　v.<br><br>**DISTRICT OF COLUMBIA BOARD OF ELECTIONS,**<br><br>　　　*Defendant*. | **No. 1:23-cv-01261-ABJ** |

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

i

App.44

## **TABLE OF CONTENTS**

INTRODUCTION ............................................................................................................... 1

ARGUMENT ..................................................................................................................... 2

   I.   Plaintiffs Have Standing ............................................................................................ 2

   II.   Plaintiffs State a Plausible Claim that the Act Violates their Right, as Citizens, to Self-

Government. ............................................................................................................... 8

   III.   Plaintiffs State Plausible Claims that the Act Violates Equal Protection. ....................... 11

   IV.   Plaintiffs State a Plausible Substantive Due Process Claim. ........................................ 16

      A.   Plaintiffs allege the violation of a carefully-defined fundamental right. ..................... 18

      B.   The right to citizen self-government is deeply rooted in the Nation's history and

"implicit in the concept of ordered liberty." ..................................................................... 19

CONCLUSION ................................................................................................................. 24

App.45

## INTRODUCTION

The right of United States citizens to govern and be governed by themselves dates to the

founding era. *See, e.g., United States v. United Foods*, 533 U.S. 405, 425 (2001) (Breyer, J.,

dissenting) (discussing the "democratic self-government that the Constitution seeks to create and

to protect."). Accordingly, "[c]itizenship is . . . a concept fundamental to structures and processes

established elsewhere in the Constitution." *Toll v. Moreno*, 458 U.S. 1, 42 n.13 (1982). The

Supreme Court has consistently recognized the centrality of citizenship to democracy:

> The distinction between citizens and aliens, though ordinarily
> irrelevant to private activity, is fundamental to the definition and
> government of a State. The Constitution itself refers to the
> distinction no less than 11 times, indicating that the status of
> citizenship was meant to have significance in the structure of our
> government. The assumption of that status, whether by birth or
> naturalization, denotes an association with the poli[t]y which, in a
> democratic republic, exercises the powers of governance.

*Ambach v. Norwick*, 441 U.S. 68, 75 (1979) (internal citation omitted). *See also Adams v. Clinton*,

90 F. Supp. 2d 35, 97 (D.D.C. 2000) ("The importance of voting by the people in a representative

democracy, such as the Constitution established, is so obvious that it is difficult to articulate its

provenance. Yet, there is no dispute that voting by the people and the existence of a representative

democracy are inextricably linked. One simply cannot exist without the other.") (Oberdorfer, J.,

dissenting in part and concurring in part).

The D.C. Noncitizen Voting Act diminishes the electoral power of U.S. citizens, as a group,

in the District of Columbia, and, by allowing noncitizens both to vote and to hold public office,

allows for citizens to be governed by noncitizens. Perhaps unsurprisingly, given the fundamental

importance of citizenship in our democracy, the Act is unconstitutional on more than one basis, as

spelled out in the Complaint. The Act infringes plaintiffs' clear constitutional right to be governed

by their citizen peers, denies them equal protection of the law, and violates their right to substantive

App.46

due process. These claims are more than plausible, and Defendant's arguments that they should be dismissed fall flat at every turn.

## ARGUMENT

### I.    Plaintiffs Have Standing.

Defendant first challenges standing. To establish Article III standing, plaintiffs must "plausibly allege three familiar requirements:" injury-in-fact, causation, and redressability. *Campaign Legal Ctr. v. FEC*, 860 F. App'x 1, 3 (D.C. Cir. 2021) (internal citations omitted). *See also Adams v. Clinton*, 90 F. Supp. 2d 35, 40-41 (D.D.C. 2000) ("Standing exists if a plaintiff sufficiently alleges an injury in fact that (i) can fairly be traced to the defendant's challenged action and (ii) is likely to be redressed by a favorable decision."). In conducting the standing analysis, "the court must assume that the [plaintiff] will prevail on the merits." *Campaign Legal Ctr*, 860 F. App'x at 3. (alteration original) (citation omitted). *See also Adams*, 90 F. Supp. at 41 ("For the purposes of standing analysis, we assume the validity of a plaintiff's substantive claim.") (citation omitted). To be cognizable, a plaintiff's claimed injury must be "(1) concrete, (2) particularized, and (3) actual or imminent. A concrete injury is direct, real, and palpable—not abstract. A particularized injury is personal, individual, distinct, and differentiated—not generalized or undifferentiated. An actual or imminent injury is certainly impending and immediate—not remote, speculative, conjectural, or hypothetical." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 914 (2015) (internal citations omitted).

Defendant claims that plaintiffs, in alleging vote dilution, have not alleged a concrete and particularized injury, because that injury is shared by all citizen-voters in D.C. Doc. 8 at 10. Defendant misunderstands the requirement that an injury be particularized, conflating a widely-shared injury with a general grievance about government that does not support standing:

App.47

Often the fact that an interest is abstract and the fact that it is widely shared go hand in hand. But their association is not invariable, and where a harm is concrete, though widely shared, the Court has found "injury in fact." See *Public Citizen [v. United States Dep't of Justice]* 491 U.S. [440] at 449-450 [(1989)] ("The fact that other citizens or groups of citizens might make the same complaint after unsuccessfully demanding disclosure . . . does not lessen [their] asserted injury"). Thus the fact that a political forum may be more readily available where an injury is widely shared (while counseling against, say, interpreting a statute as conferring standing) does not, by itself, automatically disqualify an interest for Article III purposes. Such an interest, where sufficiently concrete, may count as an "injury in fact." This conclusion seems particularly obvious where (to use a hypothetical example) large numbers of individuals suffer the same common-law injury (say, a widespread mass tort), or where large numbers of voters suffer interference with voting rights conferred by law.

*FEC v. Akins*, 524 U.S. 11, 24 (1998).

Accordingly, vote dilution has long been recognized as a particularized injury for standing purposes. As Justice Kagan explained in *Gill v. Whitford*, "[t]he harm of vote dilution . . . is individual and personal in nature." *Gill v. Whitford*, 138 S. Ct. 1916, 1935 (Kagan, J., concurring). *See also Ga. Ass'n of Latino Elected Offs., Inc. v. Gwinnett Cty. Bd. of Registration & Elections*, 36 F.4th 1100, 1114 (11th Cir. 2022) ("The Supreme Court has 'long recognized that a person's right to vote is individual and personal in nature' and 'voters who allege facts showing disadvantage to themselves as individuals have standing to sue' as they have alleged a concrete and particularized injury.") (quoting *Gill*, 138 S. Ct. at 1929) (opinion of the Court); *Lyman v. Baker*, 954 F.3d 351, 362 (1st Cir. 2020) (finding standing based on a claim of vote dilution and explaining that "[t]he voter, after all, is presumptively the best person to bring a challenge to an alleged infringement of her constitutionally protected voting rights."). *Cf. Gordon v. Haas*, 828 F. Supp. 2d 13, 19 (D.D.C. 2011) (rejecting standing because plaintiff failed to allege dilution of his own vote: "Gordon remains a voter only in the District of Columbia. The allegation that he suffers

3

App.48

injury from alleged minority vote dilution in the five states does not save his claim. For his claim to survive, Gordon must aver that *his* vote has been diluted. He does not and cannot make such an allegation in this action and therefore suffers no cognizable injury for purposes of constitutional standing".) (emphasis in original).

One kind—but far from the only kind—of vote dilution claim is partisan gerrymandering, which requires that a plaintiff live in a district that has been either "cracked" or "packed" to lessen the weight of his or her individual vote. *Rucho v. Common Cause*, 139 S. Ct. 2484, 2492 (2019). While "such practices invariably affect more than one citizen at a time[,]" the Court "understood the injury as giving diminished weight to each particular vote, even if millions were so touched. In such cases, a voter living in an overpopulated district suffered disadvantage to [herself] as [an] individual[]: Her vote counted for less than the votes of other citizens in her State." *Gill*, 138 S. Ct. at 1935 (Kagan, J., concurring) (alteration in original) (internal citation and quotation marks omitted).

There are other kinds of vote dilution that give rise to standing. In census-related apportionment cases, "plaintiffs alleging vote dilution injuries must show that their states would have had an additional representative but for the government's error." *Citizens for Const. Integrity v. Census Bureau*, Civil Action No. 1:21-cv-03045, 2023 U.S. Dist. LEXIS 67820, at *7 (D.D.C. Apr. 18, 2023). *See also DOC v. United States House of Representatives*, 525 U.S. 316, 332-34 (1999) (finding appellees, registered voters in different counties and different states, had satisfied Article III injury requirements because they "ha[d] a strong claim that they will be injured by the Bureau's plan because their votes will be diluted vis-à-vis residents of counties with larger 'undercount' rates."). Racial gerrymandering, another type of vote dilution, gives rise to a cognizable injury because "[t]he resulting discrimination against those individual voters living in

App.49

disfavored areas is easily demonstrable mathematically. Their right to vote is simply not the same right to vote as that of those living in a favored part of the State." *Reynolds v. Sims*, 377 U.S. 533, 563 (1964).

Plaintiffs here have standing because the vote dilution injury they allege is not a general complaint about government but one particular to them as individual voters in the District of Columbia. Plaintiffs "contend that their votes are diluted in [a] particular election . . . in [a] particular geographic area[,] . . . . [and] that they are an identifiable group of voters whose votes are disfavored vis-à-vis those of some other group." *Daughtrey v. Carter*, 584 F. 2d 1050, 1056 (D.C. Cir. 1978). *See also Michel v. Anderson*, 14 F.3d 623, 626 (D.C. Cir. 1994) (holding that plaintiffs had standing to bring a vote-dilution claim even though their injury was shared by all voters in all states).

Furthermore, defendant's contention that plaintiffs must, and have not, shown an intent to vote or run for office is incorrect. The plaintiffs in *Yazzie v. Hobbs*, cited by defendant, Doc. 8 at 9, challenged generally applicable procedures for counting absentee ballots under the Voting Rights Act based only on their "general desire to participate in the electoral and political processes of Arizona on an equal basis with non-Indian voters." *Yazzie v. Hobbs*, 977 F.3d 964, 967 (9th Cir. 2020). In contrast, plaintiffs in this case have all registered to vote in D.C., showing not a "general desire," but a particular one, to participate in D.C. elections. Indeed, there is a strong "inference that registered voters (particularly those who bring voting rights lawsuits) will likely vote at some point[.]" *League of United Latin Am. Citizens v. Abbott*, 2021 U.S. Dist. LEXIS 247856, at *7 n.1 (W.D. Tex. Dec. 30, 2021). As for *Carney v. Adams*, Doc. 8 at 9, there the Supreme Court found that the plaintiff did not have standing to challenge qualifications for judicial elections because he did not make a showing that he was "likely to apply to become a judge in the reasonably

5

App.50

foreseeable future," and thus was not "able and ready to apply" for a judgeship. *Carney v. Adams*, 141 S. Ct. 493, 499-500 (2020). As the *Carney* Court explained, however, the Supreme Court has found standing in "arguably similar cases . . . [that] contained more evidence that the plaintiff was able and ready" based on such plaintiff's past practices. *Id*. at 502. Plaintiffs here have previously run for office as recently as the last election, a past practice that shows that they are in fact "able and ready" to do so in the future.

The cases challenging the results of the 2020 election defendant relies on are also distinguishable because those cases involved allegations of voter fraud, and therefore with some plausibility could be held to involve only a generalized interest in the proper operation of government. Even if rightly decided, they did not involve a duly-enacted law, as this case does, that is certain to cause vote dilution—a particularized injury—to each plaintiff, much less a policy that facially dilutes the votes of two protected classes: U.S. citizens and those of American national origin. If plaintiffs are right on the merits, their constitutional rights have been violated, and this harm is particularized to each plaintiff, for each plaintiff's vote has been diluted.

For example, in *Wood v. Raffensperger*, the Eleventh Circuit explained that "[a]ll Americans, whether they voted in this election or whether they reside in Georgia, could be said to share Wood's interest in ensuring that [a presidential election] is properly administered." *Wood v. Raffensperger*, 981 F.3d 1307, 1314 (11th Cir. 2020) (alteration original) (internal quotation marks omitted). The Court went on to explain that while "various nonparties might have a particularized injury," Wood "is at most a 'concerned bystander.'" *Id*. at 1316 (quoting *Koziara v. City of Casselberry*, 392 F.3d 1302, 1305 (11th Cir. 2004)). The Court did not, however, rule out all vote dilution injuries, explaining that "vote dilution can be a basis for standing" where is has "a point of comparison." *Id*. Here, the point of comparison is a point in time: the time before the enactment

of the D.C. Noncitizen Voting Act, with the comparison being between the strength of citizens' votes at that time and their diminished strength after enactment.

Defendant's reliance on the Third Circuit's holding in *Bognet v. Sec'y of Pa.*, another voter fraud case, also fails. There, the court determined that "the purported vote dilution is . . . not concrete because it would occur in equal proportion *without* the alleged procedural illegality—that is, had the *General Assembly* enacted the Deadline Extension, which the Voter Plaintiffs do not challenge substantively." *Bognet v. Sec'y Pa*, 980 F.3d 336, 353 (3d Cir. 2020), *vacated as moot sub nom. Bognet v. Degraffenreid*, 141 S. Ct. 2508 (2021) (emphasis in original). Whatever the merits of this argument, it does not apply to this case; plaintiffs' votes would have remained undiluted but for the existence of the D.C. Noncitizen Voting Act, which plaintiffs, of course, do challenge substantively.

In short, plaintiffs have standing because they allege an injury—dilution of their votes—that has again and again been recognized as particularized, and do not merely assert a general interest in the proper operation of government. Also, if plaintiffs are right on the merits, their constitutional rights to be governed by their citizen peers, to equal protection, and to substantive due process are infringed by the Act. Defendant does not even attempt to show that the violation of these rights is not a particularized injury, and would be unable to do so. *See, e.g., McCleskey v. Kemp*, 481 U.S. 279, 291 n.8 (1987) ("It would violate the Equal Protection Clause for a State to base enforcement of its criminal laws on an unjustifiable standard such as race, religion, or other arbitrary classification. Because McClesky raises such a claim, he has standing."); *AFGE v. OPM (In re United States OPM Data Sec. Breach Litig.)*, 928 F.3d 42, 55 (D.C. Cir. 2019) ("Plaintiffs have standing based on their claimed constitutional injury."); *Time Warner Cable, Inc. v. Hudson*, 667 F.3d 630, 637 (5th Cir. 2012) ("Because the legislation targets the plaintiffs for exclusion from

App.52

this benefit provided to similarly situated speakers, TCA and Time Warner have shown constitutional injury sufficient to establish standing.").

## II.     Plaintiffs State a Plausible Claim that the Act Violates their Right, as Citizens, to Self-Government.

Defendant attempts to disparage the right to citizen self-government, and of citizens to be governed by their citizen peers, as speculative and not deeply-rooted in history, despite numerous Supreme Court holdings setting forth these rights. Doc. 8 at 12-16. In fact, nothing could be clearer than the Constitution's proclamation of popular sovereignty over an independent nation, and from that sovereignty of the people there is at most a small step—explicitly taken by the Court—to the sovereignty of U.S. citizens.

In the first sentence of the Constitution, "We the People of the United States" "ordain and establish" the Constitution. U.S. Const., Preamble. Later, that Constitution is proclaimed to be "the supreme Law of the Land." U.S. Const. Art, VI, cl. 2. In the Constitution, then, the people ordained and established the supreme law of the land. Only the sovereign of an independent United States would have had the power to do so. Thus, the Constitution proclaims in plain sight, with no need of a more explicit statement, the sovereignty of the people over this nation. *Chisholm v. Georgia*, 2 U.S. (2 Dall.) 419, 454 (1793) ("To the Constitution of the United States the term SOVEREIGN, is totally unknown. There is but one place where it could have been used with propriety. But, even in that place it would not, perhaps, have comported with the delicacy of those, who ordained and established that Constitution. They might have announced themselves 'SOVEREIGN' people of the United States: But serenely conscious of the fact, they avoided the ostentatious declaration.") (alterations original) (superseded, on other grounds, by statute); *Adams*, 90 F. Supp. at 97 ("[T]he very structure of the national government [is] subjected by the Constitution to the ultimate sovereignty of the people.") (Oberdorfer, J., concurring in part and dissenting in part).

App.53

The Supreme Court merely assumed the obvious when it equated the people with United States citizens. And it explicated the rights that flow from citizen sovereignty. "The exclusion of aliens from basic governmental processes is not a deficiency in the democratic system but a *necessary consequence* of the community's process of political self-definition." *Cabell v. Chavez-Salido*, 454 U.S. 432, 439-440 (1982) (emphasis added). American citizens, including foreign-born American citizens, comprise the body politic of the United States. *See id.* ("Self-government, whether direct or through representatives, begins by defining the scope of the community of the governed and thus of the governors as well: Aliens are by definition those outside of this community."); *Foley v. Connelie*, 435 U.S. 291, 295-96 (1978) ("The act of becoming a citizen is more than a ritual with no content beyond the fanfare of ceremony. A new citizen has become a member of a Nation, part of a people distinct from others. The individual, at that point, belongs to the polity and is entitled to participate in the processes of democratic decisionmaking. Accordingly, we have recognized a State's historical power to exclude aliens from participation in its democratic political institutions as part of the sovereign's *obligation* to preserve the basic conception of a political community.") (internal citation omitted) (emphasis added); *id.* at 296 ("[A] democratic society is *ruled by its people. Thus*, it is clear that a State may deny aliens the right to vote, or to run for elective office, for these lie at the heart of our political institutions.") (emphasis added); *id.* (holding that such restrictions "represent[] the choice, and *right, of the people to be governed by their citizen peers*.") (emphasis added); *id.* at 297 ("[A]lthough we extend to aliens the right to education and public welfare, along with the ability to earn a livelihood and engage in licensed professions, the right to govern is reserved to citizens.").

Of course, this restriction of the body politic to citizens, and their right to self-government, has the "practical consequence" that restricting municipal jobs that involve governing functions,

App.54

and the vote in municipal elections, to citizens does not offend the Equal Protection Clause. *Id.* at 296. But the premise that the Court articulated for this conclusion, and is a necessary part of its reasoning, states and implies much more. It is an affirmation of the right of United States citizens to govern, and be governed by, themselves. The Court based its holdings on self-evident principles about how democratic nations are governed, and did not mention any specific constitutional provisions. Thus, by pointing in the Complaint to a Supreme Court decision recognizing the right plaintiffs assert, and quoting that decision's description of that right, plaintiffs satisfy every requirement of pleading despite defendant's jibe that they, also, do not mention any specific constitutional provisions. Doc. 8 at 5. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (requiring sufficient facts "to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests."); *Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009) ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.") (citing *Twombly*, 550 U.S. at 556)); *Jarrell v. Tisch*, 656 F. Supp. 237, 239 (1987) ("[I]f plaintiff is asserting a claim for constitutional violations he should do so with the requisite specificity, so as to give defendants notice, plead the involvement of each defendant and clarify what constitutional right has been violated.").

In any event, as shown above, nothing is more obvious than the foundational nature of popular sovereignty in the Constitution, in which "the People" established the supreme law of the land. All the Court did in these cases is make the obvious—the only possible—equation of the people with U.S. citizens, and draw out certain consequences of popular sovereignty, notably "the right[] of the people to be governed by their citizen peers." *Foley*, 435 U.S. at 297.

Plaintiffs have stated a plausible claim that the D.C. Noncitizen Voting Act, by giving the vote to noncitizens and allowing them to hold public offices, including Council Member and

App.55

Mayor, by its very essence directly infringes their right, repeatedly recognized by the Supreme Court, to be governed by their fellow citizens.

### III.     Plaintiffs State Plausible Claims that the Act Violates Equal Protection.

The D.C. Noncitizen Voting Act gives noncitizens living in D.C. what they never had—the right to vote. And it takes away from D.C. citizens what they have always had—the exclusive right to vote. Put another way, the Act's grant of the *benefit* of voting to noncitizens *burdens* citizens by diluting their votes. This starkly differing treatment of two groups classified by the Act meets the threshold requirement for an equal protection challenge. "Analysis of an equal protection claim alleging an improper statutory classification involves two steps. Appellants must first show that the statute, either on its face or in the manner of its enforcement, results in members of a certain group being treated differently from other persons based on membership in that group." *United States v. Lopez-Flores*, 63 F.3d 1468, 1472 (9th Cir. 1995) (citing *Jones v. Helms,* 452 U.S. 412, 423-24 (1981) and *Hernandez v. Texas,* 347 U.S. 475, 479 (1954)). Thus, claims of vote dilution have consistently been analyzed under the Equal Protection Clause. *See Reynolds v. Sims*, 377 U.S. 533 (1964) (one-person, one-vote); (citing  *Brown v. Bd. of Comm'rs*. 722 F. Supp. 380 (E.D. Tenn. 1989) (non-resident voting); *Rucho v. Common Cause*, 139 S. Ct. 2484 (2019) (partisan gerrymandering). Of course, the Act also treats citizens and noncitizens "the same" by letting both groups vote. But it is hardly impossible for the same government policy to treat two groups equally and also unequally. Allowing nonresident property owners to vote in a city puts them on a par with city residents, but at the same time benefits the former and harms the latter. *See Brown v. Bd. of Comm'rs*, 722 F. Supp. 380, 398 (E.D. Tenn. 1989) (striking down an expansion of the franchise to nonresidents of a city under the Equal Protection Clause). Closing the voter registration office in a Louisiana parish to both whites and blacks treated white and black

11

App.56

applicants to vote the same, but also differently where the majority of voting-age whites in the parish were already registered and the majority of voting-age blacks were not. *United States v. Palmer*, 356 F.2d 951, 952 (5th Cir. 1966).

Second, the Act, on its face, expands the number of foreign-born persons who may vote, thus benefitting this group (which includes both citizens and noncitizens) and, consequently, harming the native-born by diluting their votes. In a word, the Act shrinks the political influence of native-born Americans in Washington, D.C. It does so on its face, since, of course, all of the noncitizens allowed to vote by the Act are foreign-born.

These groups, both of which all plaintiffs are members of, are harmed, on the face of the Act, based on protected characteristics. Citizenship is a suspect classification, with the single exception, not operative here, of when *aliens* are barred from voting or governing. *See Graham v. Richardson*, 403 U.S. 365, 371-72 (1971) ("[T]he Court's decisions have established that classifications based on alienage, like those based on nationality or race, are inherently suspect and subject to close judicial scrutiny."); *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 105 (1973) ("The highly suspect character of classifications based on race, nationality, or alienage is well established.") (Brennan, J., dissenting); *Nyquist v. Mauclet*, 432 U.S. 1, 7 (1977) ("Alienage classifications by a State that do not withstand this stringent examination cannot stand."); *Juarez v. Nw. Mut. Life Ins. Co.*, 69 F. Supp. 3d 364, 372 (S.D.N.Y. 2014) ("[T]he Court has repeatedly applied strict scrutiny to statutes discriminating on the basis of alienage."). Because aliens—that is, persons without United States citizenship—form a protected class, United States citizens should also form a protected class. Otherwise, a paradox would be created: the United States citizens who established our Constitution would have given lesser protection to themselves, as a group, than to those of foreign citizenship.

Of course, laws burdening citizens as a class are rare. There is no history, for example, of citizens being barred from owning laundries, or from serving as police officers. But the Equal Protection Clause applies to "persons," not citizens, and thus protects citizens from laws, such as the D.C. Noncitizen Voting Act or a hypothetical law barring all citizens from owning laundries, that treat all citizens equally. In other words, the Equal Protection Clause protects citizens from being disadvantaged as a group, as compared with noncitizens. And it would be paradoxical to hold that citizens receive *less* protection as a group, when so disadvantaged, than noncitizens do.

But even if American citizens do not receive at least the same level of protection under the Equal Protection Clause as non-American citizens do, and thus, in the rare event that a law burdens citizens on its face, that law does not receive the strict scrutiny that laws burdening noncitizens receive, the D.C. Noncitizen Voter Act also, on its face, dilutes the votes of American-born District of Columbia voters. It does so because its addition of noncitizens to the voter rolls automatically adds only persons of non-American birth. National-origin classifications also are suspect. And persons of American birth or ancestry, like those of birth or ancestry in any other country, are a national origin group, and thus a protected class even if American citizens somehow are not. *See Espinoza v. Farah Mfg. Co*., 414 U.S. 86, 88 (1973) ("The term 'national origin' on its face refers to the country where a person was born, or more broadly, the country from which his or her ancestors came."); *Hernandez v. Texas*, 347 U.S. 475, 479 (1954) ("The exclusion of otherwise eligible persons from jury service solely because of their ancestry or national origin is discrimination prohibited by the Fourteenth Amendment."); *Tippie v. Spacelabs Medical, Inc*., 180 Fed. App'x 51, 55 (11th Cir. 2006) (finding a prima facie case of national origin discrimination where American citizen plaintiff was denied employment in favor of a non-American citizen); *Chaiffetz v. Robertson Research Holding Ltd*., 798 F.2d 731, 733 (5th Cir. 1986) ("We agree that

employment discrimination based only on one's country of birth, whether that birthplace is the United States or elsewhere, contradicts the purpose and intent of Title VII."); *Malina v. Makitso United States LLC*, No. 4:19-01808, 2019 U.S. Dist. LEXIS 213113, at *7-8 (S.D. Tex. Oct. 18, 2019) (permitting plaintiff to "assert Title VII discrimination and harassment claims based on her 'American' national origin."); *Thomas v. Rohner-Gehrig & Co.*, 582 F. Supp. 669, 675 (N.D. Ill. 1984) (holding that an employment discrimination claim based on American national origin was legally cognizable).

Against the claim that the Act treats persons in D.C. differently based on two protected grounds—citizenship and national origin—defendant responds only with the assertion that the Act is "facially neutral." The cases defendant cites, however, show the opposite. In *Kingman Park Civic Ass'n v. Bowser*, 815 F.3d 36, 42 (D.C. Cir. 2016), cited by defendant in Doc. 8 at 17, the D.C. Circuit held that the placement of a streetcar project in a neighborhood that was largely black was "facially neutral" because the selection of that neighborhood on its face was geographical, not racial, many other parts of the District also being predominantly black. And in *In re Navy Chaplaincy*, 738 F.3d 425, 428 (D.C. Cir. 2013), Doc. 8 at 18, the same court held that chaplain-selection policies were neutral on their face because, on their face, they did not treat religious denominations differently. In both of these cases, laws were facially neutral simply because on their face they did not treat people differently on the bases—race and religion, respectively—that *plaintiffs claimed*. Here, of course, the Act burdens citizens in the way described above by its terms, which also, by logical operation, shrink the voting power of native-born Americans. The Act is thus *not* "facially neutral," but on its face treats people differently on the very bases plaintiffs claim.

App.59

Laws, such as the D.C. Noncitizen Voting Act, that on their face treat people differently based on a protected characteristic receive strict scrutiny and do not require an inquiry into legislative purpose. *See Shaw v. Reno*, 509 U.S. 630, 632, 643 (1993) ("No inquiry into legislative purpose is necessary when the racial classification appears on the face of the statute."). "Express racial classifications are immediately suspect because 'absent searching judicial inquiry . . . . there is simply no way of determining what classifications are benign or remedial and what classifications are in fact motivated by illegitimate notions of racial inferiority or simple racial politics.'" *Id.* (quoting *Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 8 (1989) (plurality opinion)); *Int'l Union v. Johnson Controls*, 499 U.S. 187, 199 (1991) ("Whether an employment practice involves disparate treatment through explicit facial discrimination does not depend on why the employer discriminates but rather on the explicit terms of the discrimination."); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985) (explaining that facial classifications based on race, alienage, and national origin "are so seldom relevant to the achievement of any legitimate state interest," that they "are subjected to strict scrutiny and will be sustained only if they are suitably tailored to serve a compelling state interest.") (superseded by statute on other grounds) (internal citations omitted); *Jana-Rock Constr., Inc. v. N.Y. State Dep't of Econ. Dev.*, 438 F.3d 195, 204 (2d Cir. 2006) (explaining that facial discrimination occurs "[w]hen the government expressly classifies persons on the basis of race or national origin."). On its face, the Act, by expanding the franchise to noncitizens, dilutes the votes of citizens, a protected class. Also on its face, it adds only foreign-born (because noncitizen) voters to the rolls, and thus dilutes the votes of non-foreign-born—that is, American-born—voters, also a protected class.

The Act cannot pass strict scrutiny. Defendant claims that "[t]he District has a compelling interest in democratic self-government, *i.e.*, defining its political community and ensuring that

members of that community have a voice in their government." Doc. 8 at 17. But this claimed interest does not even provide a rational basis for the law, or a cognizable interest necessary to pass the *Anderson-Burdick* test applicable to voting changes not based on protected characteristics.[1] D.C. has no cognizable interest, let alone a "compelling" one, in defining its political community in a way that contradicts the way the political community of the United States is defined, according to the Supreme Court, in the Constitution, and that diminishes the sovereignty of that political community. In America, "We the People" are sovereign. D.C. has no interest a United States court can recognize in legislating otherwise.

Citizens and the American-born, in the so-far rare event they are burdened based on these characteristics, deserve equal protection as much as any other protected groups. Plaintiffs have plausibly stated their claims that the D.C. Noncitizen Voting Act violates their right to equal protection under the Fifth Amendment.

## IV.    Plaintiffs State a Plausible Substantive Due Process Claim.

"The Due Process Clause guarantees more than fair process, and the 'liberty' it protects includes more than the absence of physical restraint. The Clause also provides heightened protection against government interference with certain fundamental rights and liberty interests." *Washington v. Glucksberg*, 521 U.S. 702, 719-20 (1997). Thus, substantive due process provides protection to citizens "in addition to the specific freedoms protected by the Bill of Rights." *Id.* at 720. *See also Sotto v. Wainwright*, 601 F.2d 184, 190 (5th Cir. 1979) ("The substantive component

---

[1] *See, e.g., Richardson v. Trump*, 496 F. Supp. 3d 165, 181 (D.D.C. 2020) ("Under the *Anderson-Burdick* line of cases, courts have recognized that [e]lection laws will invariably impose some burden upon individual voters, and that not all laws burdening the right to vote are subject to strict scrutiny. Instead, courts must first consider the character and magnitude of the asserted injury to the plaintiffs' right to vote against the precise interests put forward by the [government] as justifications for the burden imposed[,] including the legitimacy and strength of each of those interests and the extent to which those interests make it necessary to burden the plaintiff's rights.") (citing *Anderson v. Celebrezze*, 460 U.S. 780 (1983) and *Burdick v. Takushi*, 504 U.S. 428 (1992)) (alterations in original) (internal quotation marks omitted).

of the due process clause which goes beyond the specific provisions of the Bill of Rights embodies a conception of fundamental justice.") (citation omitted).

As defendant points out, Doc. 8 at 12-13, the D.C. Circuit and the Supreme Court have held that where the Constitution contains an explicit protection, a party is unable also to allege a substantive due process claim. *See Elkins v. District of Columbia*, 690 F.3d 554, 562 (D.C. Cir. 2012) ("Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.'") (quoting *Albright v. Oliver*, 510 U.S. 266, 273 (1994)). But the cases cited by defendant in support of dismissing plaintiffs' substantive due process claim on this basis, Doc. 8 at 16-17, are inapposite because they dealt with search and seizure injuries that are explicitly protected by the Fourth Amendment. These cases in no way show, contrary to defendant's assertion, that the implicit protection of the equal protection component of the Due Process Clause supplants the implicit protection of substantive due process under the same clause, and precludes the latter claim.

As the Supreme Court set forth, there is a two-step process for analyzing substantive due process claims:

> First, we have regularly observed that the Due Process Clause specially protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed. Second, we have required in substantive-due-process cases a careful description of the asserted fundamental liberty interest. Our Nation's history, legal traditions, and practices thus provide the crucial guideposts for responsible decisionmaking, that direct and restrain our exposition of the Due Process Clause. As we stated recently . . . the Fourteenth Amendment forbids the government to infringe . . . fundamental liberty interests *at all*, no matter what process is provided, unless the infringement is narrowly tailored to serve a compelling state interest.

17

*Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997) (quotation marks and internal citations omitted) (emphasis in original). *See also Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2246 (2022) (explaining that a court must ask "whether the right is deeply rooted in [our] history and tradition and whether it is essential to our Nation's scheme of ordered liberty."). The determination of whether a right is implicit in the concept of ordered liberty," *Abigail All. for Better Access to Developmental Drugs v. Von Eschenbach*, 495 F. 3d 695, 718 (D.C. Cir. 2007) (quotation marks and citation omitted), is an important part of this test. Among the rights recognized as "implicit in the concept of ordered liberty" are the right of association, *NAACP v. Alabama*, 357 U.S. 449 (1958); the right to access the courts, *NAACP v. Button*, 371 U.S. 416 (1963); and, as relevant here, the right to vote, *Harper v. Virginia State Board*, 383 U.S. 663 (1966).

### A.  Plaintiffs allege the violation of a carefully-defined fundamental right.

"Substantive due process analysis must begin with a careful description of the asserted right, for the 'doctrine of judicial self-restraint requires us to exercise the utmost care whenever we are asked to break new ground in this field.'" *Reno v. Flores*, 507 U.S. 292, 302 (1993) (quoting *Collins v. Harker Heights*, 503 U.S. 115, 125 (1992)). *See also Abigail All. For Better Access to Developmental Drugs v. Von Eschenbach*, 495 F.3d 695, 701 n.5 (D.C. Cir. 2007) (explaining that the "threshold requirement" for substantive due process is "a carefully described right").

Defendant asserts that Plaintiffs have not carefully defined the right at issue in this case, then suggests one proper formulation: "a purported right to have one's vote counted without the presence of non-citizens' votes." Doc. 8 at 19. Plaintiffs' complaint, however, does allege the exact "carefully described" right defendant suggests—plaintiffs complain that the D.C. Noncitizen Voting Act dilutes their fundamental right to vote by including noncitizens in the eligible voter

App.63

and candidate pools. Pl. Compl., Doc.1-1 at 15. Another formulation of this right is the right to citizen self-government, which plaintiffs allege the Act violates. *Id.* at 16.

**B. The right to citizen self-government is deeply rooted in the Nation's history and "implicit in the concept of ordered liberty."**

To receive protection under substantive due process, the "carefully described" right must also be "objectively, deeply rooted in this Nation's history and tradition and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (quotation marks and citation omitted).

As shown above, the right to citizen self-government is set forth, with the Declaration of Independence as a backdrop, in the text of the Constitution, both in the Preamble (only a sovereign "People"—that is, citizenry—of an independent nation could establish a constitution) and in the Preamble together with the Supremacy Clause (only a people or citizenry that was sovereign over an independent nation could establish "the supreme law of the land"). *See Brackeen v. Haaland*, 994 F.3d 249, 274 n.2 (5th Cir. 2021) ("The Constitution rooted its legitimacy in the consent of those whom it would come to govern, declaring that the system it outlined was 'ordained and established' by 'We the people,' U.S. Const. Preamble."), *rev'd on unrelated grounds by Haaland v. Brackeen*, 143 S. Ct. 1609 (2023); *United States Term Limits v. Thornton*, 514 U.S. 779, 849 (1995) (Thomas, J., dissenting) (discussing "the notion of popular sovereignty that undergirds the Constitution."); *Comm. to Recall Robert Menendez From the Office of U.S. Senator v. Wells*, 204 N.J. 79, 149, 7 A.3d 720, 763 (N.J. S. Ct. 2010) (discussing the "fundamental notions of popular sovereignty, that is, that all power resides with the people and that it is only by their consent that the people may be governed. That doctrine finds its most familiar expression in the Declaration of Independence"); *id.* at 150 ("That the doctrine of popular sovereignty is infused in our deepest

19

App.64

historical traditions cannot be ignored."). But even if this textual basis is deemed insufficiently "explicit," the right is still fundamental.

It is fundamental, first of all, because it *is* clearly—even if implicitly—set forth in the Constitution, starting with that document's *first three words*. And the Supreme Court has repeatedly described the right as fundamental to the very idea of a self-governing democracy. *See McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 404-05 (1819) ("The government of the Union . . . is, emphatically, and truly, a government of the people. In form and in substance it emanates from them. Its powers are granted by them, and are to be exercised directly on them, and for their benefit."); *Reynolds v. Sims*, 377 U.S. 533, 565 (1964) ("But representative government is in essence self-government through the medium of elected representatives of the people, and each and every citizen has an inalienable right to full and effective participation in the political processes of his State's legislative bodies."); *Alden v. Maine*, 527 U.S. 706 (1999) ("By splitting the atom of sovereignty, the founders established two orders of government, each with its own direct relationship, its own privity, its own set of mutual rights and obligations to the people who sustain and are governed by it."). It would take a great deal of contrary historical evidence, given the foundational importance of popular sovereignty and citizen self-government in both the Constitution and the basic theory of democracy, to show that this right is not "deeply-rooted" in our history. That defendant does not provide.

Defendant asserts that "a long history of non-citizen voting refutes" plaintiffs' claims. Doc. 8 at 12. But almost all of the history defendant cites occurred before there was any clear rule about *who was* a United States citizen, that is, before the Citizenship Clause of the Fourteenth Amendment. Doc. 8, at 13. For example, the cited portion of the Massachusetts Constitution was written by John Adams in 1780, seven years before the U.S. Constitution was ratified. Mass. Const.

pt. 2, ch. I, § 3, art. IV (1780). Three of the other cited constitutions were drafted in 1776. During

this period there was no clear rule defining who was a citizen of the United States.

And while citizenship is of vital importance in the U.S. Constitution, there was no clear

rule about who was a citizen even long after it was adopted. The Constitution explicitly authorized

Congress "[t]o establish a uniform Rule of Naturalization," U.S. Const. Art. I, § 8, cl. 4, but it did

not provide or require a definition of citizenship. The very first Congress exercised this power not

to define who a citizen was but to provide procedures for aliens seeking to become citizens.

Naturalization Act of 1790, ch. 3, 1 Stat. 103. Thus, a U.S. citizenship requirement in early state

constitutions would have only created confusion about voter qualifications even after Congress

began exercising its constitutional authority to make rules for immigration and naturalization. The

lack of such a requirement in these documents seems merely a practical accommodation to this

reality, and as such can hardly constitute "strong evidence" of "how the founding generation

conceived the right" to citizen self-government. *District of Columbia v. Heller*, 554 U.S. 570, 603

(2008).

Indeed, the Massachusetts Constitution reflects the same theory of popular sovereignty,

and the equation of the sovereign people with the citizenry, as does the U.S. Constitution, and uses

the words "people" and "citizens" interchangeably:

> The body politic is formed by a voluntary association of individuals;
> it is a social compact by which the whole people covenants with
> each citizen and each citizen with the whole people that all shall be
> governed by certain laws for the common good. It is the duty of the
> people, therefore, in framing a constitution of government, to
> provide for an equitable mode of making laws, as well as for an
> impartial interpretation and a faithful execution of them; that every
> man may, at all times, find his security in them.

Mass. Const., preamble (1780). It would be strange if Massachusetts saw power as vested in the

people, that is, citizens, and then wished to have others—noncitizens—share in that power by

App.66

voting. More likely, perhaps, is that Adams regarded Massachusetts's requirements for voting as a stab at what the requirements for Massachusetts and United States citizenship themselves were or should be.

In keeping with this lack of a clear rule of citizenship, scholars have referred not to a stable tradition, but to "the 'spasmodic' nature of alien suffrage," in American history. Kennedy-Shaffer, Alan, *Voters in a Foreign Land: Alien Suffrage and Citizenship in the United States, 1704-1926*, W&M ScholarWorks, https://dx.doi.org/doi:10.21220/s2-115t-9130 (2009) (quoting Kirk H. Porter, *A History of Suffrage in the United States* 112 (1918)). This haphazard quality is likely due to the fact that "'the line between national and state citizenship during the eighteenth and early nineteenth centuries was not clearly demarcated[.]'" *Id.* (quoting Virginia Harper-Ho, *Noncitizen Voting Rights: The History, the Law and Current Prospects for Change*, 18(2) Law & Ineq. 271, 274 (2000)). In any event, states began requiring citizenship as a voter qualification following the War of 1812. *Id.* (quoting Jamin B. Raskin, *Legal Aliens, Local Citizens: The Historical, Constitutional and Theoretical Meanings of Alien Suffrage*, 141 U Penn Law Review 1391, 1403 (1993)). States admitted to the Union beginning in 1812 "confined the franchise to citizens. Meanwhile, a number of early states" that had not required citizenship for voting "during this same period[] chang[ed] the constitutional definition of voters from 'inhabitants' to 'citizens.'" Raskin, 141 U Penn Law Review at 1404.

Furthermore, while some states did allow noncitizens the right to vote, such permission represented a mere technical infringement on the right to citizen self-government. *See Minor v. Happersett*, 88 U.S. (21 Wall.) 162, 177 (1874) (stating that several states did not require citizenship, allowing "persons of foreign birth, *who have declared their intention to become citizens of the United States*, may under certain circumstances vote.") (emphasis added). By

22

requiring this pledge, these states acknowledged the spirit of the right even as they violated its letter.

Finally, Defendant's claim that "[t]he District is just the latest jurisdiction to continue the trend" of noncitizen voting falls flat. Doc. 8 at 16. While it is true that several jurisdictions in Maryland permit the practice, noncitizen voting has also been enacted, challenged, and struck down by state courts in New York and California. *See Fossella v. Adams*, 2022 NYLJ LEXIS 1150 (N.Y. 2022) (striking down a law permitting legal permanent residents and those with employment authorization to vote in municipal elections); *Lacy v. City and County of San Francisco*, No. CPF-22-517714 (Cal. 2022) (striking down a municipal law allowing noncitizen parents to vote in school board elections). Indeed, what these cases show is precisely this innovation's collision with the historically "deeply-rooted" nature of citizen self-government.

In short, the history of permitting noncitizen voting is haphazard at best, and can hardly be described as the "'[l]ong settled and established practice'" that defendant alleges. Doc. 8 at 16 (quoting *Houston Cmty. Coll. Sys. v. Wilson*, 142 S. Ct. 1253, 1259 (2022)). As such, this history cannot overthrow the deeply-rooted nature of popular sovereignty, and the rights that flow from it, in the Constitution and the basic theory of democracy, as explicated by the Supreme Court time and again. The right of United States citizens to govern, and to be governed by, themselves is fundamental in our system of democracy.

The D.C. Noncitizen Voting Act infringes this fundamental right by its terms, and as explained above serves no compelling interest in doing so. Plaintiffs accordingly have stated a plausible claim for relief from the violation of their right to substantive due process.

**<u>CONCLUSION</u>**

For the foregoing reasons, defendant's motion to dismiss should be denied.

Dated: July 14, 2023                                Respectfully submitted,

                                                    <u>/s/ Christopher J Hajec</u>
                                                    Christopher J. Hajec (D.C. Bar No. 492551)
                                                    Gina M. D'Andrea (D.C. Bar No. 1673459)
                                                    Immigration Reform Law Institute
                                                    25 Massachusetts Ave NW, Suite 335
                                                    Washington, DC 20001
                                                    Tel: 202.232.5590
                                                    Email: chajec@irli.org
                                                            gdandrea@irli.org
                                                    *Counsel for Plaintiffs*

App.69

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **STACIA HALL,** *et al.*,<br><br>    **Plaintiffs,**<br><br>    v.<br><br>**DISTRICT OF COLUMBIA BOARD OF ELECTIONS,**<br><br>    **Defendant.** | **No. 1:23-cv-01261-ABJ** |

## <u>REPLY BRIEF IN FURTHER SUPPORT OF DEFENDANT'S MOTION TO DISMISS PLAINTIFFS' COMPLAINT</u>

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

ARGUMENT ........................................................................................................... 1

    I.      Plaintiffs Lack Standing ...................................................................... 1

    II.     The Complaint Fails to State a Claim. .................................................. 9

          A.     Plaintiffs Have Not Rebutted the District's Showing That Non-
               Citizen Voting Was Historically Practiced and Accepted. ......................... 9

          B.     The Substantive Due Process Claim Fails. ................................................ 16

          C.     The Equal Protection Claims Fail. ........................................................... 18

          D.     The "Right to Citizen Self-Government" Claim Fails. ............................. 20

CONCLUSION ......................................................................................................... 22

## INTRODUCTION

What is most remarkable about Plaintiffs' Opposition is what it lacks.  *See* Pls.' Mem. of P. & A. in Opp'n to Def.'s Mot. to Dismiss (Pls.' Opp'n) [12].  Plaintiffs lack a single case recognizing an Article III injury due to vote dilution from mere expansion of the electorate. Plaintiffs lack a single case holding—ever—that non-citizen voting is unconstitutional, despite its ubiquity at the Founding.  Plaintiffs lack a single case recognizing a substantive due process right of citizens to exclude non-citizens from the vote.  Plaintiffs lack a single case holding that laws expanding the electorate are somehow discriminatory on their face.  And Plaintiffs lack a single case recognizing a judicially enforceable "right to citizen self-government."  Plaintiffs' claims, then, are too lacking to survive dismissal.

## ARGUMENT

### I.      Plaintiffs Lack Standing.

Plaintiffs press a theory of standing that neither the Supreme Court nor D.C. Circuit has recognized and that Article III will not tolerate.  While Plaintiffs invoke cases involving "vote dilution," none of those cases recognized a theory of standing based on vote dilution due to the mere expansion of the electorate.  Pls.' Opp'n at 3–5.  Rather, the Supreme Court and D.C. Circuit have recognized vote dilution as an Article III injury when "votes are disfavored Vis-a-vis [*sic*] those of some other group."  *Daughtrey v. Carter*, 584 F.2d 1050, 1056 (D.C. Cir. 1978); *see also Gill v. Whitford*, 138 S. Ct. 1916, 1935 (2018) (Kagan, J., concurring) (explaining that cognizable vote dilution "arises when an election practice—most commonly, the drawing of district lines—devalues one citizen's vote as compared to others").  Critical to the definition of vote dilution is the differential weighing of votes.  Mem. of P. & A. in Supp. of Def.'s Mot. to Dismiss Pls.' Compl. (Def.'s Mot.) [8] 6–7.  And differential weighing is so critical because the real harm of vote dilution is discrimination.  *See Allen v. Milligan*, 143 S. Ct.

1487, 1503 (2023) (explaining that "[t]he essence" of a vote dilution claim "is that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters," "where an electoral structure operates to minimize or cancel out minority voters' ability to elect their preferred candidates" (internal quotation marks and citation omitted)); *Hudson v. Haaland*, 843 F. App'x 336, 338 (D.C. Cir. 2021) (explaining that cognizable vote dilution occurs by "irrationally favor[ing]" one class of voters over another (internal quotation marks omitted) (quoting *Wood v. Raffensperger*, 981 F.3d 1307, 1314 (11th Cir. 2020))).

Under the Local Resident Voting Rights Amendment Act of 2022 (the Act), D.C. Law 24-242, 69 D.C. Reg. 14,601 (Dec. 2, 2022), citizen votes are not weighted or treated differently from non-citizen votes. One vote cast by a Plaintiff will have the same value as a non-citizen's vote—one vote. So this is not a true vote dilution case. Indeed, the D.C. Circuit has already rejected a similar theory of vote dilution based on expansion of the electorate by reasoning that, even with additional votes in the pool, plaintiffs' votes were not "disfavored." *Daughtrey*, 584 F.2d at 1056.[1]

It would be error to expand the concept of vote dilution to cover this case. That is because when "vote dilution" occurs simply as a mathematical function of an expanded electorate, the real harm of vote dilution recognized in past cases—discrimination—is not

---

[1]     *Daughtrey* also reasoned that the plaintiffs, voters from various jurisdictions challenging the restoration of draft dodgers' voting rights, did "not contend that their votes are diluted in any particular election or in any particular geographical area," so any dilution was too speculative. 584 F.2d at 1056. Plaintiffs here suffer from a similar problem because the Court can only speculate as to the effects of the Act in elections yet to be held. Plus, Plaintiffs do not even *allege* that they intend to vote in any "particular election." *Id.* Their tardy statement in their brief about wanting to someday "participate in D.C. elections" does not cure the *pleading* deficiency. Pls.' Opp'n at 5.

2

present.  Instead, Plaintiffs only complain of "a byproduct of the voting scheme." *Hudson*, 843 F. App'x at 338.  But because any bare mathematical injury from an expanded electorate "is shared by all," it is "not the sort of vote dilution theory that courts have found to support standing." *Id.*

Nor are Plaintiffs correct that any "vote dilution" they may experience resulting from an expanded electorate is sufficiently particularized.  Plaintiffs cherry-pick language from apportionment and gerrymandering cases to argue that "[t]he harm of vote dilution . . . is individual and personal in nature."  Pls.' Opp'n at 3 (internal quotation marks omitted) (quoting *Gill*, 138 S. Ct. at 1935 (Kagan, J., concurring)).  But what the Supreme Court has held is that, in those cases, "the injuries giving rise to those claims were individual and personal in nature because the claims were brought by voters who alleged facts showing disadvantage to themselves as individuals." *Gill*, 138 S. Ct. at 1930 (majority) (internal quotation marks and citations omitted).  A "disadvantage," *id.*, is missing here.  The Supreme Court has never gone further and held that a person whose voting power is reduced by the inclusion of new voters has suffered a "disadvantage" that qualifies as an individualized injury sufficient for standing.

None of Plaintiffs' other cases state such a rule.  In the census apportionment context, the Supreme Court has recognized that cognizable vote dilution occurs when a census method would cause a voter to lose a representative in Congress. *Dep't of Com. v. U.S. House of Representatives*, 525 U.S. 316, 331–32 (1999); *Citizens for Const. Integrity v. Census Bureau*, No. 21-cv-3045, 2023 WL 2992466, at *3 (D.D.C. Apr. 18, 2023) (three-judge court), *appeal docketed*, No. 23-5140 (D.C. Cir. June 26, 2023).  But here, the expansion of the number of possible voters does not result in Plaintiffs losing a representative in District or federal government (nor do they allege so).  Also in the census apportionment context, cognizable vote

App.74

dilution may occur when a census method will increase the count of certain groups, thereby diminishing the population count—and thus representation and voting power—of localities with less population in those groups.  *Dep't of Com.*, 525 U.S. at 332–33.  But here, there is no diminishment of voting power of citizen voters "vis-à-vis" non-citizen voters.  *Id.* at 333.

Nor does *Michel v. Anderson*, 14 F.3d 623 (D.C. Cir. 1994), authorize the expansion of vote dilution precedent that Plaintiffs seek.  *Michel* was a challenge by Members of Congress and their constituents to a House rule allowing delegates from the District and U.S. territories to vote in the Committee of the Whole.  *Id.* at 624–25.  The Court started from the proposition that the Members had standing because "their voting power has been diluted" since they would each now be one vote of 440 instead of 435.  *Id.* at 625–26.  The Court then held that the constituents had "derivative" standing, *id.* at 626 (internal quotation marks omitted), "to raise a claim that their vote was diluted because previously they had a right to elect a representative who cast one of 435 votes, whereas now their vote elects a representative whose vote is worth only one in 440," *id.* at 626.

*Michel* does not stand for the proposition that the expansion of the *general electorate* works a sufficiently particularized injury on voters.  Instead, *Michel* relied on precedent that *legislators* suffer injuries when their power and sway over the chamber are diminished.  *Id.* at 625 (citing *Vander Jagt v. O'Neill*, 699 F.2d 1166 (D.C. Cir. 1982)); *see McCarthy v. Pelosi*, 480 F. Supp. 3d 28, 33 (D.D.C. 2020) (explaining that *Michel* and similar cases "all speak of voting power, and consequently the dilution of that voting power, in similar terms; a Members' voting power is defined relative to the entire congressional body"), *aff'd*, 5 F.4th 34 (D.C. Cir. 2021).  Legislator standing is its own body of law, and the special interests and issues associated with legislators' power counsel against extending *Michel* outside its legislative context.  *See Michel v.*

*McConnell*, 217 F. Supp. 3d 269, 272 (D.D.C.) (explaining that the vote dilution in *Michel* involved "some form of actual structural denial of their representative's right to vote"), *aff'd*, 664 F. App'x 10 (D.C. Cir. 2016) (per curiam).  Moreover, the *Michel* court "was presented with a set of facts under which dilution could be numerically ascertained" (1 out of 435 versus 1 out of 440).  *Kardules v. City of Columbus*, 95 F.3d 1335, 1349 (6th Cir. 1996); *see also McConnell*, 217 F. Supp. 3d at 272 ("The prototypical vote-dilution cases involve a mathematical showing of the loss of a representative voice.").  But Plaintiffs' claim of vote dilution is far more generalized and speculative because Plaintiffs have presented no facts or even allegations to predict how many non-citizens will vote or what effect their vote will have.  *See Daughtrey*, 584 F.2d at 1056 (rejecting vote dilution theory when the alleged dilution was "so diffuse, minute, and indeterminable").

Unlike *Michel*, the cases surrounding the 2020 election cited by the District are closer to addressing—and rejecting—Plaintiffs' argument that an expansion of the electorate gives rise to a cognizable vote dilution injury.  Def.'s Mot. at 5–6.  Plaintiffs' attempts to discount those cases are unpersuasive.  Plaintiffs first try to confine those cases by saying that they only address vote dilution as a result of voter fraud.  Pls.' Opp'n at 6.  That is not so.  In the Pennsylvania case, for example, one of the theories was that the Pennsylvania Supreme Court had unlawfully extended the ballot deadline, and any ballots received after the deadline diluted the votes from ballots received before the deadline.  *Bognet v. Sec'y Commonwealth of Pa.*, 980 F.3d 336, 358 (3d Cir. 2020), *vacated as moot sub nom. Bognet v. Degraffenreid*, 141 S. Ct. 2508 (2021).  The Third Circuit rejected that theory, reasoning that "[a]lthough the [ballots received before the extended deadline], under Plaintiffs' theory, should make up 100% of the total votes counted and the [ballots received after the extended deadline] 0%, there is simply no differential weighing of the

votes." *Id.*  The court, then, did not find a lack of standing simply because the plaintiffs were only asserting "a generalized interest in the proper operation of government," *i.e.*, fraud-free elections.  Pls.' Opp'n at 6.  Rather, the court held that standing was lacking because precedent does not permit a theory that allegedly unlawful votes (there, extended-deadline ballots; here, non-citizen votes) caused by an allegedly unlawful election policy (there, the state court's deadline extension; here, the Act) dilute a plaintiff's vote such that he/she suffers an Article III injury.  *Bognet*, 980 F.3d at 358.  What is more, the D.C. Circuit, albeit in a non-precedential opinion, has adopted this same reasoning from *Bognet*—in a case that did not involve voter fraud at all.  *Hudson*, 843 F. App'x at 338.

Plaintiffs next argue that the 2020 cases suffered from lacking a "point of comparison," Pls.' Opp'n at 6 (internal quotation marks omitted) (quoting *Wood*, 981 F.3d at 1314), while here "the point of comparison is a point in time" in that Plaintiffs' votes will be in a larger pool after the Act, *id.* at 6–7.  Plaintiffs misunderstand these cases.  The courts spoke of a point of comparison because cognizable vote dilution occurs when, comparing two groups' votes, the votes are weighed differently.  *See Wood*, 981 F.3d at 1314 ("[V]ote dilution occurs when voters are harmed compared to 'irrationally favored' voters from other districts." (quoting *Baker v. Carr*, 369 U.S. 186, 207–08 (1962))); *Bognet*, 980 F.3d at 358 ("[A] disadvantage to the plaintiff exists only when the plaintiff is part of a group of voters whose votes will be weighed differently compared to another group."); *Hudson*, 843 F. App'x at 338 (relying on *Wood* and *Bognet* to explain that no cognizable vote dilution occurs when votes were "weighed and were counted equally").  Plaintiffs cite no case—and the District is aware of none—holding that the disadvantage can be judged by comparing the same group at different points in time.  Rather, because vote dilution is a species of discrimination, courts compare how votes of two different

6

groups are treated (*e.g.*, voters in different districts).  In any event, Plaintiffs' votes will count the

same in future elections as they did before (as one vote).  *See Bognet*, 980 F.3d at 358 (holding

that vote dilution resulting from extending the ballot deadline was not cognizable because "no

Pennsylvania voter's vote will count for less than that of any other voter").

In sum, Plaintiffs incorrectly use the concept of "vote dilution," which refers to a specific

"type" of injury that is not present here.  *Hudson*, 843 F. App'x at 338.  The only way Plaintiffs

can have standing would be to expand vote dilution case law.  But keeping vote dilution within

its current bounds makes good sense.  As the 2020 cases teach, losing candidates, disgruntled

voters, and more will use mathematical vote dilution theories like Plaintiffs' here as their ticket

into federal court to raise generalized grievances about election processes—or even to overturn

election results.[2]  By rejecting these theories, courts across the country have laudably kept

election disputes with the political branches and kept election outcomes with the people.  This

Court should do the same.  Plaintiffs, no doubt, disagree with the policy wisdom of extending the

right to vote to all residents of a community.  In any democracy, it is their right to disagree.  But

in *our* democracy, the United States courts are not a forum to air policy disagreements.  *Carney

v. Adams*, 141 S. Ct. 493, 499 (2020).  That forum is the Council's chamber, the halls of

Congress, or the ballot box—not a courtroom.

As a final ploy, Plaintiffs argue that their allegations of constitutional violations are

enough to establish standing.  Pls.' Opp'n at 7.  Plaintiffs incorrectly conflate standing and the

---

[2]     *E.g.*, *Wood*, 981 F.3d at 1310; *Bognet*, 980 F.3d at 345–46; *Donald J. Trump for
President, Inc. v. Cegavske*, 488 F. Supp. 3d 993, 1000 (D. Nev. 2020); *Bowyer v. Ducey*, 506 F.
Supp. 3d 699, 706, 711 (D. Ariz. 2020); *Election Integrity Project Cal., Inc. v. Weber*, No. 21-
cv-32, 2021 WL 4501998, at *4 (C.D. Cal. June 14, 2021), *aff'd in part, vacated in part*, No. 21-
56061, 2022 WL 16647768 (9th Cir. Nov. 3, 2022); *Moore v. Circosta*, 494 F. Supp. 3d 289, 312
(M.D.N.C. 2020); *Paher v. Cegavske*, 457 F. Supp. 3d 919, 926 (D. Nev. 2020); *Martel v.
Condos*, 487 F. Supp. 3d 247, 253 (D. Vt. 2020).

merits.  To have standing, Plaintiffs must show that the alleged constitutional violations (even assuming they occurred) harmed Plaintiffs in a concrete, particularized way.  *Carney*, 141 S. Ct. at 498–99.  To illustrate, in *Carney*, the plaintiff challenged, as a violation of the First Amendment, a provision requiring partisan balance on Delaware's courts.  *Id.* at 496–47.  The Supreme Court explained that, even assuming the plaintiff "is right" on the merits, the fact that he "must live in a State subject to an unconstitutional judicial selection criterion" "does not create standing."  *Id.* at 499.  Instead, he needed to show a specific harm to him, namely, that the Delaware provision "in fact prevents *him*, a political independent, from having his judicial application considered" and "that he is likely to apply to become a judge in the reasonably foreseeable future if Delaware did not bar him because of political affiliation."  *Id.* at 499–500 (emphasis added).

The few cases Plaintiffs cite are not to the contrary.  Pls.' Opp'n at 7–8.  In each, there was a recognized, concrete harm associated with the constitutional violation.  In *McCleskey v. Kemp*, 481 U.S. 279, 291 (1987), a Black capital defendant alleged that "race has infected the administration of Georgia's [capital punishment] statute" in violation of the Equal Protection Clause.  So his concrete injury was that, "as a black defendant who killed a white victim," he personally had experienced the discriminatory aspects of Georgia's system.  *Id.*  In *In re U.S. Office of Personnel Management Data Security Breach Litigation*, 928 F.3d 42, 54 (D.C. Cir. 2019) (per curiam), government employee plaintiffs were victims of a data breach, which they claimed resulted in an invasion of their constitutional right to privacy.  So the concrete injury was that the plaintiffs' data had been taken.  And in *Time Warner Cable, Inc. v. Hudson*, 667 F.3d 630, 636 (5th Cir. 2012), the injury was discriminatory treatment in that a statute extended a benefit to one class but not the plaintiffs.  Such discriminatory treatment is not present here

because the Act does not extend voting rights to non-citizens but not citizens—the Act is instead neutral.  At bottom, none of these cases stands for the proposition, for which Plaintiffs cite them, that allegations of a constitutional violation are alone enough to create an injury-in-fact.

To the contrary, Plaintiffs must allege more than simply that they "must live in" a jurisdiction with "an unconstitutional" voter eligibility scheme.  *Carney*, 141 S. Ct. at 499.  They must allege "a concrete, particularized 'injury in fact' over and above the abstract generalized grievance suffered by all citizens of" the District.  *Id.*  Their only attempt at an injury-in-fact is their theory of vote dilution.  But, for reasons explained, their particular theory of vote dilution does not allege a cognizable injury-in-fact.  Thus, Plaintiffs have not shown standing.

## II.     **The Complaint Fails to State a Claim.**

### A.     **Plaintiffs Have Not Rebutted the District's Showing That Non-Citizen Voting Was Historically Practiced and Accepted.**

Since the District moved to dismiss, the Supreme Court has—again—rejected constitutional claims at odds with "settled and established [historical] practice."  *Moore v. Harper*, 143 S. Ct. 2065, 2086 (2023) (internal quotation marks omitted) (quoting *The Pocket Veto Case*, 279 U.S. 655, 689 (1929)).  In response to the District's defense that Plaintiffs' claims are at odds with a long history of non-citizen voting, Plaintiffs offer little in the way of argument and even less in the way of support.

Plaintiffs argue that all the Founding Era history of non-citizen voting marshalled by the District is meaningless because this history "occurred before there was any clear rule about *who was* a United States citizen, that is, before the Citizenship Clause of the Fourteenth Amendment."  Pls.' Opp'n at 20.  Plaintiffs start off on the wrong foot by arguing that Founding Era history is irrelevant to a historical inquiry.  *See N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111, 2136–38 (2022) (explaining that the Founding is the operative reference point

9

when inquiring into the Constitution's meaning).  Although the definition of who is a U.S.

citizen was (and still is) complex and changing, there has been—since the Founding—a concept

of national citizenship.  *Minor v. Happersett*, 88 U.S. 162, 165–66 (1874); *see also* Gerald L.

Neuman, *"We are the People": Alien Suffrage in German and American Perspective*, 13 Mich.

J. Int'l L. 259, 292 (1992).[3]  The Constitution, from its inception, empowered Congress "[t]o

establish an uniform Rule of Naturalization."  U.S. Const. art. I, § 8.  And the First Congress

exercised that power by enacting a statute signed by President Washington defining who could

become a U.S. citizen.  Naturalization Act of 1790, 1 Stat. 103.  Contrary to Plaintiffs'

suggestion that the statute was only about "procedures," Pls.' Opp'n at 21, the statute set forth

substantive qualifications for citizenship (*e.g.*, residency, race), so it helped define the concept of

national citizenship, *Minor*, 88 U.S. at 168.

Other historical evidence shows that there was enough of a concept of U.S. citizenship

from the Founding that states could have conditioned suffrage on citizenship or courts could

have held that such a condition was constitutionally required.  One of the original states,

Georgia, *did* limit suffrage to citizens.  Ron Hayduk, *Democracy for All: Restoring Immigrant*

*Voting Rights in the United States* 19 (2006), https://tinyurl.com/5aepa5bd; Alan Kennedy-

Shaffer, *Voters in a Foreign Land: Alien Suffrage and Citizenship in the United States, 1704–*

*1926* 17 (2009), https://tinyurl.com/3rtdh99c (citing Ethel K. Ware, *A Constitutional History of*

*Georgia* 144 (1947)); *see* Ga. Const. art. IV, § 1 (1798) ("The electors of members of the general

assembly shall be citizens and inhabitants of this state . . . .").  Likewise, several of the first states

---

[3]      A concept of national citizenship in fact predates the Constitution, as colonies recognized
British citizenship and colony citizenship separately, and the Articles of Confederation had a
privileges and immunities clause which gave state citizenship "extraterritorial consequences."
Neuman, *supra*, at 292.

to enter the Union (*e.g.*, Louisiana, Indiana, Mississippi, Alabama, Maine, Missouri) conditioned suffrage on U.S. citizenship.  Jamin B. Raskin, *Legal Aliens, Local Citizens: The Historical, Constitutional and Theoretical Meanings of Alien Suffrage*, 141 U. Pa. L. Rev. 1391, 1404 (1993).  Plaintiffs admit as much, Pls.' Opp'n at 22, and thus disprove their own theory that early states could not condition suffrage on citizenship because "there was no clear rule about who was a citizen even long after [the Constitution] was adopted," *id.* at 21.

Early judicial precedent further confirms that early Americans understood that national citizenship was its own status—but not a necessary voter qualification.  For example, the supreme courts of Pennsylvania and Illinois rejected challenges to non-citizen voting laws and specific arguments that only citizens could vote.  *Stewart v. Foster*, 2 Binn. 110, 118 (Pa. 1809); *Spragins v. Houghton*, 3 Ill. 377, 414 (1840).  In doing so, both courts recognized a distinction between citizenship and residency.  In Pennsylvania, a Pittsburgh law allowed non-citizens to vote for certain offices, but not others, and only allowed citizens to hold office.  *Stewart*, 2 Binn. at 117–18.  The court upheld the law, reasoning that there was no infirmity in allowing non-citizens to vote, and it was the legislature's power to decide for which offices "the superadded qualification of *citizenship*" should apply.  *Id.* at 121.  In Illinois, the court surveyed the state's and Nation's histories to find that the "distinction" between U.S. citizenship and residency was "well understood and settled," *Spragins*, 3 Ill. at 404, and Illinois had—with Congress' approval—extended the franchise based only on residency, *id.* at 393, so the court could not require an additional qualification based on citizenship, *id.* at 409.  These cases also refute Plaintiffs' argument that, at the Founding, the concepts of the people and the citizenry were "interchangeabl[e]."  Pls.' Opp'n at 22; *see Spragins*, 3 Ill. at 403 ("[T]he words citizen and

inhabitant can not be considered synonymous.").  Plaintiffs have nothing to say about these cases, although they were cited in the District's Motion.  Def.'s Mot. at 11.

All said, history repudiates Plaintiffs' suggestion that states could not have conditioned suffrage on citizenship until the rules of citizenship were clarified with the Fourteenth Amendment.  Even if the line between national and state citizenship was not clear, the fact remains that states did not condition suffrage on *any* form of citizenship.  Def.'s Mot. at 8–10. Citizenship aside, states always could have limited voting rights to natural-born Americans.  But the vast majority of early states did not.  *Id.*  Instead, citizenship (national or state) and American birth were simply not prerequisites to vote.  *Id.*; *see also* Virginia Harper-Ho, *Noncitizen Voting Rights: The History, the Law and Current Prospects for Change*, 18(2) Law & Ineq. 271, 275 (2000) ("Through the colonial and early federal period, alien suffrage was often uncontested because voting rights were not based on citizenship, but on property ownership and race, as well as residence.").  While Plaintiffs try to discount some state constitutions because they were adopted prior to the ratification of the Constitution, Pls.' Opp'n at 20–21, they continued in force following ratification, *see, e.g.*, *Minor*, 88 U.S. at 173 (surveying voter qualification provisions in early state constitutions); *Stewart*, 2 Binn. at 118 (stating that Pennsylvania, "both under the proprietary government, and since her independence, has held out encouragement to aliens, unknown to the principles of the [English] common law" that non-citizens cannot vote).  And regardless of their precise adoption date, they are Founding Era history.  *See Moore*, 143 S. Ct. at 2087 (relying on many of the same constitutions cited by the District to reject an argument as historically unsound).

Even accepting Plaintiffs' assumption that there was only a "clear rule" of U.S. citizenship with the adoption of the Fourteenth Amendment, Pls.' Opp'n at 20, Plaintiffs' attempt

App.83

to rebut the District's historical showing still fails.[4]   In several cases decided *after* the Fourteenth

Amendment was adopted, the Supreme Court observed that states may and indeed had extended

the franchise to non-citizens.  Def.'s Mot. at 11–12 (citing *Minor*, 88 U.S. at 177; *Pope v.*

*Williams*, 193 U.S. 621, 632 (1904); *Sugarman v. Dougall*, 413 U.S. 634, 649 (1973)).   In

particular, the Supreme Court in *Minor* addressed whether the Fourteenth Amendment's

Citizenship Clause or anything in the Constitution required all citizens be allowed to vote.  88

U.S. at 165.  The Court, tracing the history of citizenship and suffrage (including non-citizen

suffrage), concluded that citizenship and suffrage were historically distinct concepts under the

Constitution.  *Id.* at 178.  Thus, even when national citizenship was—in Plaintiffs' view—clearly

defined, the Court rejected the notion that citizenship has "in all cases been made a condition

precedent to the enjoyment of the right of suffrage."  *Id.* at 177.

Plaintiffs' only response to these cases is to say that the Court simply observed that some

states allowed non-citizens to vote if they intended to become citizens, which is "a mere

technical infringement" of the Constitution.  Pls.' Opp'n at 22.  The cases are not so limited.  In

these cases, the core holding was that the right to vote "does not follow from mere citizenship,"

so the state may decide who may vote.  *Pope*, 193 U.S. at 632; *see also Minor*, 88 U.S. at 177–

78.  In line with this holding, the Court observed that states "might provide that persons of

---

[4]      Plaintiffs err in suggesting that the Fourteenth Amendment conclusively settled the
definition of U.S. citizenship.  The Amendment only provided one "rule" of citizenship, Pls.'
Opp'n at 20, that "[a]ll persons born or naturalized in the United States, and subject to the
jurisdiction thereof, are citizens of the United States," U.S. Const. amend. XIV, § 1.  The
definition of who is and may become a citizen is far more complex than the Fourteenth
Amendment's few words and subject to legislative change.  *See Minor*, 88 U.S. at 167 ("The
Constitution does not, in words, say who shall be natural-born citizens."); 8 U.S.C. § 1401 *et seq.*
(providing rules for citizenship by birth); *id.* § 1421 *et seq.* (providing rules for citizenship by
naturalization); Neuman, *supra*, at 293 ("The relationship of national citizenship to state
citizenship was only partially clarified by the adoption of the Fourteenth Amendment . . . .").

foreign birth could vote without being naturalized." *Pope*, 193 U.S. at 632.  Nowhere did the Court suggest that the reason non-citizen voting is permissible is that aliens intend to become citizens.  Instead, the reason is that states historically had not tied voting to citizenship, and states have the power to set voter qualifications. *Minor*, 88 U.S. at 172, 176–77.

Moreover, Plaintiffs' argument that the Supreme Court has blessed "technical infringement[s]" of the Constitution in the past, Pls.' Opp'n at 22, echoes an argument recently rejected by the Supreme Court.  In *Moore*, state legislators argued that the Constitution vests the power to make election rules exclusively in state legislatures, unchecked by state constitutions. 143 S. Ct. at 2074.  The Court observed that state constitutions at the Founding prescribed election rules. *Id.* at 2087.  So the Court rejected the legislators' interpretation of the Constitution because, under the legislators' view, state constitutions were infringing the federal Constitution "from the start." *Id.*  Plaintiffs' argument is similar.  If Plaintiffs are correct that no government can allow non-citizens to vote, then states, localities, and the federal government have been violating the Constitution "from the start." *Id.*  Yet, Plaintiffs ask the Court to ignore this history as "technical infringement[s]" of the Constitution.  But courts should not accept constitutional theories that will render centuries of historical practice unconstitutional. *See id.* at 2086.

Cases like *Minor* also disprove Plaintiffs' argument that the Constitution has always evinced a "restriction of the body politic to citizens."  Pls.' Opp'n at 9; *see also id.* at 20 (arguing that "[i]t would take a great deal of contrary historical evidence" to overcome the supposed assumption in the Constitution that only citizens can form the political community).  The Supreme Court has never held that it is unconstitutional for states or the federal government to include non-citizens in the political process.  Such a holding would run headlong into the

historical truth that states and the federal government have long included non-citizens in our democracy.  Def.'s Mot. at 8–12.  At most in these cases, the Court explained that states "*may*" exclude non-citizens from political processes (although none of these cases were a challenge to a voting restriction).  *Foley v. Connelie*, 435 U.S. 291, 296 (1978) (emphasis added); *see also Cabell v. Chavez-Salido*, 454 U.S. 432, 439 (1982).  The Court has not gone so far as to command that states *must* exclude non-citizens.

In fact, these cases support the District.  In reasoning that states may exclude non-citizens from political processes, the Court has relied on the principle that a state has "broad power to define its political community" and to set voter qualifications.  *Sugarman*, 413 U.S. at 643.  Given that principle, the Court has held that the judiciary should take a hands-off approach to states' decisions about whether non-citizens should participate in political processes.  *Cabell*, 454 U.S. at 439.  Relying on the same principle, the Court has noted that states have historically *included* non-citizens in the political process.  *Pope*, 193 U.S. at 632; *Minor*, 88 U.S. at 177–78.  Thus, if there is any current running through all this precedent, it is that "alien suffrage is entirely discretionary—neither constitutionally compelled nor constitutionally forbidden."  Neuman, *supra*, at 292.

Besides misconstrued Supreme Court precedent, Plaintiffs cite two state trial court cases invalidating non-citizen voting laws in New York and California.  Pls.' Opp'n at 23 (citing *Fossella v. Adams*, No. 85007/2022, 2022 NYLJ LEXIS 1150 (N.Y. Sup. Ct. June 27, 2022), *appeal docketed*, No. 2022-05794 (N.Y. App. Div. July 22, 2022), and *Lacy v. City & County of San Francisco*, No. CPF-22-517714, slip op. (Cal. Sup. Ct. July 29, 2022), *rev'd*, --- Cal. Rptr. 3d ----, No. A165899, 2023 WL 5025684 (Cal. Ct. App. Aug. 8, 2023)).  Plaintiffs omit that these decisions were (1) decided purely on state law, and (2) reversed or appealed.  To the

App.86

District's knowledge, no court—state or federal—has ever struck down a non-citizen voting law on federal constitutional grounds.

Plaintiffs' arguments are also just plain unsupported by historical evidence. Plaintiffs only cite three articles for their argument that the concept of citizenship was too unclear prior to the Fourteenth Amendment to place much weight on the fact that non-citizens widely voted at the Founding. Pls.' Opp'n at 22. But each of those articles, in fact, disagrees with Plaintiffs and instead agrees with the District: non-citizen suffrage was historically practiced, and its constitutionality cannot be—and has never been—questioned. Kennedy-Shaffer, *supra*, at 38, 46; Harper-Ho, *supra*, at 275; Raskin, *supra*, at 1397; *see also* Def.'s Mot. at 21 (collecting additional scholarship in agreement).[5] So not only do Plaintiffs fail to put up any primary sources to rebut the District's historical showing, but Plaintiffs also cannot even muster a single secondary source to support them. That makes resolving the historical question in the District's favor straightforward. *See Bruen*, 142 S. Ct. at 2130 n.6 (explaining that "the principle of party presentation" applies in cases involving a historical inquiry, and "[c]ourts are thus entitled to decide a case based on the historical record compiled by the parties" (internal quotation marks and citation omitted)).

### B.      The Substantive Due Process Claim Fails.

Plaintiffs' Complaint did not plausibly allege a fundamental liberty interest or that the Act failed any form of scrutiny. Def.'s Mot. at 12–17. Plaintiffs' Opposition does not cure these deficiencies.

---

[5]      Plaintiffs also cite these articles for the proposition that the prevalence of non-citizen suffrage has fluctuated throughout American history. Pls.' Opp'n at 22. The District does not quarrel with that proposition. Def.'s Mot. at 11. But what matters is that non-citizen suffrage was widespread at the Founding (the key reference point), and it has always been allowed. *Id.*

In belatedly trying to provide a "'careful description' of the asserted fundamental liberty interest," *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997) (quoting *Reno v. Flores*, 507 U.S. 292, 302 (1993)), Plaintiffs say that "the [Act] dilutes their fundamental right to vote by including noncitizens in the eligible voter and candidate pools," Pls.' Opp'n at 18–19.  So Plaintiffs agree with the District that the alleged liberty interest is "a purported right to have one's vote counted without the presence of non-citizens' votes."  Def.'s Mot. at 15.  As explained, such a formulation does not meet the test for a fundamental liberty interest—and no court has held so.  *Id.*  Plaintiffs also suggest that the right at issue could be described as "the right to citizen self-government."  Pls.' Opp'n at 19.  But there is no such right recognized by any court or consistent with history.  Argument § II.A, *supra*; Def.'s Mot. at 20–21.

In response to the District's explanation why the Act passes any form of scrutiny, Def.'s Mot. at 15–17, Plaintiffs only argue that the District has no interest (compelling or rational) in defining its political community to include non-citizens, Pls.' Opp'n at 15–16.  Plaintiffs misunderstand the interest and the difference between interests and tailoring.  The District's interest here is in "democratic self-government," Def.'s Mot. at 17, and Plaintiffs cite no authority holding that such an interest is anything less than compelling, *see id.*; *Sugarman*, 413 U.S. at 642 ("We recognize a State's interest in establishing its own form of government . . . .").  Extending voting rights is the means for furthering that interest, as "the further electoral rights are extended, . . . the strength of democracy increases."  Raskin, *supra*, at 1391 (internal quotation marks omitted) (quoting Alexis De Tocqueville, 2 *Democracy in America* 10 (Henry Reeve trans., & Phillips Bradley ed., Knopf 1946) (1840)).  After all, the story of the United States is the story of an expanding "circle of voting membership," *id.* at 1392, as generations have strived to create "a more perfect Union," U.S. Const. pmbl.  Plaintiffs are incorrect to

App.88

suggest that the Constitution mandates that circle stop at citizens, so their argument that the Court cannot recognize the District's rationale here is equally wrong.  Argument § II.A, *supra*.

### C.    The Equal Protection Claims Fail.

To plausibly allege an equal protection claim, Plaintiffs needed to show that the Act either (1) on its face discriminated against citizens or "native-born" Americans, Compl. ¶ 65, or (2) had a discriminatory purpose.  Def.'s Mot. at 17–19.  Plaintiffs' Complaint did neither.  *Id.* In their Opposition, Plaintiffs disclaim any need for the Court to inquire whether the Act had a discriminatory purpose and do not argue that the Act's purpose was to discriminate against citizens.  Pls.' Opp'n at 15.  They thus forfeit the issue.  *Young Habliston v. FINRA Regul., Inc.*, No. 15-cv-2225, 2017 WL 396580, at *4 (D.D.C. Jan. 27, 2017) (Berman Jackson, J.).  All, then, that is left to decide is whether the Act is facially neutral.

It is.  Def.'s Mot. at 17–18.  In arguing otherwise, Plaintiffs misunderstand what "facially neutral" means.  A statute is not facially neutral when it "imposes an express . . . classification" that "provide[s] for preferential treatment" of one class.  *Rothe Dev., Inc. v. U.S. Dep't of Def.*, 836 F.3d 57, 64 (D.C. Cir. 2016).  The Act, however, does not "express[ly]" provide that non-citizens are given any preferences when it comes to voting.  *Id.*  The Act simply provides that both citizens and non-citizens can vote in District elections, so—as Plaintiffs admit—the Act "treats citizens and noncitizens 'the same' by letting both groups vote."  Pls.' Opp'n at 13.

Plaintiffs nonetheless argue that the Act treats citizens and non-citizens differently because "the Act's grant of the *benefit* of voting to noncitizens *burdens* citizens by diluting their votes."  *Id.* at 11.  In other words, Plaintiffs argue that the Act is not facially neutral because it results in vote dilution.  *Id.*; *see also id.* at 12.  But vote dilution is an *effect* of the Act, not a classification, apparent on the face of the Act, providing for preferential treatment.

App.89

Supreme Court precedent proves the point.  The Supreme Court originally held that the Voting Rights Act of 1965 (VRA), 79 Stat. 437, as amended, 52 U.S.C. § 10301 *et seq.*, did not prohibit facially neutral laws, unmotivated by provable animus, that nonetheless had discriminatory effects on voters.  *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2332 (2021) (discussing *City of Mobile v. Bolden*, 446 U.S. 55 (1980)).  Based on that interpretation, the Court held that the VRA did not recognize vote dilution claims.  *Id.*  In response, Congress amended the statute to provide that election laws that "*result[ ] in* a denial or abridgement of the right . . . to vote on account of race or color" were actionable.  *Id.* (internal quotation marks and citation omitted).  In amending the statute to allow challenges to discriminatory effects, Congress—as the Court later recognized—made vote dilution claims cognizable.  *Id.* at 2332–33.  This history of the VRA shows that vote dilution claims are claims about the *effect* of a statute.  If vote dilution claims were an attack on facially discriminatory classifications, then Congress would never have needed to amend the VRA to allow for claims based on discriminatory effects.

Indeed, Plaintiffs cannot cite any case holding that a law expanding the electorate facially discriminates against any group.  And Plaintiffs have no response to the consensus view that laws expanding the electorate only get rational basis review, Def.'s Mot. at 15–16, which is reserved for facially neutral laws, *Kingman Park Civic Ass'n v. Bowser*, 815 F.3d 36, 42 (D.C. Cir. 2016).  Since the District moved to dismiss, another appellate court has agreed—and rejected a "vote dilution" challenge to a non-citizen voting law.  *Lacy*, 2023 WL 5025684, at *13–15.

The only cases Plaintiffs cite (both non-binding and both decades old) to argue that expansions of the franchise are facially discriminatory do not support them.  Pls.' Opp'n at 11–12 (citing *United States v. Palmer*, 356 F.2d 951 (5th Cir. 1966), and *Brown v. Bd. of Comm'rs*,

722 F. Supp. 380 (E.D. Tenn. 1989)).  Neither case held that the law at issue discriminated on its face.  In *Brown*, the court made no finding on facial neutrality and instead applied rational basis review to an expansion of the electorate—the standard for facially neutral laws.  722 F. Supp. at 399.  In *Palmer*, the court evaluated a parish's decision to close the voter registration office where most potential applicants were Black.  356 F.2d at 952.  The court found the closing decision's apparent neutrality—in that the office was closed to *everyone*—was not sufficient to overcome the parish's discriminatory motive, so the parish violated the VRA.  *Id.*  *Palmer* merely illustrates how a facially neutral law can be discriminatory if motivated by a discriminatory purpose.  But Plaintiffs here do not allege or even argue that the Council acted with a discriminatory purpose.

Finally, Plaintiffs argue that the Act "on its face, dilutes the votes of American-born District of Columbia voters . . . because its addition of noncitizens to the voter rolls automatically adds only persons of non-American birth."  Pls.' Opp'n at 13.  Again, an argument about the Act's dilutive effects is an argument about discriminatory *effects*, not preferential treatment on the face of the Act.  The Act on its face says nothing about national origin.  Moreover, Plaintiffs' argument that the Act dilutes votes based on national origin makes no sense.  Not all citizens are born in the United States, and foreign-born citizens have always voted in District elections.  Under Plaintiffs' theory, the Act dilutes their votes, too, by expanding the electorate.  So the alleged discriminatory effects are not felt based on national origin because both U.S.-born and foreign-born citizens will allegedly have their votes diluted.

**D.**     **The "Right to Citizen Self-Government" Claim Fails.**

Plaintiffs cannot state a "right to [exclusively] citizen self-government" claim because no right exists—and certainly not one recognized by any court as judicially enforceable.  Def.'s Mot. at 20–21.  In response, Plaintiffs do not cite any case from any court greenlighting an even

App.91

remotely similar claim.  Pls.' Opp'n at 8–11.  And Plaintiffs give no good reason for this Court to be the first.

All Plaintiffs can do is selectively quote from a handful of cases and the Preamble to argue that such a right exists.  *Id.*  But, as explained, Plaintiffs seriously misread those cases. Argument § II.A, *supra*; Def.'s Mot. at 21.  Reliance on the Preamble as the source of any cognizable right is likewise misplaced because the Preamble only "indicates the general purposes for which the people ordained and established the Constitution."  *Jacobson v. Massachusetts*, 197 U.S. 11, 22 (1905).  It does not "lay out discernable rules or standards that one would expect to have substantive effect."  *Virginia v. Ferriero*, 525 F. Supp. 3d 36, 60–61 (D.D.C. 2021), *aff'd sub nom. Illinois v. Ferriero*, 60 F.4th 704 (D.C. Cir. 2023).  In any event, Plaintiffs are wrong to read the Preamble—and the Constitution more generally—to only extend notions of popular sovereignty and protections to citizens.  *See* Gerald E. Neuman, *Strangers to the Constitution: Immigrants, Borders, and Fundamental Law* 145 (1996) ("[P]opular sovereignty in the United States has been a flexible notion, which has not restricted political power by a rigid definition of the People . . . ."); *Evenwel v. Abbott*, 136 S. Ct. 1120, 1132 (2016) ("As the Framers of the Constitution and the Fourteenth Amendment comprehended, representatives serve all residents, not just those eligible or registered to vote."); *United States v. Verdugo-Urquidez*, 494 U.S. 259, 270 (1990) ("[A]liens enjoy certain constitutional rights.").

At bottom, the source of constitutional rights is the Constitution's text, *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2244 (2022), yet Plaintiffs crib from judicial opinions (which they misread) and the Preamble (which is unenforceable).  Plaintiffs thus provide no source of law on which to rest their "right to citizen self-government" claim.

**CONCLUSION**

For these reasons, the Court should dismiss the Complaint for lack of jurisdiction or

failure to state a claim.

Date: August 18, 2023.                    Respectfully submitted,

                                          BRIAN L. SCHWALB
                                          Attorney General for the District of Columbia

                                          STEPHANIE E. LITOS
                                          Deputy Attorney General
                                          Civil Litigation Division

                                          */s/ Matthew R. Blecher*
                                          MATTHEW R. BLECHER [1012957]
                                          Chief, Civil Litigation Division, Equity Section

                                          */s/ Honey Morton*
                                          HONEY MORTON [1019878]
                                          Assistant Chief, Equity Section

                                          */s/ Adam J. Tuetken*
                                          ADAM J. TUETKEN [242215]
                                          PAMELA A. DISNEY [1601225]
                                          Assistant Attorneys General
                                          Civil Litigation Division
                                          400 6th Street, NW
                                          Washington, D.C. 20001
                                          Phone: (202) 735-7474
                                          Email: adam.tuetken@dc.gov

                                          *Counsel for Defendant*

App.93

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **STACIA HALL,** *et al.*,<br><br>    *Plaintiffs*,<br><br>    v.<br><br>**DISTRICT OF COLUMBIA BOARD OF ELECTIONS,**<br><br>    *Defendant*. | **No. 1:23-cv-01261-ABJ** |

## <u>DECLARATION OF PLAINTIFF STACIA HALL</u>

Pursuant to 28 U.S.C. §§ 1653 and 1746, I, Stacia Hall, state the following:

1. I am over eighteen years of age and have personal knowledge of the facts set forth below.

2. I am a United States citizen and resident of the District of Columbia. I live at 3726 Connecticut Avenue NW, Apt 109, Washington, DC 20008.

3. I am a registered member of the District of Columbia Republican Party.

4. I first ran for public office in the District of Columbia in 2022. In that election, I was the Republican candidate for Mayor of the District of Columbia.

5. Although I lost the 2022 election, I knew then that this was the beginning of my fight for the people of D.C. I wanted to continue fighting to serve the District and knew that part of that effort would be to run for public office again in the 2024 elections.

6. After my loss in the 2022 election, I discussed my intention to run for office again with other members of the District of Columbia Republican party.

App.94

7. At the time this lawsuit was filed, I was planning to run for public office in the District in 2024, and was being pressed by other members of the District of Columbia Republican Party to run for the at-large seat on the District of Columbia Council in the 2024 election.

8. In the summer of 2023, I finalized my plans for the 2024 election, and decided that, instead of running for D.C. Council, I would run for the at-large position on the District of Columbia Board of Education.

9. I am currently a candidate for the at-large seat on the District of Columbia Board of Education.

10. The election for the District of Columbia Board of Education is on November 5, 2024.

11. I brought the present lawsuit because I believe allowing aliens to vote in District of Columbia municipal elections violates the U.S. Constitution.

12. I have publicly fought against allowing aliens to vote in District of Columbia municipal elections.

13. Due to my campaign against allowing alien voting, I believe that aliens would be much less likely to vote for me than would citizens in the election for the District of Columbia Board of Education, and thus that the law permitting aliens to vote will hurt my chances in that election.

14. As a potential officeholder I have an interest in ensuring that the votes tallied during District of Columbia elections reflect legally cast votes and not an inaccurate final vote tally.

15. As a candidate for office and potential officeholder, I will be impacted if illegally cast ballots are counted in the final vote tally.

I declare under the penalty of perjury that the foregoing is true and correct.

2

App.95

Executed on the 29 day of February, 2024

Stacia Hall
Stacia Hall

App.96

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **STACIA HALL**, *et al.*,<br><br>    **Plaintiffs,**<br><br>    **v.**<br><br>**DISTRICT OF COLUMBIA BOARD OF ELECTIONS,**<br><br>    **Defendant.** | **No. 1:23-cv-01261-ABJ** |

### DEFENDANT'S COMBINED RESPONSE TO PLAINTIFF'S NOTICE OF SUPPLEMENTAL AUTHORITY AND DECLARATION OF STACIA HALL

Months after the District's Motion to Dismiss [8] became ripe, Plaintiffs make a thinly veiled attempt to introduce a brand new theory of standing.  Plaintiffs direct the Court's attention to the conclusion in *Fossella v. Adams*, --- N.Y.S.3d ----, No. 2022-05794, slip op. (N.Y. App. Div. Feb. 21, 2024), that candidates had standing to challenge New York City's non-citizen voting law because "those plaintiffs have 'a cognizable interest in ensuring that the final vote tally accurately reflects the legally valid votes cast,' as '[a]n inaccurate vote tally is a concrete and particularized injury to candidates,'" *id.* at 11 (quoting *Carson v. Simon*, 978 F.3d 1051, 1058 (8th Cir. 2020)).  *See* Pls.' Not. of Supp. Auth. [16] at 1.  In tandem with *Fossella*, Plaintiffs submit a declaration from one plaintiff, Stacia Hall, that states she is running for office in the District, Decl. of Pl. Stacia Hall [17] ¶ 9, and, echoing *Fossella*, "[a]s a potential officeholder I have an interest in ensuring that the votes tallied during District of Columbia elections reflect legally cast votes and not an inaccurate final vote tally," *id.* ¶ 14.

It appears that Plaintiffs are belatedly and surreptitiously trying to argue that this one plaintiff has candidate standing like the *Fossella* court recognized.  But Plaintiffs never raised

this theory of standing before.  Rather, their sole theory of standing was that "plaintiffs have standing because they allege an injury—dilution of *their votes*."  Pls.' Opp'n to Def.'s Mot. to Dismiss [12] at 7 (emphasis added); *see also, e.g.*, *id.* at 5 ("Plaintiffs here have standing because the vote dilution injury they allege is not a general complaint about government but one particular to them as individual *voters* . . . ." (emphasis added)); *id.* at 6 ("[H]arm is particularized to each plaintiff, for each plaintiff's *vote* has been diluted." (emphasis added)).  In other words, their theory of standing was that, as *voters*, their votes were diluted, not that, as *candidates*, they were injured by an inaccurate vote tally.[1]

"[O]rdinary rules of forfeiture apply to standing."  *Gov't of Manitoba v. Bernhardt*, 923 F.3d 173, 179 (D.C. Cir. 2019).  By failing to raise a candidate theory of standing in their opposition, Plaintiffs forfeited that theory.  *Id.*; *see also Nguyen v. DHS*, 460 F. Supp. 3d 27, 34 (D.D.C. 2020).  And it is especially wrong for Plaintiffs to belatedly introduce a declaration to bolster their new standing theory and attempt to cure their standing deficiencies.  *Twin Rivers Paper Co. LLC v. SEC*, 934 F.3d 607, 615 (D.C. Cir. 2019); *Nguyen*, 460 F. Supp. 3d at 34.

Accordingly, the Court should decline to consider a candidate theory of standing, *Fossella*'s conclusion about candidate standing, and Hall's declaration.  If, however, the Court is interested in considering the candidate theory of standing, the District respectfully requests the opportunity to file a short brief addressing that new theory.  *See Nguyen*, 460 F. Supp. 3d at 34 (court would not consider untimely affidavits "when Defendants have had no opportunity to respond").

Date: March 11, 2024.                           Respectfully submitted,

                                                BRIAN L. SCHWALB

---

[1]     Plaintiffs' original voter theory of standing was rejected by the *Fossella* court, for similar reasons to those advanced in the District's Motion to Dismiss.  *Fossella*, slip op. at 8–10.

App.98

Attorney General for the District of Columbia

STEPHANIE E. LITOS
Deputy Attorney General
Civil Litigation Division

*/s/ Matthew R. Blecher*
MATTHEW R. BLECHER [1012957]
Chief, Civil Litigation Division, Equity Section

*/s/ Honey Morton*
HONEY MORTON [1019878]
Assistant Chief, Equity Section

*/s/ Adam J. Tuetken*
ADAM J. TUETKEN [242215]
PAMELA A. DISNEY [1601225]
Assistant Attorneys General
Civil Litigation Division
400 6th Street, NW
Washington, D.C. 20001
Phone: (202) 735-7474
Email: adam.tuetken@dc.gov

*Counsel for Defendant*

3

App.99

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

STACIA HALL, *et al.*,        )
                        )
           Plaintiffs,     )
                        )
         v.               )       Civil Action No. 23-1261 (ABJ)
                        )
DISTRICT OF COLUMBIA    )
BOARD OF ELECTIONS,      )
                        )
           Defendant.     )
                        )

---

## <u>ORDER</u>

Pursuant to Fed. R. Civ. P. 58 and for the reasons stated in the accompanying Memorandum Opinion, it is hereby **ORDERED** that defendant's motion to dismiss [Dkt. # 8] is **GRANTED** and the above-captioned case is **DISMISSED**.  This is a final, appealable order.


AMY BERMAN JACKSON
United States District Judge


DATE:  March 20, 2024

App.100

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STACIA HALL, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) Civil Action No. 23-1261 (ABJ) |
| | ) |
| DISTRICT OF COLUMBIA | ) |
| BOARD OF ELECTIONS, | ) |
| | ) |
| Defendant. | ) |
| | ) |

## <u>MEMORANDUM OPINION</u>

Plaintiffs, seven U.S. citizens who reside in the District of Columbia,[1] brought an action

on March 14, 2023 against the D.C. Board of Elections.  They allege that the Local Resident Voting

Rights Amendment Act of 2022 violates their Fifth Amendment guarantees of substantive due

process and equal protection, as well as "the constitutional right of citizen self-government."

Compl. [Dkt. # 1] ¶ 53.  On May 4, 2023, defendant removed the case under 28 U.S.C. §§ 1441(a)

and 1446 and Federal Rule of Civil Procedure 81(c).  *See* Def.'s Notice of Removal [Dkt. # 1] at 1.

Defendant has moved to dismiss the complaint for lack of subject matter jurisdiction under

Federal Rule of Civil Procedure 12(b)(1), arguing that plaintiffs lack standing, and it also seeks to

dismiss the complaint for failure to state a claim under Rule 12(b)(6).  *See* Def.'s Mot. to Dismiss

---

1       Plaintiff Stacia Hall is a U.S. citizen and D.C. resident registered to vote.  Compl. ¶ 13.  In
2022, she was the Republican candidate for Mayor in the District.  Compl. ¶ 13.

Plaintiff Ralph Chittams is a U.S. citizen and D.C. resident registered to vote.  Compl. ¶ 14.  In
2018, he was the Republican candidate for an at-large seat on the District's Council.  Compl. ¶ 14.

Plaintiffs Suzanne Keller, Ken McClenton, Kimberly Epps, Richard Heller, and Nicolle S. A.
Lyon are U.S. citizens and D.C. residents registered to vote.  Compl. ¶¶ 15–19.

[Dkt. # 8] ("Mot.").  Plaintiffs oppose the motion, and the matter is fully briefed.  *See* Pls.' Opp. to Mot. [Dkt. # 12] ("Opp."); Def.'s Reply Brief [Dkt. # 15] ("Reply"); Pls.' Notice of Suppl. Authority [Dkt. # 16] ("Pl.'s Suppl."); Decl. of Plaintiff Stacia Hall [Dkt. # 17] ("Hall Decl."); Def.'s Resp. to Pls.' Suppl. [Dkt. # 18].[2]

Because plaintiffs lack standing, the Court will grant defendant's motion to dismiss under Rule 12(b)(1).

## BACKGROUND

In 2022, the Council of the District of Columbia passed the "Local Resident Voting Rights Amendment Act of 2022" ("the Act").  Compl. ¶ 3; D.C. Law 24-242, 69 D.C. Reg. 14,601 (Dec. 2, 2022).  The Act removed the prior citizenship requirement for voting in municipal elections, thereby enabling noncitizen residents of the District to vote in local – but not federal – elections. Compl. ¶¶ 3, 33–34.   Under the Act, noncitizen residents may vote in elections for D.C. government positions, such as mayor, as well as local initiatives, referenda, recalls, or charter amendment measures, so long as they satisfy other D.C. voting requirements.  D.C. Law 24-242 § 2(a)(2).  The Act also permits noncitizen residents to run for D.C. government positions and to serve on the District's Board of Elections.  Compl. ¶ 4.

The gravamen of plaintiffs' complaint is that this enfranchisement of noncitizens "dilutes the vote of every U.S. citizen voter in the District."  Compl. ¶ 5.  Based on that premise, plaintiffs allege that the Act: (1) infringes on their fundamental right to vote in violation of the Fifth Amendment guarantee of substantive due process; (2) discriminates against U.S. citizens living in

---

2      The Court also received an amicus brief in support of defendant's motion to dismiss from the Lawyers' Committee for Civil Rights Under Law and the Washington Lawyers' Committee for Civil Rights and Urban Affairs.  *See* Brief of Amici Curiae [Dkt. # 11].

D.C. based on their citizenship in violation of the Fifth Amendment guarantee of equal protection; (3) discriminates against native-born U.S. citizens living in D.C. based on their national origin, also in violation of the equal protection clause; and (4) violates the "constitutional right to citizen self-government."  Compl. ¶¶ 55–70.  Plaintiffs seek declaratory and injunctive relief to prohibit defendant from implementing the Act, registering noncitizens to vote, and counting votes cast by noncitizens.  Compl. at 16–17.

## LEGAL STANDARD

Federal courts are courts of limited jurisdiction, and the law presumes that "a cause lies outside this limited jurisdiction."  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (citation omitted); *see also Gen. Motors Corp. v. EPA*, 363 F.3d 442, 448 (D.C. Cir. 2004) (citation omitted) ("As a court of limited jurisdiction, we begin, and end, with an examination of our jurisdiction.").  "[B]ecause subject-matter jurisdiction is 'an Art[icle] III as well as a statutory requirement . . . no action of the parties can confer subject-matter jurisdiction upon a federal court.'"  *Akinseye v. District of Columbia*, 339 F.3d 970, 971 (D.C. Cir. 2003), quoting *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982).  Moreover, a federal court must determine whether it has jurisdiction to hear a case before it may consider whether plaintiffs have stated a cognizable claim.  *Hancock v. Urban Outfitters*, 830 F.3d 511, 513 (D.C. Cir. 2016) ("Federal courts cannot address the merits of a case until jurisdiction – the power to decide – is established.").

"To state a case or controversy under Article III, a plaintiff must establish standing."  *Ariz. Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 133 (2011); *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  Standing is a necessary predicate to any exercise of federal jurisdiction; if it is lacking, then the dispute is not a proper case or controversy under the

App.103

Constitution, and federal courts have no subject matter jurisdiction to decide the case.  *Dominguez v. UAL Corp.*, 666 F.3d 1359, 1361 (D.C. Cir. 2012).  Plaintiffs must show standing for each claim they assert,  *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006); *Friends of the Earth, Inc. v. Laidlaw Env't Servs.*, 528 U.S. 167, 185 (2000), and the party invoking federal jurisdiction bears the burden of establishing standing.  *Lujan*, 504 U.S. at 561.

To establish constitutional standing, a plaintiff must show: (1) that he or she has suffered "injury-in-fact"; (2) that the injury is "fairly traceable" to the challenged action of the defendant; and (3) that it is "likely, as opposed to merely speculative," that a favorable decision will redress the injury.  *Lujan,* 504 U.S. at 560–61; *see also Laidlaw Env't. Servs.*, 528 U.S. at 180-81.

To satisfy the first requirement, plaintiffs must demonstrate that they "suffered an invasion of a legally protected interest that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016), quoting *Lujan*, 504 U.S. at 560 (internal quotation marks omitted).  To be "concrete," the injury "must actually exist," meaning that it is real and not abstract, although concreteness is "not . . . necessarily synonymous with 'tangible.'"  *Spokeo*, 578 U.S. at 339–42.  And to be "particularized," the injury must affect a plaintiff "in a personal and individual way."  *Id.* at 339.  Of significance to this case, a "plaintiff raising only a generally available grievance about [the] government – claiming only harm to his and every citizen's interest in [the] proper application of the Constitution and laws and seeking relief that no more directly and tangibly benefits him than it does the public at large – does not state an Article III case or controversy."  *Lujan*, 504 U.S. at 573–74; *see also Am. Legal Found. v. FCC*, 808 F.2d 84, 92 (D.C. Cir. 1987) (observing that an injury-in-fact requires "more than allegations of damage to an interest in 'seeing' the law obeyed or a social goal furthered").

4

In evaluating a motion to dismiss under Rule 12(b)(1), the Court must "treat the complaint's factual allegations as true . . . and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (internal citations omitted), quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979); *see also Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011), quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005).  Nevertheless, the Court need not accept inferences drawn by plaintiffs if those inferences are unsupported by facts alleged in the complaint, nor must the Court accept plaintiffs' legal conclusions.  *Food and Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015); *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  Moreover, when considering a motion to dismiss for lack of jurisdiction, unlike when deciding a motion to dismiss under Rule 12(b)(6), the Court "is not limited to the allegations of the complaint."  *Hohri v. United States*, 782 F.2d 227, 241 (D.C. Cir. 1986), *vacated on other grounds*, 482 U.S. 64 (1987).  Instead, "a court may consider such materials outside the pleadings as it deems appropriate to resolve the question [of] whether it has jurisdiction to hear the case."  *Scolaro v. D.C. Bd. of Elections & Ethics*, 104 F. Supp. 2d 18, 22 (D.D.C. 2000), citing *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992); *see also Jerome Stevens Pharms., Inc. v. FDA*, 402 F.3d 1249, 1253 (D.C. Cir. 2005).

## ANALYSIS

Plaintiffs maintain that the alleged dilution of their votes as U.S. citizens satisfies the requirement of the particularized injury-in-fact that gives them standing to invoke the Court's jurisdiction.  Opp. at 3.

The Supreme Court has "long recognized that a person's right to vote is 'individual and personal in nature,'" *Gill v. Whitford*, 585 U.S. 48, 49 (2018), citing *Reynolds v. Sims*, 377 U.S.

5

533, 561 (1964), and that "voters who allege facts showing disadvantage to themselves as individuals have standing to sue." *Baker v. Carr*, 369 U.S. 186, 206, 208 (1962) (holding that qualified voters of various Tennessee counties had standing to challenge an allegedly unconstitutional statewide apportionment scheme because they had "a plain, direct and adequate interest in maintaining the effectiveness of their votes") (internal citations omitted).  For example, in the context of malapportionment, voter dilution can support standing when a classification "places [voters] in a position of constitutionally unjustifiable inequality vis-a -vis voters in irrationally favored counties."  *Id.* at 207-208.

The Supreme Court has also found the necessary disadvantage to be present when the vote of one member of a group receives less weight than that of another member of the same group based on an arbitrary distinction in the gerrymandering context.  *See, e.g.*, *Rucho v. Common Cause*, 139 S. Ct. 2484, 2492 (2019) (noting that partisan gerrymandering could cause an injury in fact because plaintiffs lived in a district that had been either "cracked" or "packed" to lessen the weight of their votes);[3] *contra United States v. Hays*, 515 U.S. 737, 739 744–745 (1995) (holding that plaintiffs failed to produce evidence that they had suffered individualized harm in the racial gerrymandering context when their claims focused on a "majority-minority" district, that is, a district "in which a majority of the population is a member of a specific minority group," but they did not live in that district).

---

3    A "cracked" district is one in which "a party's supporters are divided among multiple districts, so that they fall short of a majority in each," while a "packed" district is one in which "a party's supporters are highly concentrated, so they win that district by a large margin, 'wasting' many votes that would improve their chances in others."  *Rucho*, 139 S. Ct. at 2492 (internal citations omitted).

App.106

The Supreme Court has also recognized that malapportionment based on a flawed census could give rise to a cognizable injury. *See Reynolds*, 377 U.S. at 555, 563 (holding that Alabama residents and voters had standing to challenge a state reapportionment plan that gave the same number of representatives to unequal numbers of constituents and noting that "[w]eighting the votes of citizens differently, by any method or means, merely because of where they happen to reside, hardly seems justifiable."); *Dep't of Com. v. U.S. House of Representatives*, 525 U.S. 316, 331–32 (1999) (plaintiffs satisfied the injury-in-fact requirement for standing when they demonstrated that it was a "virtual certainty" that Indiana would lose a House seat under the proposed census plan because Indiana residents' votes would be diluted by the loss).

But not every alleged dilution of voting rights gives rise to an injury that would support a finding of standing. In *Gill,* Wisconsin residents complained that partisan gerrymandering left them with "a less valuable vote." 585 U.S. at 77 (Kagan, J., concurring). The Court held that the plaintiffs had not come forward with any evidence to show that they had suffered such an injury; the only plaintiff to testify at trial about the alleged gerrymander's effects "expressly acknowledged that his district would be materially identical under any conceivable map," meaning he was not "among the injured." *Id*. As the D.C. Circuit explained in *Daughtrey v. Carter*, 584 F.2d 1050, 1056 (D.C. Cir. 1978), in each case, "the determination of injury must necessarily proceed on an Ad hoc scrutiny of the facts." (internal citations and quotations omitted).

Plaintiffs' complaint, which is more of a memorandum of points and authorities than the required "short and plain statement of the claim showing that the pleader is entitled to relief," *see* Fed. R. Civ. Proc. 8(a)(2), is thin on facts. It posits that "by necessary operation," the Act authorizing noncitizens to vote in local elections dilutes the votes of the citizens who reside in the district. Compl. ¶ 5. But this *ipse dixit* is insufficient to invoke the Court's jurisdiction.

The complaint recites inarguable, important principles – "all qualified voters have a constitutionally protected right to vote, and to have their votes counted," Compl. ¶ 45, and "the Due Process Clause of the Fifth Amendment contains an equal protection component prohibiting the United States from invidiously discriminating between individuals or groups," Compl. ¶ 49 – but it does not include facts showing that *plaintiffs'* right to vote has been denied, that they have been subjected to discrimination or inequitable treatment or denied opportunities when compared to another group, or that their rights as citizens have been "subordinated merely because of [their] father's country of origin."  *See* Compl. ¶ 51. They identify nothing that has been taken away or diminished and no right that has been made subordinate to anyone else's.

In sum, plaintiffs have not alleged that they have personally been subjected to any sort of disadvantage as individual voters by virtue of the fact that noncitizens are permitted to vote, too. They may object as a matter of policy to the fact that immigrants get to vote at all, but their votes will not receive less weight or be treated differently than noncitizens' votes; they are not losing representation in any legislative body; nor have citizens as a group been discriminatorily

App.108

gerrymandered, "packed," or "cracked" to divide, concentrate, or devalue their votes. At bottom, they are simply raising a generalized grievance which is insufficient to confer standing.[4]

Indeed, the D.C. Circuit has already specifically rejected the contention that the mere expansion of the electorate as a whole gives rise to the necessary particularized injury affecting an existing voter in a personalized and individual way. *See Daughtrey*, 584 F.2d at 1056-57.

In *Daughtrey,* a group consisting of retired and active duty military officers, a civilian former prisoner of war, the minor child of a prisoner of war who died in captivity, and some of

---

4       On March 4, 2024, plaintiffs filed a supplemental notice of authority transmitting an opinion issued by the New York State Court of Appeals. *See* Pl.'s Suppl. In *Fossella v. Adams*, No. 2022-05794, slip. op. (N.Y. App. Div. Feb. 21, 2024), the court concluded that the voter plaintiffs lacked standing for reasons similar to those outlined in this opinion. *Id.* at 8. However, it did find that officeholders had standing to challenge New York City's noncitizen voting law. *Id.* at 11. Given that development, plaintiffs submitted a declaration from plaintiff Hall in a belated effort to base standing on her more recent status as a candidate for the at-large position on the District of Columbia Board of Education. *See* Pl.'s Suppl; Hall Decl. ¶ 8.

The D.C. Circuit has made it clear that "standing is assessed as of the time a suit commences." *Del Monte Fresh Produce Co. v. United States*, 570 F.3d 316, 324 (D.C. Cir. 2009). The complaint, which was filed in May 2023, simply alleges that "in 2022, Ms. Hall was the Republican candidate for Mayor of the District of Columbia," and it made no reference to any current or impending candidacy. Compl. ¶ 13. In her recently filed declaration, plaintiff Hall states: "*At the time this lawsuit was filed*, I was *planning* to run for public office in the District in 2024, and was being pressed by other members of the District of Columbia Republican Party to run for the at-large seat on the District of Columbia Council in the 2024 election." Decl. ¶ 7 (emphasis added). She asserts that she finalized her plans "[i]n the summer of 2023," and she is now "currently a candidate." Decl. ¶¶ 8-9.

Even if this out-of-circuit opinion were binding on this Court, the case at hand presents an entirely different set of circumstances. While the court in *Fossella* held that the officeholder plaintiffs had standing because "the record reflects that each of the officeholder plaintiffs *intended* to seek reelection," *Fossella*, slip. op. at 12, plaintiff Hall was not an *officeholder* seeking *re*election; at the time of the complaint, she was *intending* to be a *candidate*. While the court stated that "[a]n inaccurate vote tally is a concrete and particularized injury to candidates," *id.* at 11, Hall was not yet a candidate at the time the lawsuit commenced. Moreover, given that the relevant plaintiffs in *Fossella* were "individuals who held or had recently been elected to public office," *id.* at 3, and not merely "candidates," any dicta regarding standing with respect to candidates has no bearing on the instant case.

their spouses alleged that their votes were unconstitutionally devalued when individuals who had

left the country to avoid military service during the Vietnam War were permitted to return, with

their voting rights restored.  *Id.* at 1054.  They challenged then-President Carter's Proclamation

and Executive Order on the grounds that as eligible voters, their voting rights would be diluted by

the reentry of persons they alleged should remain excluded.  *Id.*  The Court of Appeals observed

that the appellants did "not contend that their votes [were] diluted in any particular election or in

any particular geographical area" or that they were an "identifiable group of voters whose votes

are disfavored Vis-a-vis those of some other group."  *Id.* at 1056.   It added that "at best," the

complaint could be read to claim that as qualified voters, plaintiffs' votes were being diluted "as a

result of the reentry into the United States of an admittedly unknown, relatively small number of

persons who allegedly should be excluded, and who therefore should not be entitled to vote."  *Id.*

Because this did not present a "discrete factual context" within which a "concrete injury" had

occurred, the court affirmed the district court's dismissal of the complaint for lack of standing.

*Id.*[5]

Plaintiffs point to a general statement contained in an out-of-circuit case to argue that the

existence of "a point of comparison" means that they have standing.  *See* Opp. at 6-7, citing *Wood*

*v. Raffensperger*, 981 F.3d 1307, 1314 (11th Cir. 2020) (upholding the dismissal of an individual

---

[5]     The Court also concluded that "the dilution of voting rights [appellants] have alleged is so
diffuse, minute, and indeterminable that we must conclude the injury asserted is too speculative to
support standing under the circumstances presented here." *Daughtrey*, 584 F.2d at 1056 (internal
quotations omitted).  While plaintiffs here have pointed to a more geographically concentrated
impact than the nationwide action challenged in *Daughtery,* they have made no effort to quantify
the number of noncitizens who will meet the criteria to vote in local elections, much less, do so.
But the Court's ruling here is based on the lack of a particularized injury recognized in *Daughtery*
as opposed to the Circuit's concern about the diffuse or speculative nature of the injury alleged in
that case.

App.110

voter's challenge to the 2020 presidential election results in Georgia for lack of standing, and noting that "vote dilution can be a basis for standing. . . [b]ut it requires a point of comparison."). They maintain that the "point" at which the strength of their votes was diminished was the date when the statute was enacted.  Opp. at 6.  But they have lifted the term out of context, as the Eleventh Circuit was not talking about a point in time, and it went on to identify examples of the particular forms of vote dilution that could cause a cognizable injury: "For example, in the racial gerrymandering and malapportionment contexts, vote dilution occurs when voters are harmed compared to 'irrationally favored' voters from other districts."  981 F. 3d at 1314, citing *Baker v. Carr,* 369 U.S. at 207-08.  Here, the power of plaintiffs' individual votes was not diminished in any way on that date: plaintiffs' votes will be counted and weighted exactly as they were before.[6]

## CONCLUSION

Because plaintiffs have failed to establish the injury-in-fact element of standing, the Court will **GRANT** defendant's motion to dismiss [Dkt. # 8] for lack of subject matter jurisdiction.

---

[6]     Plaintiffs also cite *Michel v. Anderson*, 14 F.3d 623 (D.C. Cir. 1994), Opp. at 5, but this case presents an entirely different set of circumstances.  In *Michel*, members of Congress and their constituents challenged a House rule allowing delegates from D.C. and U.S. territories to vote in the House Committee of the Whole.  *Id.* at 624–25.  The court considered a standing challenge raised by *amici* given the jurisdictional nature of the issue.  *Id.* at 625.  Notably, the *amici* did "not question the congressmen's standing to assert that their voting power has been diluted."  *Id.*  Given that the applicability of the vote dilution theory was conceded, the court only needed to decide whether the private voters had standing as well.  The *amici* argued that the constituents had merely asserted a "derivative" injury and that the dilution of the voting power of their congressmen was a generalized grievance suffered by every American voter.  *Id.* at 626.  The *Michel* court held that the fact that all voters in the 50 states suffered the injury did not render it "abstract," and that the private citizens faced the same injury as the representatives: "previously they had a right to elect a representative who cast one of 435 votes, whereas now their vote elects a representative whose vote is worth only one in 440."  *Id.*  The opinion went on to observe:  "[t]hat an injury is widespread . . . does not mean it cannot form the basis for a case in federal court so long as each person can be said to have suffered a distinct and concrete harm."  *Id.*  Here, the ruling that plaintiffs lack standing is based on the absence of a particularized injury suffered by *any* of the U.S. citizen plaintiffs, not the fact that there may be a large number of other citizens residing in the District.

A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE:  March 20, 2024

App.112