NOT YET SCHEDULED FOR ORAL ARGUMENT

———————————

Nos. 24-7050 & 24-7065

———————————

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

STACIA HALL, *et al.*,
APPELLANTS & CROSS-APPELLEES,

v.

DISTRICT OF COLUMBIA BOARD OF ELECTIONS,
APPELLEE & CROSS-APPELLANT.

———————————

ON APPEAL FROM AN ORDER OF THE
UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

———————————

**PRINCIPAL AND RESPONSE BRIEF OF
APPELLEE/CROSS-APPELLANT THE DISTRICT OF COLUMBIA
BOARD OF ELECTIONS**

———————————

BRIAN L. SCHWALB
Attorney General for the District of Columbia

CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

CARL J. SCHIFFERLE
Deputy Solicitor General

BRYAN J. LEITCH
Assistant Attorney General
Office of the Solicitor General

Office of the Attorney General
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-6524
bryan.leitch@dc.gov

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

A.     *Parties and amici*.—Stacia Hall, Ralph Chittams, Suzzanne Keller, Ken McClenton, Kimberly Epps, Dick Anthony Heller, and Nicolle S.A. Lyon are plaintiffs-appellants and cross-appellees.  The District of Columbia Board of Elections is the defendant-appellee and cross-appellant.  The Lawyers' Committee for Civil Rights Under Law and the Washington Lawyers' Committee for Civil Rights and Urban Affairs appeared as amici curiae in the district court in support of defendant.  No amici curiae has yet appeared in this Court.

B.     *Ruling under review*.—The ruling under review is the March 20, 2024 Memorandum Opinion and Order (ECF Nos. 19 & 20), entered by U.S. District Judge Amy Berman Jackson, which granted defendant's motion to dismiss plaintiffs' complaint for lack of standing.  The decision is not reported but is available at 2024 WL 1212953 and is included in the joint appendix.

C.     *Related cases*.—These consolidated appeals have not previously been before this Court or any other court.  Undersigned counsel is not aware of any case related to this consolidated appeal and cross-appeal.

# TABLE OF CONTENTS

INTRODUCTION ..................................................................1

STATEMENT OF THE ISSUES.................................................3

STATEMENT OF THE CASE...................................................3

    1.    Historical And Legal Background.......................................3

        A.    The history of noncitizen voting in the United States ...............3

        B.    The District of Columbia Voting Act ........................................7

    2.    Factual And Procedural Background ...................................9

        A.    Plaintiffs file suit alleging that the Voting Act's expansion of voting rights violates the Constitution....................................9

        B.    The Board moves to dismiss, and plaintiffs try to supplement their complaint with an untimely declaration........10

        C.    The district court dismisses plaintiffs' complaint for lack of Article III standing................................................................12

STANDARD OF REVIEW .....................................................14

SUMMARY OF ARGUMENT .................................................14

ARGUMENT .......................................................................18

    I.    The District Court Correctly Found That Plaintiffs Lack Standing................................................................................18

        A.    Plaintiffs forfeited their "citizen self-government" theory of injury, which is a generalized grievance in any event..........18

        B.    Plaintiffs' "vote dilution" allegations do not establish an imminent threat of a particularized Article III injury ...............22

            1.    Plaintiffs' complaint alleges no intention to vote, or run for District office, in future elections........................22

2.      Plaintiffs' theory is also a generalized grievance since their vote-dilution interest is admittedly shared by all citizen voters in equal measure ................24

3.      Plaintiffs' counterarguments fail ....................27

C.     Hall's post-complaint candidacy cannot retroactively confer Article III standing..........................................31

II.    If Standing Exists, The Court Can Affirm The Dismissal Of Plaintiffs' Suit On The Merits...............................................35

A.     Plaintiffs' substantive-due-process and citizen-self-government claims lack merit....................................................35

1.      Plaintiffs have not invoked a carefully defined or deeply rooted fundamental right.....................................36

a.      The asserted fundamental right is not a general "right to vote" but an exclusive right of citizens to vote ...................................................36

b.      History and tradition do not support an "exclusive right to vote" for citizens....................38

c.      Plaintiffs' counterarguments fail..........................45

2.      The Voting Act passes rational-basis review ................48

B.     Plaintiffs' equal-protection claims lack merit..........................49

1.      The Voting Act is facially neutral and rationally advances the legitimate interest of expanding democracy in the District.................................................50

2.      Plaintiffs have alleged nothing to suggest that the Voting Act was enacted for the purpose of harming protected classes ............................................................56

CONCLUSION ......................................................................................61

*Cases*

*Abbott v. Perez*,
  585 U.S. 579 (2018)......................................................................57

*\*Abigail All. for Better Access to Dev. Drugs v. von Eschenbach*,
  495 F.3d 695 (D.C. Cir. 2007) (en banc)...............................36, 38, 45

*Air Excursions LLC v. Yellen*,
  66 F.4th 272 (D.C. Cir. 2023)........................................................14

*Albence v. Higgin*,
  295 A.3d 1065 (Del. 2022) ...........................................................33

*Alexander v. S.C. State Conf. of the NAACP*,
  601 U.S. 1 (2024)..........................................................................57

*Ambach v. Norwick*,
  441 U.S. 68 (1979)...................................................................47, 48

*Angel v. City of Fairfield*,
  793 F.2d 737 (5th Cir. 1986) .........................................................54

*Armstrong v. Exceptional Child Ctr., Inc.*,
  575 U.S. 320 (2015)......................................................................46

*Arpaio v. Obama*,
  797 F.3d 11 (D.C. Cir. 2015).....................................................22, 28

*Baker v. Carr*,
  369 U.S. 186 (1962)......................................................................27

*Bennett v. Yoshina*,
  140 F.3d 1218 (9th Cir. 1998) .......................................................54

---

\*      Authorities upon which we chiefly rely are marked with asterisks.

*Berg v. Obama*,
    586 F.3d 234 (3d Cir. 2009) ............................................................26

*Bognet v. Sec'y of Pa.*, 980 F.3d 345 (3d Cir. 2020),
    cert. granted, vacated as moot sub nom. Bognet v. Degraffenreid, 141 S.
    Ct. 2508 (2021) ......................................................25, 26, 27, 34

*Bost v. Ill. Bd. of Elections*,
    114 F.4th 634 (7th Cir. 2024) .........................................25, 33, 34

*Brockington v. Rhodes*,
    396 U.S. 41 (1969).........................................................................33

*Brown v. Bd. of Comm'rs*,
    722 F. Supp. 380 (E.D. Tenn. 1989)..............................27, 52, 55, 56

*Cabell v. Chavez-Salido*,
    454 U.S. 432 (1982)........................................................................47

*Cantwell v. Hudnut*,
    566 F.2d 30 (7th Cir. 1977) ...........................................................54

*Carney v. Adams*,
    592 U.S. 53 (2020).....................................................................22, 33

*Carson v. Simon*,
    978 F.3d 1051 (8th Cir. 2020) ........................................................34

*Castro v. Scanlan*,
    86 F.4th 947 (1st Cir. 2023)............................................................33

*CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*,
    601 U.S. 416 (2024)........................................................................40

*Chen v. City of Houston*,
    206 F.3d 502 (5th Cir. 2000) ..........................................................43

*Chisholm v. Georgia*,
    2 U.S. 419 (1793)............................................................................47

*Citizens Awareness Network, Inc. v. United States,*
    391 F.3d 338 (1st Cir. 2004) ...............................................................59

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) ...........................................................................22

*Colindres v. U.S. Dep't of State,*
    71 F.4th 1018 (D.C. Cir. 2023) .......................................................4, 39

*Collins v. Town of Goshen,*
    635 F.2d 954 (2d Cir. 1980) ..............................................................52

*Connell v. State,*
    144 N.E. 882 (Ind. 1924) ...................................................................43

*Cross v. Fox,*
    23 F.4th 797 (8th Cir. 2022) ..............................................................23

*Crosse v. Bd. of Supervisors of Elections of Balt. City,*
    221 A.2d 431 (Md. 1966) ...................................................................44

*DaimlerChrysler Corp. v. Cuno,*
    547 U.S. 332 (2006) .....................................................................18, 34

*Daughtrey v. Carter,*
    584 F.2d 1050 (D.C. Cir. 1978) .........................................24, 25, 27, 28, 29

*Davis v. Linville,*
    864 F.2d 127 (11th Cir. 1989) ...........................................................54

*Dep't of State v. Munoz,*
    602 U.S. 899 (2024) .................................................................36, 37, 39

*Dillard v. Chilton Cnty. Comm'n,*
    495 F.3d 1324 (11th Cir. 2007) .........................................................21

*Dist. Attorney's Off. for Third Jud. Dist. v. Osborne,*
    557 U.S. 52 (2009) .............................................................................38

*District of Columbia v. Heller,*
    554 U.S. 570 (2008) .....................................................................39, 46

*Dobbs v. Jackson Women's Health Org.*,
    597 U.S. 215 (2022) ............................................................... 46

*Doe v. City of Lafayette*,
    377 F.3d 757 (7th Cir. 2004) (en banc) .............................. 45

*Drake v. FAA*,
    291 F.3d 59 (D.C. Cir. 2002) ............................................... 14

*\*Duncan v. Coffee County*,
    69 F.3d 88 (6th Cir. 1995) ............................... 50, 52, 53, 58

*Dunn v. Blumstein*,
    405 U.S. 330 (1972) ............................................................. 43

*Election Integrity Project Cal., Inc. v. Weber*,
    113 F.4th 1072 (9th Cir. 2024) ............................... 50, 52, 56

*Est. of Boyland v. U.S. Dep't of Agric*,
    913 F.3d 117 (D.C. Cir. 2019) ............................................ 14

*FDA v. All. for Hippocratic Med.*,
    602 U.S. 367 (2024) ............................................................. 20

*Feehan v. Wis. Elections Comm'n*,
    506 F. Supp. 3d 596 (E.D. Wis. 2020) .............................. 34

*Fireside Nissan, Inc. v. Fanning*,
    30 F.3d 206 (1st Cir. 1994) ................................................ 49

*Fla. Audubon Soc. v. Bentsen*,
    94 F.3d 658 (D.C. Cir. 1996) (en banc) ............................. 31

*Foley v. Connelie*,
    435 U.S. 291 (1978) ............................................................. 47

*Fossella v. Adams*,
    206 N.Y.S.3d 611 (N.Y. App. Div. 2024) ..................... 11, 13

*Ga. Ass'n of Latino Elected Offs., Inc. v. Gwinnett Cnty. Bd. of Registration
    & Elections*, 36 F.4th 1100 (11th Cir. 2022) ..................... 27

*Gill v. Whitford,
    585 U.S. 48 (2018)...............................................................20, 24, 29

Gordon v. Holder,
    721 F.3d 638 (D.C. Cir. 2013)..........................................................48

Graham v. Richardson,
    403 U.S. 365 (1971)..........................................................................60

Hancock v. Urb. Outfitters, Inc.,
    830 F.3d 511 (D.C. Cir. 2016)....................................................31, 32

Heckler v. Mathews,
    465 U.S. 728 (1984)..........................................................................30

Hedgepeth ex rel. Hedgepeth v. WMATA,
    386 F.3d 1148 (D.C. Cir. 2004)..................................................37, 56

Hemp Indus. Ass'n v. DEA,
    36 F.4th 278 (D.C. Cir. 2022)....................................................35, 58

Herriott v. City of Seattle,
    500 P.2d 101 (Wash. 1972) ..............................................................44

Hudson v. Haaland,
    843 F. App'x 336 (D.C. Cir. 2021)..................................................24

Hutchins v. District of Columbia,
    188 F.3d 531 (D.C. Cir. 1999) (en banc)....................................38, 47

In re Navy Chaplaincy,
    738 F.3d 425 (D.C. Cir. 2013)....................................................51, 52

In re Wehlitz,
    16 Wis. 443 (1863) ..........................................................................43

Jackson v. Thornburgh,
    907 F.2d 194 (D.C. Cir. 1990)..........................................................51

Kareem v. Haspel,
    986 F.3d 859 (D.C. Cir. 2021)..........................................................14

*Kingman Park Civic Ass'n v. Bowser*,
    815 F.3d 36 (D.C. Cir. 2016)................................................................50

*Lacy v. San Francisco*,
    312 Cal. Rptr. 3d 391 (Cal. Ct. App. 2023).....................................44

*Lance v. Coffman*,
    549 U.S. 437 (2007)....................................................................21, 34

*LaRoque v. Holder*,
    650 F.3d 777 (D.C. Cir. 2011)............................................................23

*Lewis v. Becerra*,
    111 F.4th 65 (D.C. Cir. 2024)..............................................20, 26, 30

*Linger v. Balfour*,
    149 S.W. 795 (Tex. Civ. App. 1912)..................................................42

*Locklear v. N.C. State Bd. of Elections*,
    514 F.2d 1152 (4th Cir. 1975) ...........................................................54

*\*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992).....................................................18, 21, 22, 31

*Lyman v. Baker*,
    954 F.3d 351 (1st Cir. 2020).............................................................27

*Lynch v. Clarke*,
    1 Sand. Ch. 583, 1844 WL 4808 (N.Y. Ch. 1844) ...........................42

*Mark v. Republic of the Sudan*,
    77 F.4th 892 (D.C. Cir. 2023)...........................................................13

*Mathews v. Diaz*,
    426 U.S. 67 (1976).............................................................................60

*\*May v. Town of Mountain Vill.*,
    132 F.3d 576 (10th Cir. 1997) .......................................50, 53, 54, 58

*McCarthy v. Froelke*,
    63 Ind. 507 (1878) .............................................................................42

*Michel v. Anderson*,
    14 F.3d 623 (D.C. Cir. 1994).......................................................28, 29

*Minor v. Happersett*,
    88 U.S. 162 (1874)..........................................................................43

*Mobile v. Bolden*,
    446 U.S. 55 (1980)....................................................................57, 58

*Nguyen v. INS*, 208 F.3d 528 (5th Cir. 2000),
    *aff'd*, 533 U.S. 53 (2001) .............................................................31

*Padilla v. Allison*,
    113 Cal. Rptr. 582 (Cal. Ct. App. 1974).....................................44

*Partido Nuevo Progresista v. Perez*,
    639 F.2d 825 (1st Cir. 1980).........................................................54

*People v. Scott*,
    22 N.W. 274 (Mich. 1885).............................................................43

*Perry Cap. LLC v. Mnuchin*,
    864 F.3d 591 (D.C. Cir. 2017)......................................................14

*Pope v. Williams*,
    193 U.S. 621 (1904).......................................................................43

*Powell v. Power*,
    436 F.2d 84 (2d Cir. 1970) ...........................................................54

*Prisology, Inc. v. Fed. Bureau of Prisons*,
    852 F.3d 1114 (D.C. Cir. 2017)....................................................20

*Pub. Citizen, Inc. v. NHTSA*,
    489 F.3d 1279 (D.C. Cir. 2007)..............................................19, 26

*Raines v. Byrd*,
    521 U.S. 811 (1997).......................................................................34

*Reno v. Flores*,
    507 U.S. 292 (1993)..................................................................36, 37

*Rhode Island v. Massachusetts*,
  37 U.S. 657 (1838)..................................................................................46

*Richards v. Elective Bd. for Town & Suburbs of Frederiksted*,
  1 V.I. 351, 1936 WL 73547 (D.V.I. 1936) ........................................44

*Rothe Dev., Inc. v. U.S. Dep't of Def.*,
  836 F.3d 57 (D.C. Cir. 2016)............................................51, 52, 56

*Rucho v. Common Cause*,
  588 U.S. 684 (2019)..............................................................................49

*Sanchez v. Off. of State Superint. of Educ.*,
  45 F.4th 388 (D.C. Cir. 2022)............................................................48

*SECSYS, LLC v. Vigil*,
  666 F.3d 678 (10th Cir. 2012) ...........................................................59

*Sessions v. Morales-Santana*,
  582 U.S. 47 (2017)..................................................................................51

*Sierra Club v. Jackson*,
  648 F.3d 848 (D.C. Cir. 2011).............................................................29

*Spahos v. Town of Savannah Beach*,
  371 U.S. 206 (1962) (per curiam)......................................................52

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016)..............................................................................27

*Spragins v. Houghton*,
  3 Ill. 377 (1840) .....................................................................5, 41, 42

*State v. Fowler*,
  6 So. 602 (La. 1889) .............................................................................43

*State ex rel. Off v. Smith*,
  14 Wis. 497 (1861) ...............................................................................43

*Steffan v. Perry*,
  41 F.3d 677 (D.C. Cir. 1994) (en banc)............................................18

*Stewart v. Foster,*
    2 Binn. 110 (Pa. 1809) ................................................................ 41

*Sutton v. Escambia Cnty. Bd. of Educ.,*
    809 F.2d 770 (11th Cir. 1987) ..................................................... 50

*Swanson Grp. Mfg. LLC v. Jewell,*
    790 F.3d 235 (D.C. Cir. 2015) ...................................................... 31

*Thornburg v. Gingles,*
    478 U.S. 30 (1986) ........................................................................ 57

*Toll v. Moreno,*
    458 U.S. 1 (1982) .......................................................................... 47

*Trump v. Wis. Elections Comm'n,*
    983 F.3d 919 (7th Cir. 2020) ........................................................ 34

*Twin Rivers Paper Co. LLC v. SEC,*
    934 F.3d 607 (D.C. Cir. 2019) ...................................................... 19

*United States v. Cohen,*
    733 F.2d 128 (D.C. Cir. 1984) (en banc) ..................................... 59

*United States v. Hays,*
    515 U.S. 737 (1995) ................................................................ 21, 31

*United States v. Hirschfield,*
    26 F. Cas. 328 (C.C.S.D.N.Y. 1876) ............................................ 43

*United States v. Johnson,*
    40 F.3d 436 (D.C. Cir. 1994) ........................................................ 56

*United States v. SCRAP,*
    412 U.S. 669 (1973) ...................................................................... 27

*United Steelworkers of Am., AFL-CIO-CLC v. Weber,*
    443 U.S. 193 (1979) ...................................................................... 60

*Utah Republican Party v. Cox,*
    892 F.3d 1066 (10th Cir. 2018) .................................................... 49

*Vacco v. Quill*,
521 U.S. 793 (1997)........................................................50

*Van Valkenburg v. Brown*,
43 Cal. 43 (1872) ..........................................................43

\*Washington v. Glucksberg*,
521 U.S. 702 (1997)...................................36, 37, 38, 48

*Waterkeeper All., Inc. v. Regan*,
41 F.4th 654 (D.C. Cir. 2022)........................................22

*Whitfield v. Thurston*,
3 F.4th 1045 (8th Cir. 2021) .........................................33

*Williams v. Att'y Gen. of Ala.*,
378 F.3d 1232 (11th Cir. 2004) .....................................39

*Wise v. Circosta*,
978 F.3d 93 (4th Cir. 2020) (en banc) ...........................56

*Wood v. Raffensperger*,
981 F.3d 1307 (11th Cir. 2020) .....................................25

*Woodcock v. Bolster*,
35 Vt. 632 (1863)..........................................................42

*Yazzie v. Hobbs*,
977 F.3d 964 (9th Cir. 2020) ...................................22, 23

### Statutes, Rules, and Regulations

15 Stat. 536 (Dec. 3, 1818) ...............................................41

42 U.S.C. § 2000e-2..........................................................60

Act of 1812, ch. 75, § 2, 2 Stat. 723 (May 4, 1812) ...........40

Act of 1874, ch. 337, § 2, 18 Stat. 116 (June 20, 1874) ......40

Act of April 19, 1816, ch. 57, § 3, 14 Stat. 289..................40

Act of April 18, 1818, ch. 67, § 4, 15 Stat. 430......................................................41

Act of Aug. 7, 1789, ch. 8, 1 Stat. 50 ....................................................................5

Act of May 3, 1802, ch. 53, § 2, 2 Stat. 196 (1802) .................................................6

D.C. Code § 1-1001.02 (2022)...................................................................................7

D.C. Code § 1-1001.02 (2024)...................................................................8, 51, 55

D.C. Code § 1-1001.04 ..............................................................................................8

D.C. Code § 1-1001.05 ..............................................................................................7

D.C. Code § 1-1204.02 ..............................................................................................9

D.C. Code § 1-1301.83 ..............................................................................................9

D.C. Code § 1-1309.05 ..............................................................................................9

D.C. Election Code of 1955,
    Pub. L. 84-376, 69 Stat. 699, § 2(2) (Aug. 12, 1955)........................................7

Del. Const. art. IV, § 1 (1792) ..................................................................................4

Equitable Voting Rights Amendment Act of 2004,
    B15-0977 § 2 (July 13, 2004) ...........................................................................7

Fed. R. Civ. P. 12(b)(1)...........................................................................................11

Fed. R. Civ. P. 12(b)(6)...........................................................................................11

Ga. Const. art. IX (1777) ..........................................................................................5

Ill. Const. art. II, § 27 (1818) ............................................................................4, 41

Ky. Const. art. III, § 1 (1792) ...................................................................................5

Lawful Permanent Resident Voting Rights Amendment Act of 1992,
    Bill 9-532 (May 6, 1992) ...................................................................................7

Local Resident Voting Rights Act of 2013,
B20-0597 (Dec. 3, 2013) ...................................................7

Local Resident Voting Rights Amendment Act of 2015,
B21-0028 (Jan. 20, 2015) .................................................7

Local Resident Voting Rights Amendment Act of 2017,
B22-0074 (Jan. 24, 2017) .................................................8

Local Resident Voting Rights Amendment Act of 2019,
B23-0492 (Oct. 8, 2019) ..................................................8

Local Resident Voting Rights Amendment Act of 2022,
D.C. Law 24-242, 69 D.C. Reg. 14,601 (Dec. 2, 2022) ..................1, 8

Mass. Const. pt. 2, ch. I, § 3, art. IV, at 30 (1780) ................4, 5

Md. Const. art. II (1776) ...............................................4

N.C. Const. art. VII-IX (1776) ..........................................4

N.H. Const. pt. 2, art. 27 (1792) .......................................4

N.J. Const. art. IV (1776) ..............................................4

N.Y. Const. art. VII (1777) .............................................4

Ohio Const. art. IV, § 1 (1802) .........................................4

Ohio Enabling Act of 1802, ch. 15, § 4, 2 Stat. 174 (Apr. 30, 1802).....5

Pa. Decl. of the Rights of the Inhabitants of the Commonwealth, art. VII
(1776) .................................................................5

S.C. Const. art. I, § 4 (1790) ..........................................5

Takoma Park, Md., Mun. Charter, art. VI, § 601(a) ......................44

Tenn. Const. art. III, § 1 (1796) .......................................5

U.S. Const. art. I, § 2 ................................................40

U.S. Const. art. I, § 3 ..................................................................40

U.S. Const. art. II, § 1 .................................................................40

U.S. Const. amend. XI ................................................................47

Va. Decl. of Rights § 6 (1776) .......................................................5

Vt. Act No. M-5 (H.177, Montpelier) (eff. June 24, 2021) ...................44

Vt. Const. ch. 1, art. 8 (1793)........................................................5

*Other*

15A Charles Alan Wright, et al., *Federal Practice and Procedure* § 3904
    (3d ed. June 2024) ................................................................13

Leon E. Aylsworth, *The Passing of Alien Suffrage*,
    25 Am. Pol. Sci. Rev. 114 (1931) ...............................................6

Erwin Chemerinsky, *Constitutional Law* (6th ed. 2019) .......................51

D.C. Council, Comm. on the Jud. & Pub. Safety,
    Report on Bill 24-0300, the "Local Resident Voting Rights Amendment
    Act of 2022" (Sept. 27, 2022).....................................8, 48, 49, 54, 58

Federalist No. 39 (Madison) (1788) .................................................41

Charles W. Hall, *Noncitizens Prepare to Vote in Arlington Primary School
    Board*, Wash. Post, at B4 (May 22, 1994)......................................44

Virginia Harper-Ho, *Noncitizen Voting Rights: The History, the Law and
    Current Prospects for Change*, 18(2) Law & Ineq. 271 (2000)..............6, 44

Ron Hayduk, *Democracy for All: Restoring Immigrant Voting Rights in the
    United States* (2006) ................................................................3

Alan H. Kennedy, *Voters in a Foreign Land: Alien Suffrage in the United
    States, 1704-1926*, 34 J. Policy History 245 (2022)..........................3, 7

James H. Kettner, *The Development of American Citizenship 1608-1870*
    (1978)...................................................................................3

James C. McKay, Jr., *Separation of Powers in the District of Columbia under Home Rule*, 27 Catholic U. L. Rev. 515 (1978) ................................................40

*Gerald L. Neuman, *Strangers to the Constitution: Immigrants, Borders, and Fundamental Law* (1996)...............................................3, 6, 41, 42, 46

Jamin B. Raskin, *Legal Aliens, Local Citizens: The Historical, Constitutional and Theoretical Meanings of Alien Suffrage*, 141 U. Pa. L. Rev. 1391 (1993) .........................................................................................................5, 6

Kirk H. Porter, *A History of Suffrage in the United States* (1918) .........................41

Chilton Williamson, *American Suffrage from Property to Democracy 1760-1860* (1960) ....................................................................................5, 6, 42

## GLOSSARY

JA                            Joint Appendix

Plaintiffs                    Appellants, Cross-Appellees

The Board                     District of Columbia Board of Elections

The Voting Act                Local Resident Voting Rights Amendment Act of 2022, D.C. Law 24-242.

## INTRODUCTION

Plaintiffs seeking to overturn democratically enacted legislation under the guise of the Constitution carry a heavy burden. They must first show that the legislation injured them in some particularized way, and then show that the challenged law violates an established constitutional right. Plaintiffs here flunk both tests. They identify no particularized harm caused by the law they challenge—which expands the right to vote in local elections—and on the merits, they offer only a hodgepodge of ill-defined constitutional theories. At bottom, plaintiffs' claims are ahistorical policy disputes dressed up in legal garb. But such disagreements belong in the halls of the legislature, not on the dockets of Article III courts.

The legislation plaintiffs challenge in this case reflects the considered judgment of the democratic branches of the District government. After years of careful study, the District decided to allow qualified noncitizens with fixed residency in the District to vote in local elections and to run for local office in the Local Resident Voting Rights Amendment Act of 2022 ("Voting Act" or "Act"), D.C. Law 24-242, 69 D.C. Reg. 14,601 (Dec. 2, 2022). As the Council of the District of Columbia explained in enacting this law, noncitizen residents deserve a voice in local matters because they are part of the District's political community, members of its workforce, and contributors to its taxbase.

Plaintiffs disagree with this democratic choice. In their view, the Voting Act is unconstitutional because it supposedly "dilutes" citizens' votes and violates an unenumerated "right" to "citizen self-government." That is wrong.

To start, the district court correctly found that plaintiffs alleged no particularized Article III injury. They admit that their "citizen self-government" theory, aside from being unpreserved, is a generalized interest in self-governance shared by every citizen in the District. And they further admit that their alleged "vote dilution" injury is experienced by each citizen voter to the same degree.

Their suit is just as weak on the merits. Given our country's extensive history of noncitizen voting and officeholding—particularly at the Founding—plaintiffs cannot plausibly claim that citizens have a fundamental unenumerated right to monopolize local voting and officeholding. Fundamental rights must be deeply rooted in this Nation's history. They cannot be cobbled together, as plaintiffs try to do, from scattered dicta or contestable policy views. Nor can plaintiffs claim unconstitutional "vote dilution" from granting noncitizens local voting rights when the Voting Act undisputedly counts all votes equally. The essence of unconstitutional vote dilution is the *intentional* and *unequal* weighing of votes—it is not a catchall basis for condemning every purported loss of voting power due to facially neutral expansions of the franchise. This Court should affirm.

## STATEMENT OF THE ISSUES

1.     Whether the district court properly dismissed plaintiffs' suit for lack of Article III standing.

2.     Whether, if standing exists, plaintiffs' claims lack merit.

## STATEMENT OF THE CASE

**1.     Historical And Legal Background.**

**A.     The history of noncitizen voting in the United States.**

Voting was not limited to citizens in early American history. *See, e.g.*, Gerald L. Neuman, *Strangers to the Constitution: Immigrants, Borders, and Fundamental Law* 63-65 (1996) (discussing the "tradition of alien suffrage in the United States"). In the colonies, unnaturalized immigrants voted and held office as early as 1692. James H. Kettner, *The Development of American Citizenship 1608-1870* at 122-23 (1978) (discussing Maryland, Pennsylvania, Georgia, and South Carolina). And most jurisdictions continued to allow noncitizen voting in state and local elections after the American Revolution and the Constitution's ratification. *See* Alan H. Kennedy, *Voters in a Foreign Land: Alien Suffrage in the United States, 1704-1926*, 34 J. Policy History 245, 249-51 (2022) (listing jurisdictions).

Many early state constitutions, in fact, granted "persons," "inhabitants," or "residents" voting rights regardless of citizenship. Ron Hayduk, *Democracy for All: Restoring Immigrant Voting Rights in the United States* 15-17, 19-20 (2006). For

example, the 1780 Massachusetts Constitution, written by John Adams, conditioned

the franchise on gender, residency, age, and property ownership, but not citizenship:

> Every male person, being twenty-one years of age, and resident in any particular town in this Commonwealth for the space of one year next preceding, having a freehold estate within the same town, of the annual income of three pounds, or any estate of the value of sixty pounds, shall have a right to vote in the choice of a Representative, or Representatives, for the said town.

Mass. Const. pt. 2, ch. I, § 3, art. IV, at 30 (1780), https://tinyurl.com/33n9dtw4.[1]

Many other states had similar constitutional provisions. *E.g.*, N.J. Const.

art. IV (1776), https://tinyurl.com/mw7rd4dk; Md. Const. art. II (1776),

https://tinyurl.com/43kucsvt; N.Y. Const. art. VII (1777),

https://tinyurl.com/2frxau3s; Del. Const. art. IV, § 1 (1792),

https://tinyurl.com/4vawu3uw; N.H. Const. pt. 1, art. 11, pt. 2, art. 27 (1792),

https://tinyurl.com/yc5mv3sy; Ohio Const. art. IV, § 1 (1802),

https://tinyurl.com/5n7tjjpb; Ill. Const. art. II, § 27 (1818),

https://tinyurl.com/rty3sw2s. Some of them granted voting rights to landowning

"inhabitants." N.C. Const. art. VII-IX (1776), https://tinyurl.com/yn5yxunp; Ga.

---

[1] Many of these qualifications, such as gender, would of course be unconstitutional today, and it cannot be overlooked that states for much of the Nation's history conditioned the franchise on race. The Board condemns such conditions, and it cites these provisions only as historical background. *See, e.g.*, *Colindres v. U.S. Dep't of State*, 71 F.4th 1018, 1023 (D.C. Cir. 2023) (recounting the history of federal immigration law "not to endorse" any "policy or application, but simply to note" its development).

Const. art. IX (1777), https://tinyurl.com/mr2dw578; S.C. Const. art. I, § 4 (1790), https://tinyurl.com/mu7tkmv5; Ky. Const. art. III, § 1 (1792), https://tinyurl.com/5n746c55; Tenn. Const. art. III, § 1 (1796), https://tinyurl.com/nhb7xu5j. Others focused on community attachment, including Virginia, which gave a "right of suffrage" to "all men, having sufficient evidence of permanent common interest with, and attachment to, the community." Va. Decl. of Rights § 6 (1776), https://tinyurl.com/m97k7zpr; Pa. Decl. of the Rights of the Inhabitants of the Commonwealth, art. VII (1776), https://tinyurl.com/yc5pyecv; Vt. Const. ch. 1, art. 8 (1793), https://tinyurl.com/me8c59zc.

The federal government also allowed noncitizen voting in certain elections. Chilton Williamson, *American Suffrage from Property to Democracy 1760-1860*, at 277 (1960) (noting that "territories permitted aliens to vote"). The First Congress, for example, provided that men were qualified "as an elector" in the Northwest Territory if they owned "fifty acres of land" and had "two years residence." Act of Aug. 7, 1789, ch. 8, 1 Stat. 50, 51 n.(a) (readopting the 1787 Northwest Ordinance promulgated under the Articles of Confederation), https://tinyurl.com/5n74npwc. And Congress gave "aliens as well as citizens the right of electing and being elected to office" in other territories, too. *Spragins v. Houghton*, 3 Ill. 377, 394 (1840) (discussing, among other laws, the Ohio Enabling Act of 1802, ch. 15, § 4, 2 Stat. 174 (Apr. 30, 1802)); *see* Jamin B. Raskin, *Legal Aliens, Local Citizens: The*

*Historical, Constitutional and Theoretical Meanings of Alien Suffrage*, 141 U. Pa. L. Rev. 1391, 1402 (1993) (noting that Congress "extended the right to vote to aliens" in various laws "authorizing the election of representatives to statewide constitutional conventions in Ohio, Indiana, Michigan and Illinois").  Indeed, in the District of Columbia, Congress granted taxpaying "inhabitants of full age" the right to vote for city-council members, regardless of citizenship.  Act of May 3, 1802, ch. 53, § 2, 2 Stat. 196 (1802), https://tinyurl.com/3cutfd8t.

The prevalence of noncitizen voting has of course fluctuated over time.  *See, e.g.*, Raskin, *supra* at 1397-1417.  Some states after the War of 1812, limited voting to citizens or so-called "declarant aliens"—noncitizens who declared their intention to become citizens.  Neuman, *supra* at 65-66.  But after the Civil War, the "movement to enfranchise aliens reached its height."  Williamson, *supra* at 277.  The trend shifted again with the onset of World War I, and states generally abandoned noncitizen voting by 1926.  Leon E. Aylsworth, *The Passing of Alien Suffrage*, 25 Am. Pol. Sci. Rev. 114, 114 (1931).  Yet by the end of the twentieth century, many cities and towns again began to allow noncitizens to vote in certain local elections.  *See* Kennedy, *supra* at 268-69 (noting that "noncitizen voting is drawing renewed attention"); Virginia Harper-Ho, *Noncitizen Voting Rights: The History, the Law and Current Prospects for Change*, 18 Law & Ineq. 271, 310-22 (2000).

**B.    The District of Columbia Voting Act.**

The District of Columbia Board of Elections is an independent agency tasked with conducting elections, counting votes, and registering voters in the District. D.C. Code § 1-1001.05.  The Board implements the election laws enacted by the Council; it does not prescribe qualifications for voting or candidacy in the District. *See id.*  Rather, under District law, individuals may register to vote, and participate in District elections, when, among other things, they meet "the qualifications as a qualified elector as defined" by the legislature "in § 1-1001.02(2)."  At one time, a "qualified elector" meant only individuals "who will be 18 years of age on or before the next general election," who have "maintained a residence in the District for at least 30 days preceding the next election," and who, as relevant here, are "a citizen of the United States."  *Id.* § 1-1001.02(2) (2022); *see* D.C. Election Code of 1955, Pub. L. 84-376, 69 Stat. 699, § 2(2) (Aug. 12, 1955).

While many of those qualifications drew little attention, the citizenship requirement engendered controversy for decades.  *See, e.g.*, Lawful Permanent Resident Voting Rights Amendment Act of 1992, Bill 9-532 § 2(3) (May 6, 1992), https://tinyurl.com/2r3m4bcb.[2]    And in June 2021, the D.C. Council again

---

[2]      *See* Equitable Voting Rights Amendment Act of 2004, B15-0977 § 2 (July 13, 2004), https://tinyurl.com/yzm78kyj; Local Resident Voting Rights Act of 2013, B20-0597 § 2(b) (Dec. 3, 2013), https://tinyurl.com/bdzf4j5w; Local Resident Voting Rights Amendment Act of 2015, B21-0028 § 2(a) (Jan. 20, 2015),

considered a proposal to allow noncitizen voting on local matters. *See* D.C. Council, Comm. on the Jud. & Pub. Safety, Report on Bill 24-0300, the "Local Resident Voting Rights Amendment Act of 2022," at 2-3 (Sept. 27, 2022) ("Comm. Rep."), https://tinyurl.com/49fxd3ha. After studying the issue and its history for more than a year, and after holding a public hearing at which more than 50 members of the public spoke, the Council found that noncitizen residents "deserve the opportunity to have a voice in the issues that affect them," because they comprise a meaningful part of the District's community, workforce, and taxbase, and "they are impacted by local laws just as much as citizen residents." *Id.* at 3-5; *see id.* at 2-10.

The Council's careful study culminated in the Local Resident Voting Rights Amendment Act of 2022. The Act allows competent adult noncitizens whose "principal or primary home" is "fixed" in the District to vote on certain matters by removing the citizenship requirement for "local election[s]." D.C. Code § 1-1001.02(2), (16). The term "local election" refers to certain District offices, as well as initiatives, referenda, recalls, or charter-amendment measures. *Id.* § 1-1001.02(34). As a result, noncitizen residents may be eligible to serve on the Board of Elections, *id.* § 1-1001.04(a)(1), or Advisory Neighborhood Commission,

---

https://tinyurl.com/2whjy6z2; Local Resident Voting Rights Amendment Act of 2017, B22-0074 § 2(a) (Jan. 24, 2017), https://tinyurl.com/3x5sp27j; Local Resident Voting Rights Amendment Act of 2019, B23-0492 § 2(a) (Oct. 8, 2019), https://tinyurl.com/3hfdu83x.

*id.* § 1-309.05(a)(1)(A), or to run for Mayor, *id.* § 1-204.21(c)(1), Attorney General, *id.* § 1-301.83(a)(1), or Council, *id.* § 1-204.02. Rather than limit the Act only to legal permanent residents, the Council included all qualified noncitizen residents because doing so was "easier to administer for the Board" and because "immigration status" is "an arbitrary category as it relates to participation and investment in the community." Comm. Rep. 7-8.

The Voting Act was enacted on November 21, 2022, and transmitted to Congress. The Act went into effect on February 23, 2023.

## 2. Factual And Procedural Background.

### A. Plaintiffs file suit alleging that the Voting Act's expansion of voting rights violates the Constitution.

In March 2023, plaintiffs Stacia Hall, Ralph Chittams, Suzzanne Keller, Ken McClenton, Kimberly Epps, Dick Anthony Heller, and Nicolle S.A. Lyon brought suit to challenge the Voting Act's constitutionality. Joint Appendix ("JA") 2-4. Hall and Chittams had previously run for District office, but plaintiffs sued in their capacity as U.S. citizens registered to vote in the District, and they named the Board as defendant because it administers and implements District election laws passed by the Council, including the Voting Act. JA 4. As relevant here, plaintiffs sought a declaration that the Act violates the Constitution as well as an injunction prohibiting the Board from spending funds to implement the Act, from registering noncitizens to vote, and from counting noncitizens' votes. JA 16-17.

Plaintiffs asserted four claims. They first alleged that the Act infringes the "right to vote" under the Fifth Amendment's "[s]ubstantive due process" guarantee because "enfranchising noncitizens" allegedly "[d]ilut[es]" citizens' votes. JA 14-15. Plaintiffs' second and third claims invoked the Fifth Amendment's "equal protection component," alleging that the Act "discriminate[d]" against "U.S. citizens" and "native-born U.S. citizens" in the District on the theory that "enfranchising noncitizens" will allegedly "dilut[e] the votes of U.S. citizens" and "native-born U.S. citizens." JA 15-16. Their fourth cause of action alleged that the Act violated a "constitutional right to citizen self-government" by allowing "noncitizens to" vote and "hold public office." JA 16.

## B. The Board moves to dismiss, and plaintiffs try to supplement their complaint with an untimely declaration.

After removing the case to federal court, the Board moved to dismiss plaintiffs' complaint for lack of standing under Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim under Rule 12(b)(6). JA 18-43; JA 70-93. On standing, the Board noted that plaintiffs had not alleged any intent to vote or run for office in future elections, and that their alleged "vote dilution" injury was a generalized grievance. JA 25-28; JA 72-80. On the merits, the Board argued that plaintiffs' claims were foreclosed by governing law as well as the long-recognized historical practice of noncitizen voting. JA 28-42, 80-92.

Plaintiffs opposed the Board's motion. JA 44-69. Asserting a "vote dilution injury" based on their status "as individual voters," plaintiffs argued that they had Article III standing because they are "all registered to vote in D.C.," and because two of them had "previously run for office." JA 50-51; *see* JA 47-53. Plaintiffs also argued on the merits that, by allegedly "diluting" citizens' votes, the Act violated a "right to citizen self-government" as well as the Fifth Amendment's "substantive due process" and "equal protection" guarantees. JA 53-68.

Several months later, plaintiffs filed a notice of supplemental authority and a declaration from plaintiff Hall. The notice cited *Fossella v. Adams*, 206 N.Y.S.3d 611 (N.Y. App. Div. 2024), which held that officeholders intending to seek reelection had standing under state law to challenge a New York City provision allowing noncitizens to vote, but that voters lacked standing to bring a vote-dilution claim. ECF No. 16. Hall's declaration asserted that she was "planning to run" for District office when this suit was filed, that she was "currently a candidate" for the D.C. Board of Education, and that she had "an interest in ensuring that the votes tallied during District of Columbia elections reflect legally cast votes." JA 95.

The Board responded to plaintiffs' notice and declaration. JA 97-99. It noted that plaintiffs' "sole theory of standing" before then had focused on their status as voters and an alleged vote-dilution injury, and that they had never before argued "candidate standing" on a theory that one of them could be "injured by an inaccurate

11

vote tally." JA 97-98 (citing JA 50-52). The Board urged the court to either not consider plaintiffs' new theory or allow supplemental briefing on the issue. JA 98.

### C. The district court dismisses plaintiffs' complaint for lack of Article III standing.

The district court granted the Board's motion to dismiss under Rule 12(b)(1). JA100-12. The court observed that plaintiffs' asserted injury was "the alleged dilution of their votes" through the "enfranchisement of noncitizens." JA 102, 105 (citing JA 2, 48). Yet the court recognized that "not every alleged dilution of voting rights gives rise to" Article III standing, JA 107, and that "the D.C. Circuit has already specifically rejected the contention that the mere expansion of the electorate" automatically inflicts a "particularized injury," JA 109.

In this case, the court held, plaintiffs' complaint was "thin on facts." JA 107. It posits only "that 'by necessary operation,' the Act authorizing noncitizens to vote in local elections dilutes the votes of the citizens." JA 107 (quoting JA 2). But that "*ipse dixit* is insufficient," the court explained, because "plaintiffs have not alleged that they have personally been subjected to any sort of disadvantage as individual voters by virtue of the fact that noncitizens are permitted to vote, too." JA 107-08. In particular, the complaint alleged no facts suggesting that plaintiffs' votes will "receive less weight or be treated differently than noncitizens' votes," or that "citizens as a group" have been treated "discriminatorily" to "devalue their votes." JA 108-09. To the contrary, "the power of plaintiffs' individual votes was not

diminished in any way" given that their "votes will be counted and weighted exactly as they were before." JA 111. The court thus found that plaintiffs had alleged only "a generalized grievance which is insufficient to confer standing." JA 109.

The court also rejected plaintiffs' reliance on *Fossella*, 206 N.Y.S.3d 611, and their "belated effort to base standing on [Hall's] more recent status as a candidate." JA 109 n.4. As the court explained, *Fossella* held that "voter plaintiffs lacked standing for reasons similar to those outlined in this opinion," and the only plaintiffs with standing in *Fossella* were "officeholders" intending to seek reelection. JA 109 n.4 (quoting *Fossella*, 206 N.Y.S.3d at 625). Yet plaintiffs' complaint here "made no reference to any current or impending candidacy," and Hall had admittedly not "finalized her plans" to run for office until "'summer of 2023,'" months after this suit commenced. JA 109 n.4 (quoting JA 94-95).

The district court entered final judgment on March 20, 2024. Plaintiffs filed a notice of appeal on April 16. ECF No. 21. The Board timely noticed its cross-appeal on April 29. ECF No. 23.[3]

---

[3] The Board cross-appealed because dismissal for lack of standing under Rule 12(b)(1) is typically without prejudice, while dismissal for failure to state a claim under Rule 12(b)(6) is customarily ordered *with* prejudice. *See Mark v. Republic of the Sudan*, 77 F.4th 892, 899 (D.C. Cir. 2023). Affirming the dismissal of plaintiffs' suit on the merits would thus alter the judgment under review by requiring dismissal with prejudice. *See* 15A Charles Alan Wright, et al., *Federal Practice and Procedure* § 3904 & n.12 (3d ed. June 2024). And that is the proper

## STANDARD OF REVIEW

Dismissal of a complaint under Rule 12 is reviewed de novo. *Est. of Boyland v. U.S. Dep't of Agric.*, 913 F.3d 117, 123 (D.C. Cir. 2019). Standing is subject to the same pleading standards that govern the merits. *See Air Excursions LLC v. Yellen*, 66 F.4th 272, 277-78 (D.C. Cir. 2023) ("A plaintiff must support allegations of standing in the same way as any other matter on which the plaintiff bears the burden of proof." (internal quotation marks omitted)). Conclusory assertions unsupported by adequate factual matter thus cannot establish Article III standing or a plausible claim to relief. *Kareem v. Haspel*, 986 F.3d 859, 865-66 (D.C. Cir. 2021) ("[T]hreadbare recitals of the elements of standing, supported by mere conclusory statements, do not suffice." (cleaned up)); *Perry Cap. LLC v. Mnuchin*, 864 F.3d 591, 610 n.9 (D.C. Cir. 2017) ("On a motion to dismiss for failure to state a claim, we are not required to credit a bald legal conclusion[.]").

## SUMMARY OF ARGUMENT

This Court should affirm the dismissal of plaintiffs' complaint for lack of standing or, alternatively, because their claims fail on the merits.

---

remedy in this case should the Court find that standing exists because no amendment of plaintiffs' complaint can cure the legal flaws in their claims, and they have never requested leave to amend in any event. *See Drake v. FAA*, 291 F.3d 59, 72 (D.C. Cir. 2002) ("[P]laintiffs whose complaints are dismissed waive their right to amend following appeal if they failed to seek leave to amend from the District Court.").

1. As the district court correctly held, plaintiffs lack Article III standing because they have not alleged a particularized injury in fact.

To begin, plaintiffs' citizen-self-government theory of standing is forfeited and lacks merit. In the district court, plaintiffs argued standing almost exclusively based on vote dilution, and they cannot offer a new theory of injury on appeal. Arguments in favor of standing can be forfeited just like any other argument, and this theory was not adequately preserved below. But forfeiture aside, plaintiffs essentially admit that their citizen-self-government injury is a generalized grievance because it is allegedly shared by each and every citizen in the District in the same, undifferentiated way. That is true even if the Court assumes that this purported "right" exists, because standing requires a particularized injury, not simply the existence of an abstract "right" held by the entire populace.

Plaintiffs' vote-dilution theory also fails to establish standing. For one, their complaint alleged no intent to vote or run for office in future elections, which confirms that any alleged injury was not imminent. For another, their vote-dilution theory is a classic generalized grievance because citizens' and noncitizens' votes are counted equally and any alleged dilution is experienced by all citizen voters in the District in numerically equal measure. With no particularized impact on their votes, plaintiffs simply lack Article III standing to challenge the Voting Act.

None of Hall's belated assertions about her 2024 candidacy changes the analysis. Standing must be established when suit is filed; it cannot be manufactured retroactively. Here, plaintiffs' March 2023 complaint says nothing about Hall's unspoken intent to run for office in 2024, and they never sought leave to amend to include such allegations. Even assuming the issue is not moot now that the 2024 election is over, then, Hall's post-complaint actions cannot create jurisdiction where none existed at the outset of litigation.

2. Even if plaintiffs had Article III standing, their claims fail on the merits, and the Court should affirm the dismissal of their suit under Rule 12(b)(6).

The Voting Act in no way violates the Fifth Amendment's guarantee of substantive due process, let alone an unenumerated right to citizen self-government. Plaintiffs' contrary arguments fail at the threshold because they have not carried their burden to invoke a carefully defined or deeply rooted fundamental right. Instead, their claim rests on the ahistorical theory that local voting and officeholding are exclusive rights for citizens. But noncitizen voting dates back to the earliest days of this Nation, including in the District, and plaintiffs offer no historical evidence establishing a deeply rooted tradition to the contrary. Nor could they. While the prevalence of noncitizen voting has ebbed and flowed over time, its historical pedigree is undeniable and its legitimacy unquestioned even by the Supreme Court.

That being so, rational-basis review applies here, and plaintiffs have not come close to negating every conceivable justification for the Voting Act.

Plaintiffs' equal-protection claims fail for similar reasons. The Voting Act is facially neutral as to citizenship and national origin in local elections, and plaintiffs' contrary assertions ignore the Act's plain text. Indeed, by plaintiffs' own admission, the Act *eliminates* a prior citizenship requirement for local elections, JA 2—thus *removing* a classification from the statute, not imposing one. Facially neutral expansions of the franchise, moreover, need only be rational. The Voting Act easily satisfies that deferential standard because it extends local voting rights only to noncitizen *residents* who, the Council reasonably concluded, have a substantial interest in District affairs. Further, plaintiffs have alleged no facts suggesting that the Act was enacted for a discriminatory purpose, much less to harm "protected" groups. They at most suggest that vote dilution was foreseeable, not that the Act was created for that specific purpose. And they test the limits of common sense in claiming that citizens and native-born Americans are constitutionally "protected classes" in the same way that racial minorities and aliens are.

**ARGUMENT**

## I.     The District Court Correctly Found That Plaintiffs Lack Standing.

Plaintiffs bear the burden of establishing Article III standing in their complaint. *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 & n.3 (2006) ("[F]ederal courts lack jurisdiction unless the contrary appears affirmatively from the record." (internal quotation marks omitted)). When seeking prospective relief, plaintiffs must show an imminent threat of a particularized injury that is traceable to the challenged action and redressable by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561-62 (1992). These requirements are particularly critical in constitutional cases because "constitutional judgments are justified only out of the necessity of adjudicating rights in particular cases." *Steffan v. Perry*, 41 F.3d 677, 693 (D.C. Cir. 1994) (en banc) (cleaned up). The district court in this case correctly found that plaintiffs lacked standing because they had asserted, at most, a generalized grievance, not an imminent particularized injury. JA 101-12.

### A.     Plaintiffs forfeited their "citizen self-government" theory of injury, which is a generalized grievance in any event.

Plaintiffs' lead argument on appeal is one they did not clearly make below. In particular, plaintiffs appear to contend for the first time that Article III standing exists in this case based on a "citizen self-government" injury. Br. 9-20. Under this theory, plaintiffs supposedly have standing to challenge the Voting Act because, by allowing noncitizen residents to participate in local elections, the Act deprives every

citizen in the District of a "right" to a particular form of government—namely, one in which only citizens vote and hold office. *See* Br. 15, 17, 20.

Yet plaintiffs presented a different argument to the district court. Specifically, they focused on a "vote dilution injury" in opposing dismissal, JA 50, and did not directly advance any other theory of Article III injury, JA 47-53; *see* JA 52 ("In short, plaintiffs have standing because they allege an injury—dilution of their votes[.]"). Although plaintiffs asserted a *cause of action* based on a "right to citizen self-government," JA 16, the district court correctly recognized that the "gravamen" of their complaint was that the Voting Act "'dilutes'" citizens' votes, JA 102 (quoting JA 2); that all of plaintiffs' claims were "[b]ased on that premise," JA 102; and that the injury asserted in their opposition was a "dilution of their votes as U.S. citizens," JA 105 (citing JA 48). Plaintiffs' "citizen self-government" theory, by contrast, appears to focus more on the structure of local government rather than the Voting Act's alleged impact on voting power. *See* Br. 15, 17, 20. Because that argument differs from the one plaintiffs made below, it is forfeited. *See Twin Rivers Paper Co. LLC v. SEC*, 934 F.3d 607, 615 (D.C. Cir. 2019) ("[O]rdinary rules of forfeiture apply to standing." (internal quotation marks omitted)).

But even if preserved, plaintiffs' new theory is a mere generalized grievance. A "generalized grievance" is an alleged harm that is "widely shared" and "undifferentiated." *Pub. Citizen, Inc. v. NHTSA*, 489 F.3d 1279, 1293 (D.C. Cir.

2007) (internal quotation marks, emphasis omitted). The paradigmatic example is a person's interest in having her government follow the Constitution. *See, e.g.*, *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 382 (2024). Such harms do "not stat[e] an Article III case or controversy" because they are "common to everyone" and do "not differentiate [plaintiffs] from the public at large." *Prisology, Inc. v. Fed. Bureau of Prisons*, 852 F.3d 1114, 1116-17 (D.C. Cir. 2017); *see Gill v. Whitford*, 585 U.S. 48, 66, 68-70 (2018) (holding that voters' "shared interest in the composition of the legislature" was "a generalized grievance" or "collective political interest, not an individual legal interest" (cleaned up)).

Here, plaintiffs' own arguments confirm that their theory is a generalized grievance. According to plaintiffs, this "right to citizen self-government" is a collective "right of the people" belonging to "[e]ach and every American citizen." JA 13-14, 16 (internal quotation marks, punctuation omitted). And it entitles all citizens—and only citizens—to live in a "self-governing democracy" that is "constitutionally reserved for citizens" and that "by definition" excludes noncitizens. Br. 13, 16. By plaintiffs' own admission, then, their asserted "injury" is shared not only "by all citizen *voters* in DC," Br. 6 (emphasis added), but by "*every American citizen*" in the District—voter or not, JA 16 (emphasis added). That is the very definition of a generalized grievance: a widely shared and undifferentiated "injury" with no particularized impact on the litigants bringing suit. *See Lewis v. Becerra*,

111 F.4th 65, 71-72 (D.C. Cir. 2024) (finding only a "generalized grievance" where granting relief "would benefit [plaintiffs] 'no more directly and tangibly' than it would benefit 'the public at large'" (quoting *Lujan*, 504 U.S. at 574)).

Plaintiffs nevertheless contend that, if the Court "assume[s]" that a "right to citizen self-government" exists, then they must have standing. Br. 12. That is incorrect. Not every asserted "right" translates automatically to an Article III injury. Voters, for example, have a "right to a government that does not deny equal protection of the laws," yet they lack standing to bring racial-gerrymandering claims if they do not live in the gerrymandered district. *United States v. Hays*, 515 U.S. 737, 743-47 (1995) (internal quotation marks omitted). Voters might also assert "rights under the Elections Clause" of the Constitution to vote in districts drawn by their state legislature, yet they lack standing to argue that a state violated those rights by implementing a court-ordered redistricting plan rather than the legislature's plan. *Lance v. Coffman*, 549 U.S. 437, 441-42 (2007). The same logic forecloses plaintiffs' efforts to create standing based on a generalized interest in "citizen self-government." *See, e.g.*, *Dillard v. Chilton Cnty. Comm'n*, 495 F.3d 1324, 1330-35 (11th Cir. 2007) (noting that voters' interest in "restoring their democratically chosen form of government" was a "generalized grievance" (cleaned up)).

**B.    Plaintiffs' "vote dilution" allegations do not establish an imminent threat of a particularized Article III injury.**

      1.     Plaintiffs' complaint alleges no intention to vote, or run for District office, in future elections.

As noted, parties seeking prospective relief must allege facts establishing a "certainly impending" injury. *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015). "'[S]ome day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of [] 'actual or imminent' injury." *Waterkeeper All., Inc. v. Regan*, 41 F.4th 654, 663 (D.C. Cir. 2022) (quoting *Lujan*, 504 U.S. at 564). Even "an objectively reasonable likelihood" of harm "at some point in the future" is "too speculative" for Article III purposes. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 401 (2013); *see Carney v. Adams*, 592 U.S. 53, 60-64 (2020) (holding that plaintiff lacked standing to challenge judicial-appointment requirements because his "general intent" to apply was insufficient and evidence showed that "he was not 'able and ready' to apply").

Voting cases are no different. To establish an "imminent" injury, plaintiffs suing as voters must allege, "at a bare minimum," that they "intend to vote in" a future election. *Yazzie v. Hobbs*, 977 F.3d 964, 966-67 (9th Cir. 2020) (internal quotation marks omitted) (holding plaintiffs lacked standing to challenge vote-by-mail deadline as none intended to vote by mail). Likewise, plaintiffs suing as candidates must allege a concrete intent and ability to seek office "in the

reasonably foreseeable future." *Cross v. Fox*, 23 F.4th 797, 800 (8th Cir. 2022) (internal quotation marks omitted) ("As Cross did not allege that he intended to run for public office, his challenges to the eligibility requirement lack standing."). But a "general intent" to "cast a ballot," or "a general desire to participate in the electoral and political processes" at some point in the future, "epitomizes speculative injury" and cannot satisfy Article III. *Yazzie*, 977 F.3d at 966 (internal quotation marks omitted); *cf. LaRoque v. Holder*, 650 F.3d 777, 788 (D.C. Cir. 2011) (holding that candidate had standing to challenge ballot-access rule because his complaint alleged that "he intended to run for election" (cleaned up)).

Here, plaintiffs' complaint is noticeably bereft of any allegation that they intend to vote or run for office in future elections. The complaint asserts that plaintiffs are registered voters in the District, and that two of them previously ran for office. JA 4. Yet it otherwise says nothing about plaintiffs' intentions or plans to vote or to become a candidate, and does not even allege that they have ever voted in past District elections. *See* JA 2-17. Plaintiffs cannot challenge an electoral system in which they have no concrete intentions to participate. *Yazzie*, 977 F.3d at 966-67. And for the reasons explained below, *see infra* pp. 31-33, that is true regardless of Hall's post-complaint declaration and her now-former status as a candidate.

2. Plaintiffs' theory is also a generalized grievance since their vote-dilution interest is admittedly shared by all citizen voters in equal measure.

Aside from not being sufficiently imminent, plaintiffs' alleged injury is also too generalized for Article III. Vote dilution may be a cognizable injury when a district's composition causes a vote to "carry less weight than it would carry in another, hypothetical district." *Gill*, 585 U.S. at 67. But that "does not make every alleged dilution of voting rights a sufficient injury to confer standing." *Daughtrey v. Carter*, 584 F.2d 1050, 1056 (D.C. Cir. 1978). Rather, vote dilution is "a paradigmatic generalized grievance" when votes are "weighed" and "counted equally," and "[n]o single voter is specifically disadvantaged." *Hudson v. Haaland*, 843 F. App'x 336, 337-38 (D.C. Cir. 2021) (internal quotation marks omitted); *see Gill*, 585 U.S. at 69-70, 72 (holding named-plaintiff lacked standing as redistricting plan "did not affect the weight of his vote"). This is especially so where an "expansion" of the electorate affects all votes "equally." *Hudson*, 843 F. App'x at 337-38 (holding plaintiff lacked standing to challenge agency's "expansion of" tribal council where "power of [his] vote was the same as those cast by all other voters").

This Court's decision in *Daughtrey* illustrates the rule. There, voters alleged that restoring draft-evaders' voting rights expanded the electorate and thus "necessarily results in a dilution of their right to vote." 584 F.2d at 1052-56. This was not a "sufficient injury to confer standing," the Court held, because the voters

24

had not alleged dilution "in any particular election" or that their "votes are disfavored *vis-à-vis* those of some other group." *Id.* at 1056. They instead merely speculated that their votes were "being diluted as a result of the reentry into the United States of an admittedly unknown, relatively small number of persons who allegedly should be excluded." *Id.* Such allegations are not "sufficient for standing." *Id.*

Several other courts have adopted the same commonsense rule. The Seventh Circuit, for example, has held that plaintiffs lack standing to assert vote dilution based on "late-arriving ballots" when their "votes would be diluted in the same way that every other vote cast in Illinois prior to Election Day would be diluted." *Bost v. Ill. Bd. of Elections*, 114 F.4th 634, 638-41 (2024). The Eleventh Circuit has likewise held that a voter asserts only a "generalized grievance" in alleging that absentee-ballot and recount procedures "diluted the weight of his vote." *Wood v. Raffensperger*, 981 F.3d 1307, 1310-14 (2020). And the Third Circuit, too, has held that voters lack standing to challenge the counting of late mail-in ballots because the "alleged 'dilution' [is] suffered equally by all voters" in "an 'undifferentiated' manner." *Bognet v. Sec'y of Pa.*, 980 F.3d 345-46, 352, 355-56 (2020), *cert. granted, vacated as moot sub nom. Bognet v. Degraffenreid*, 141 S. Ct. 2508 (2021). The critical point is that even if allegedly improper votes have some "mathematical impact on the final tally and thus on the proportional effect of every vote," plaintiffs lack standing unless they are "specifically disadvantaged" in the sense that their

"votes will be weighed differently compared to another group."  *Bognet*, 980 F.3d at 355-56, 358 (internal quotation marks omitted).

The same analysis applies here.  Plaintiffs admit that their alleged "injury" is shared by "*every* U.S. citizen voter in the District" because the Voting Act allegedly "dilutes the votes of *all* U.S. citizen voters."  JA 2-3 (emphases added).  And they further admit that this alleged harm is shared by all citizen voters in *equal measure*.  *See* Br. 16-17, 20.  Relying on numerical estimates not alleged in their complaint, plaintiffs surmise that, if 523 of the District's 450,750 registered voters are noncitizens, "*each* citizen voter's vote will thus be diluted by roughly 0.1%"—the same undifferentiated percentage for all 450,000 or so citizen voters.  Br. 17 (emphasis added).  But even if the Court considers those newly cited figures, plaintiffs' calculation simply shows that every citizen voter in the District shares precisely the same interest that they do.  *See, e.g.*, *Berg v. Obama*, 586 F.3d 234, 240 (3d Cir. 2009) (rejecting challenge to candidate's eligibility because an injury shared "*pari passu* with all voters" is "too general for the purposes of Article III").

Plaintiffs' failure to differentiate themselves from other citizen voters is fatal to standing.  *See Lewis*, 111 F.4th at 71-72 (finding only "generalized grievance" where plaintiff "fails to distinguish [himself] from any other citizen").  As this Court has noted, no "matter how many persons have been injured," a plaintiff must still allege "a particularized and *differentiated* harm."  *Pub. Citizen.*, 489 F.3d at 1292-

93 (internal quotation marks omitted; emphasis added). Mass torts, for example, cause "widely shared" injuries, but "each victim suffers a particularized" injury (e.g., burnt leg, broken arm, etc.) that separates them from the public at large. *Id.* (internal quotation marks omitted); *see Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 n.7 (2016) (same). A particularized injury is lacking in vote-dilution cases, however, where, as here, the plaintiffs "have not alleged that their votes are less influential than any other vote." *Bognet*, 980 F.3d at 358 n.13; *see Daughtrey*, 584 F.2d at 1055-56.

3. Plaintiffs' counterarguments fail.

Plaintiffs offer little or no legal support for a contrary conclusion. Br. 16-26. Many of their cited cases do not even address Article III standing. *See, e.g.*, *Brown v. Bd. of Comm'rs*, 722 F. Supp. 380, 393-400 (E.D. Tenn. 1989). Others have nothing to do with vote dilution. *See, e.g.*, *United States v. SCRAP*, 412 U.S. 669, 683-90 (1973) (APA claims); *Ga. Ass'n of Latino Elected Offs., Inc. v. Gwinnett Cnty. Bd. of Registration & Elections*, 36 F.4th 1100, 1107-08 (11th Cir. 2022) (rejecting statutory claim for multilingual voting information). Still others confirm that vote-dilution claimants lack standing absent "facts showing *disadvantage to themselves as individuals*." *Baker v. Carr*, 369 U.S. 186, 206 (1962) (emphasis added) (addressing malapportionment claims where votes in densely populated districts weighed less than votes in thinly populated districts); *Lyman v. Baker*, 954 F.3d 351, 361-62 (1st Cir. 2020) (addressing challenge to state's winner-take-all

system for presidential electors that "*unequally* dilut[ed] the strength of [plaintiffs'] votes" for losing presidential candidates (emphasis added)).

Nor can plaintiffs cast aside this Court's precedent in *Daughtrey* by asserting that those claimants "did not even allege that their votes would be diluted in any particular election." Br. 19-20. Plaintiffs here did not do so either given their failure to allege any intention of voting in future elections, *see supra* pp. 22-23, and they cannot fix this on appeal by "assum[ing]" that "hundreds of noncitizens" will vote and thereby "dilute" citizens' votes to an "ultimately-measurable degree," Br. 20. Their complaint made no attempt to quantify any dilution, JA 2-17, and "assertions contained only in the briefs may not be used to expand the allegations of the complaint," *Arpaio*, 797 F.3d at 21 (internal quotation marks omitted). Hence, just like *Daughtrey*, this is also a case where it cannot "be concluded that any plaintiff['s] own right to vote" will "be infringed" by the expansion of the electorate. Br. 20.

Also misplaced is plaintiffs' reliance (Br. 18-19) on *Michel v. Anderson*, 14 F.3d 623 (D.C. Cir. 1994), which they cited only in passing below, JA 50, and which the district court correctly noted "presents an entirely different set of circumstances," JA 111 n.6. In *Michel*, congresspersons and their constituents challenged a House of Representatives rule allowing delegates from the District of Columbia and federal territories to vote in the House's Committee of the Whole. 14 F.3d at 624-25. The Court held that the congresspersons had standing because the House rule expanded

the Committee from 435 to 440 members, and that, as a result, the constituents could assert a "derivative" yet "distinct" injury based on "a dilution in their representational rights." *Id.* at 625-26, 628 n.4 (emphasis omitted). But nothing in *Michel* overruled *Daughtrey* or otherwise held that expansions of the *general electorate* give every voter standing to sue. *See, e.g.*, *Sierra Club v. Jackson*, 648 F.3d 848, 854 (D.C. Cir. 2011) (emphasizing "the norm that the older case remains undisturbed by the later"). *Michel* thus cannot salvage plaintiffs' case.

Least persuasive of all is plaintiffs' cherrypicked invocation (Br. 23) of Justice Kagan's concurrence in *Gill*. *See* 585 U.S. at 68 (maj. op.) ("The reasoning of this Court with respect to the disposition of this case is set forth in this opinion and none other."). All agree that vote dilution *can* constitute a personal harm in some cases. *Id.* at 69 (noting that plaintiffs "pleaded a particularized burden" by alleging that partisan gerrymandering "diluted" their votes). But that does not end the inquiry because even Justice Kagan recognized that "vote dilution" standing exists only when an election practice "devalues" a plaintiff's individual vote, such that it "carries less weight" than another. *Id.* at 75-76 (Kagan, J., concurring). Federal jurisdiction, in other words, cannot be manufactured simply by reciting the words "vote dilution" in a complaint—plaintiffs must instead "show that *their own votes* were indeed diluted in order to establish standing." *Id.* at 83 (emphasis added)

(agreeing with the majority that plaintiffs there had shown only a generalized grievance); *see id.* at 65-72 (maj. op.) (same).

Moreover, it is hardly "absurd" for plaintiffs to lack standing when their "votes will be counted and weighed exactly as they were before." Br. 18-19. Plaintiffs argue otherwise based on far-fetched hypotheticals about a "racially discriminatory" "expansion of the DC electorate." Br. 6-7, 26. They hypothesize that, under the district court's reasoning, "no black voters in DC would have standing to challenge" a law allowing only "white residents of DC suburbs" (i.e., Maryland and Virginia) "to vote in DC elections" because the "black DC voters' votes" "would be weighed equally with those of the white suburbanites." Br. 18-19. Plaintiffs are mistaken. Their hypothesized law would inflict a racially stigmatizing injury on nonwhite voters in the District that is, by definition, not shared in equal measure by all citizens, *see Heckler v. Mathews*, 465 U.S. 728, 739-40 (1984), and surely any nonwhite suburbanite who is otherwise qualified to vote would have standing to challenge his or her *exclusion* from the franchise. Besides, "the possibility that no one would have standing" in plaintiffs' contrived hypothetical "is not a reason to find standing" here, *Lewis*, 111 F.4th at 75—especially since plaintiffs admit that in this case "*all* DC Citizen voters share" the same alleged injury and "*each* citizen voters' vote" is "diluted" to the same extent. Br. 17, 18 (emphases added).

Finally, plaintiffs urge the Court to relax Article III's requirements because their claims purportedly demand "strict scrutiny" rather than "rational basis" review. Br. 24. That is wrong in every respect. Article III standing is jurisdictional. Levels of scrutiny go to the merits. And jurisdiction does not depend on the merits. *See Fla. Audubon Soc. v. Bentsen*, 94 F.3d 658, 664 n.1 (D.C. Cir. 1996) (en banc) ("[A] review of standing does not review the merits of a claim[.]"); *see also Nguyen v. INS*, 208 F.3d 528, 533 (5th Cir. 2000) (noting that "standing" is independent of and antecedent to "deciding what level of scrutiny to apply"), *aff'd*, 533 U.S. 53 (2001). Plaintiffs are thus wrong about the applicable level of scrutiny, *see infra* pp. 34-60, and their argument fails either way because Article III applies just as stringently to claims that trigger strict scrutiny. *See, e.g.*, *Hays*, 515 U.S. at 742-46 (holding that voters lacked standing to raise racial-gerrymandering claim).

## C. Hall's post-complaint candidacy cannot retroactively confer Article III standing.

Plaintiffs cannot use Hall's declaration to argue theories of standing not alleged in the complaint or timely raised below. Standing must exist when suit is filed—it cannot be "retroactively created" through "postcomplaint litigation conduct." *Lujan*, 504 U.S. at 569 n.4 (plurality op.); *see Swanson Grp. Mfg. LLC v. Jewell*, 790 F.3d 235, 240-41 (D.C. Cir. 2015). And a plaintiff who "fails to seek leave from the District Court to amend its complaint" to assert new standing theories

"forfeits the right to seek leave to amend on appeal." *Hancock v. Urb. Outfitters, Inc.*, 830 F.3d 511, 515 (D.C. Cir. 2016) (internal quotation marks omitted).

Here, plaintiffs insist that Hall gained Article III standing once she became "an office-seeker." Br. 28-31. In her post-complaint declaration—filed nearly eight months after opposing dismissal—Hall asserted for the first time that she "was planning to run" when "this lawsuit was filed" in March 2023; that she "finalized [her] plans for the 2024 election" during "the summer of 2023"; and that she was "currently a candidate" in February 2024. JA 95. In plaintiffs' view, this shows that Hall had standing to assert an "interest in an accurate vote count." Br. 31.

Yet that argument was not preserved below. Plaintiffs' complaint says nothing about Hall's plans to seek office or her purported interest as a candidate in accurate vote counts. JA 2-17. They raised no such arguments in opposing the motion to dismiss. JA 47-53. And plaintiffs never tried to amend their complaint to present such allegations properly. *See Hancock*, 830 F.3d at 515 ("[H]aving failed to request the opportunity to amend their complaint in district court, [plaintiffs] are in no position to ask this court to permit amendment in the first instance."). This is reason enough to reject Hall's newly asserted theory of standing.

In addition, the district court correctly held that Hall's "belated" assertions about her post-complaint "status as a candidate" do not change the Article III analysis. JA 109 n.4. Hall cannot retroactively establish standing by asserting

nearly a year after litigation began that she had secretly hoped to run for office before filing suit. *See Castro v. Scanlan*, 86 F.4th 947, 954 (1st Cir. 2023) (holding candidate could not show injury "on the basis of developments" that "occurred *after* he filed his complaint"). And that is particularly true since Hall is no longer a candidate for District office now that the 2024 election is over, which likely moots this issue altogether. *See Brockington v. Rhodes*, 396 U.S. 41, 43 (1969) (deeming ballot-access challenge "moot because the congressional election is over" and the candidate "did not allege that he intended to run for office in any future elections"); *Whitfield v. Thurston*, 3 F.4th 1045, 1046-47 (8th Cir. 2021) (same).

Nor do plaintiffs cite authority compelling a different result. *Carney* addressed a challenge to eligibility rules for *appointing* judges; it involved no "vote count" at all. *See* 592 U.S. at 55-66. The state court in *Albence v. Higgin*, 295 A.3d 1065 (Del. 2022), was admittedly "not bound by the federal rules of justiciability." *Id.* at 1086. And contrary to plaintiffs' assertions (Br. 28-29), it remains an open question whether candidates can establish Article III standing based on an inaccurate vote counts by itself, given that accuracy for accuracy's sake "appears to be precisely the kind of undifferentiated, generalized grievance about the conduct of government that the Supreme Court has long considered inadequate for standing." *Bost*, 114 F.4th at 643-44 (internal quotation marks omitted) (holding that candidates and

voters "failed to allege a certainly impending injury" based on the "threat of an inaccurate vote tally" in an election that was "months away").[4]

\* \* \*

In sum, nothing in plaintiffs' complaint dispels the presumption that Article III jurisdiction is lacking in this case.  *See DaimlerChrysler*, 547 U.S. at 342. As the Supreme Court has made clear, "federal courts may exercise power only in the last resort, and as a necessity."  *Raines v. Byrd*, 521 U.S. 811, 819 (1997) (cleaned up).  But here, the district court correctly held that plaintiffs alleged no particularized injury sufficient to necessitate the exercise of jurisdiction over their suit.  JA 105-12. This Court can and should affirm for that reason alone.

---

[4]    *Compare Carson v. Simon*, 978 F.3d 1051, 1058 (8th Cir. 2020) (stating, without citing any authority, that an "inaccurate vote tally" is a "particularized injury to candidates"), *and Trump v. Wis. Elections Comm'n*, 983 F.3d 919, 924 (7th Cir. 2020) (reciting *Carson*'s language without analysis), *with Bost*, 114 F.4th at 643-44 (questioning whether *Carson*'s "brief treatment of this issue without citation to any authority" is "consistent with the Supreme Court's" precedent (citing *Lance*, 549 U.S. at 442, and *Carson*, 978 F.3d at 1063 (Kelly, J., dissenting))), *and Bognet*, 980 F.3d at 348-52 & n.6 (rejecting *Carson*'s logic and holding that candidate could "not plead a cognizable injury" based on the counting of allegedly unlawful ballots), *and Feehan v. Wis. Elections Comm'n*, 506 F. Supp. 3d 596, 610-13 (E.D. Wis. 2020) (adopting Judge Kelly's dissent in *Carson*, 978 F.3d at 1063).

## II. If Standing Exists, The Court Can Affirm The Dismissal Of Plaintiffs' Suit On The Merits.

Even if plaintiffs had standing, however, their facial challenges to the Voting Act's constitutionality fail on the merits. As noted, courts need not accept conclusory assertions or plaintiffs' "'view' or 'characterization' of the complaint." *Hemp Indus. Ass'n v. DEA*, 36 F.4th 278, 288 (D.C. Cir. 2022). Here, plaintiffs have not shown that their substantive-due-process and citizen-self-government claims rest on a carefully defined or deeply rooted fundamental right. And their equal-protection challenges fare no better, as the Voting Act is a facially neutral expansion of the franchise with no discriminatory purpose or intent to harm a "protected" class. All plaintiffs' challenges are therefore subject to rational-basis review—a deferential standard that the Voting Act easily satisfies.

### A. Plaintiffs' substantive-due-process and citizen-self-government claims lack merit.

Plaintiffs have not alleged plausible violations of substantive due process or an unenumerated right to citizen self-government. Although plaintiffs plead these theories as separate causes of action, they admit that their "substantive due process claim" asserts "the same right as in their citizen self-government claim." Br. 21 (citing JA 15-16); *see* JA 63-64 (same). The Court can therefore analyze those flawed theories together and reject them for substantially the same reasons. *See,*

*e.g.*, *Dep't of State v. Munoz*, 602 U.S. 899, 910 (2024) (noting that "unenumerated rights" are typically analyzed under "substantive due process").

1. Plaintiffs have not invoked a carefully defined or deeply rooted fundamental right.

Unenumerated rights trigger strict scrutiny only when they are "fundamental"—that is, when they are "carefully described" and "deeply rooted in this Nation's history and tradition." *Washington v. Glucksberg*, 521 U.S. 702, 721-22 (1997). Laws implicating nonfundamental rights need only pass rational-basis review. *Id.* at 728. Plaintiffs here have not invoked a carefully defined or historically grounded fundamental right because this case does not involve the "right to vote" simpliciter, and American history does not recognize an *exclusive* citizen right to vote. Accordingly, plaintiffs' claim is subject to rational-basis review.

a. The asserted fundamental right is not a general "right to vote" but an exclusive right of citizens to vote.

Substantive-due-process cases "must begin with a careful description of the asserted right." *Reno v. Flores*, 507 U.S. 292, 300, 302 (1993). Because judicial recognition of unenumerated rights cuts off the political process, this "threshold requirement of a careful description" is critical to "responsible decisionmaking" in the "uncharted area" of substantive due process. *Abigail All. for Better Access to Dev. Drugs v. von Eschenbach*, 495 F.3d 695, 701 n.5, 702 (D.C. Cir. 2007) (en banc) (internal quotation marks omitted). In defining an "asserted fundamental

right," then, plaintiffs cannot "ignore" a "plainly pertinent fact" or appeal to the broadest "level of generality." *Hedgepeth ex rel. Hedgepeth v. WMATA*, 386 F.3d 1148, 1155-56 (D.C. Cir. 2004) (Roberts, J.) (rejecting plaintiff's asserted "right to freedom from restraint" in favor of "the right of freedom of movement when there is probable cause for arrest"). They must instead define their asserted right with reference to the specific case they have brought. *See Munoz*, 602 U.S. at 910 (rejecting plaintiff's invocation of a "right to marriage" in favor of "the right to reside with her noncitizen spouse in the United States" (emphasis omitted)).

*Glucksberg* exemplifies this requirement. There, plaintiffs claimed that a law prohibiting physician-assisted suicide violated their "right to die." 521 U.S. at 722. But the Supreme Court rejected that formulation and instead defined the interest more narrowly as "a right to commit suicide with another's assistance." *Id.* at 724. The Court ultimately rejected that claim, holding that because "the asserted 'right' to assistance in committing suicide is not a fundamental liberty interest," the state's "assisted-suicide ban" was valid as "rationally related to legitimate government interests." *Id.* at 728; *see Flores*, 507 U.S. at 299-303, 309-15 (rejecting similarly abstract claim and holding that the "mere novelty" of an asserted right "is reason enough to doubt that 'substantive due process' sustains it").

So too here. At times, plaintiffs invoke a "right to vote" generally. *E.g.*, JA 11, 12, 15. But that abstract formulation ignores the context of this suit, which

involves an "*expansion* of the franchise." JA 12 (emphasis added). In fact, plaintiffs appeared to concede below that they are not asserting a "right to vote" generally but a "'right to have one's vote counted without the presence of noncitizens' votes.'" JA 63-64 (quoting JA 36). In plaintiffs' own words, then, their asserted right is more properly stated as an "*exclusive* right to vote," JA 56 (emphasis added)—i.e., "to vote in an election in which *only* citizens vote," Br. 21 (emphasis added).

> b. History and tradition do not support an "exclusive right to vote" for citizens.

Even formulated more precisely, plaintiffs' asserted right is not fundamental. The category of rights that qualify as "fundamental" is small. *Glucksberg*, 521 U.S. at 720-21. It covers only rights that are "deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Id.* (cleaned up). But it does not include "rights" arising "relatively late in the constitutional day." *Abigail*, 495 F.3d at 706-07 (holding that a "limited history of efficacy regulation prior to 1962 does not establish a fundamental right of access to unproven drugs"); *see Dist. Attorney's Off. for Third Jud. Dist. v. Osborne*, 557 U.S. 52, 72-74 (2009) (finding no "freestanding right to DNA evidence" as there was "no long history of such a right").

Claimants have the burden on this issue and "must show" at the pleading stage that their "right is deeply rooted." *Abigail*, 495 F.3d at 702-04. They cannot carry that burden with dicta from inapposite judicial decisions. *See Hutchins v. District*

*of Columbia*, 188 F.3d 531, 536-37 (D.C. Cir. 1999) (en banc) (plurality op.) (declining to recognize a "right to movement" based on "*dicta*"); *Williams v. Att'y Gen. of Ala.*, 378 F.3d 1232, 1236-38 & n.7 (11th Cir. 2004) (declining "to infer a new fundamental right" from "scattered *dicta*"). Nor can they do so by pointing to historical practices that shifted over time in response to policy preferences. *See, e.g.*, *Munoz*, 602 U.S. at 910-16 (finding no fundamental right to bring noncitizen spouses to the United States even though the "United States had relatively open borders until the late 19th century"); *Colindres*, 71 F.4th at 1021-24 (similar, even if Congress occasionally "facilitated citizens bringing their spouses to America").

Plaintiffs here have not carried their burden to establish a fundamental unenumerated right. As noted, noncitizen voting dates back to the colonies, and it continued after the Constitution's ratification. *See supra* pp. 3-6. Many early state constitutions also undisputedly allowed certain noncitizen "inhabitants" to vote, JA 65-67, which strongly indicates that the founding generation would not have understood the right to vote as belonging exclusively to citizens, *see, e.g.*, *District of Columbia v. Heller*, 554 U.S. 570, 603 (2008) (recognizing that early state constitutions provide "strong evidence" of "how the founding generation conceived" of a "right"). After all, the drafters of the federal Constitution certainly knew how to impose citizenship requirements when they wanted to, but did not do so for voting.

*E.g.*, U.S. Const. art. I, §§ 2-3 (qualifications for U.S. representatives and senators); *id*. art. II, § 1 (qualifications for President).

Early federal law confirms as much. The First Congress authorized noncitizen voting in the federal territories as early as 1789, and just three years later Congress allowed noncitizens to vote for city-council members in the District of Columbia. *See supra* pp. 5-6.[5] This, too, is powerful evidence that plaintiffs' asserted right is anything but deeply rooted. For it is difficult to imagine that early Congresses— filled with many of the Constitution's Framers—would have so brazenly dishonored a fundamental right in allowing noncitizens to vote alongside citizens. *See, e.g.*, *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 432 (2024) (recognizing that the actions of the First Congress provide "contemporaneous and weighty evidence of the Constitution's meaning" (internal quotation marks omitted)).

Even after the War of 1812, Congress and many states continued to allow noncitizen voting. *See, e.g.*, Act of April 19, 1816, ch. 57, § 3, 14 Stat. 289 (authorizing "all persons" with "legal qualifications to vote" in the Indiana territory "to choose representatives" for its constitutional convention). Congress, for

---

[5]     Congress subsequently limited voting in the District to "every free white male citizen of lawful age," Act of 1812, ch. 75, § 2, 2 Stat. 723 (May 4, 1812), before establishing an appointment-based government in 1874, which lasted until 1967. Act of 1874, ch. 337, § 2, 18 Stat. 116 (June 20, 1874); *see* James C. McKay, Jr., *Separation of Powers in the District of Columbia under Home Rule*, 27 Catholic U. L. Rev. 515, 526 (1978).

instance, allowed the then-territory of Illinois to form a constitutional convention on the condition that it establish a "republican" government, Act of April 18, 1818, ch. 67, § 4, 15 Stat. 430, which was understood to mean a representative government that "derives all its powers directly or indirectly from the great body of the people," Federalist No. 39 (Madison) (1788), https://tinyurl.com/4av9km33.  And when Illinois submitted a constitution allowing noncitizen "inhabitants" to vote, *see* Ill. Const. art. II, § 27, Congress did not hesitate to declare Illinois's government "republican," 15 Stat. 536 (Dec. 3, 1818).  *See Spragins*, 3 Ill. at 392-95 (discussing similar histories with Ohio, Indiana, and Michigan).  Implicit in that determination is a considered judgment by the federal government early in this Nation's history that noncitizen voting was consistent with the American conception of popular sovereignty.  *See* Neuman, *supra* at 64, 143 (recognizing that "popular sovereignty" in the United States has historically been "flexible" and that "the Constitution does not provide a single 'conception of a political community'").

Courts and commentators since that time, moreover, have recognized that "it has been unquestionably constitutional" for jurisdictions "to permit aliens to vote." Kirk H. Porter, *A History of Suffrage in the United States* 121 (1918); *see Stewart v. Foster*, 2 Binn. 110, 114-22 (Pa. 1809) (upholding noncitizen's state-law right to vote in borough elections).  As one court explained in 1840, the legality of noncitizen voting had been "undisputed" and "settled" in that state for decades and was "no

41

longer an open or debatable" issue. *Spragins*, 3 Ill. at 391-92, 406-07 (holding that foreign-born resident "was a legal, qualified voter" even if "not a citizen of the United States"). By the same token, states could freely choose as a matter of policy to allow noncitizens to hold public office. *Woodcock v. Bolster*, 35 Vt. 632, 637-41 (1863) (upholding the "wise policy" of giving "unnaturalized foreigners" a "limited right to vote and hold office" in school elections); *see Lynch v. Clarke*, 1 Sand. Ch. 583, 661-62, 1844 WL 4808, at *53 (N.Y. Ch. 1844) (noting that many states gave "aliens the right of suffrage" and that "our national legislation" allowed certain "alien inhabitants to vote, if they were freeholders").

This practice did not end with the Civil War, either. Williamson, *supra* at 277. Many states in the postbellum period continued to allow foreign-born residents to vote and hold local office regardless of whether they were U.S. citizens. *See, e.g.*, *McCarthy v. Froelke*, 63 Ind. 507, 508-12 (1878) (upholding election of Prussia native to "township trustee" as he was "a voter under the constitution of the State of Indiana, though not a citizen of the United States"); *Linger v. Balfour*, 149 S.W. 795, 800-01 (Tex. Civ. App. 1912) (holding that "alien" who "declared his intention of becoming a citizen" was "a qualified elector and eligible to" serve as county clerk). And this makes historical sense given that "alien soldiers fought for the North in the Civil War and that alien voters were among the People who adopted the Civil War Amendments." Neuman, *supra* at 69. As the Supreme Court itself recognized

during this period, "citizenship has not in all cases been made a condition precedent to the enjoyment of the right of suffrage," *Minor v. Happersett*, 88 U.S. 162, 177 (1874), and a "state might provide that persons of foreign birth could vote without being naturalized," *Pope v. Williams*, 193 U.S. 621, 632-33 (1904), *overruled in part on other grounds by Dunn v. Blumstein*, 405 U.S. 330 (1972).[6]

While noncitizen voting appears to have faded at the state level by 1926 as a matter of policy, its constitutionality was not seriously questioned. *See, e.g.*, *Chen v. City of Houston*, 206 F.3d 502, 523 n.16 (5th Cir. 2000) (finding "no provision of the Constitution which expressly or by clear implication prohibits the states from extending the franchise to lawfully resident aliens"). As courts recognized, the "franchise as a badge of citizenship" had "only recently come into full recognition," because in "the nineteenth century the laws and constitutions of at least 22 states and

---

[6]    Other courts likewise acknowledged that a "state may confer the right to vote" on "an alien." *In re Wehlitz*, 16 Wis. 443, 446-48 (1863); *see Connell v. State*, 144 N.E. 882, 884 (Ind. 1924) (reiterating that an otherwise-qualified person "could not be excluded from an office because of not being a citizen of the United States"); *State v. Fowler*, 6 So. 602, 602 (La. 1889) (noting that a "state, in the exercise of its sovereignty, can confer the right to vote, can make an alien an elector"); *People v. Scott*, 22 N.W. 274, 274 (Mich. 1885) ("[T]here are in this state many electors of foreign birth who have never been naturalized."); *Van Valkenburg v. Brown*, 43 Cal. 43, 51 (1872) (noting that in many states "unnaturalized foreigners were by State laws allowed to vote—following in this respect the early policy of the Federal Government"); *United States v. Hirschfield*, 26 F. Cas. 328, 329 (C.C.S.D.N.Y. 1876) ("Some aliens who have never been admitted to become citizens are entitled to vote."). *But cf. State ex rel. Off v. Smith*, 14 Wis. 497, 498-501 (1861) (holding that an "alien" could not serve as sheriff).

43

territories granted aliens or declarant aliens the right to vote." *Herriott v. City of Seattle*, 500 P.2d 101, 110 n.11 (Wash. 1972). And so it remained undeniably true that "a state has the right to extend qualification for state office to its citizens, even though they are not citizens of the United States." *Crosse v. Bd. of Supervisors of Elections of Balt. City*, 221 A.2d 431, 435-36 (Md. 1966); *see Padilla v. Allison*, 113 Cal. Rptr. 582, 584 (Cal. Ct. App. 1974) (recognizing that "states could extend the franchise to aliens"); *Richards v. Elective Bd. for Town & Suburbs of Frederiksted*, 1 V.I. 351, 354, 358, 1936 WL 73547, at *3 (D.V.I. 1936) (holding that an "alien woman" had the "right to vote in the Virgin Islands").

Additionally, noncitizens voted at the local level in the late twentieth century. *See* Harper-Ho, *supra* at 310-22. Chicago, New York City, and Arlington, Virginia, were early proponents of allowing noncitizens to vote in certain local elections. *See, e.g.*, Charles W. Hall, *Noncitizens Prepare to Vote in Arlington Primary School Board*, Wash. Post, at B4 (May 22, 1994), https://tinyurl.com/2e522uex. And since the early 1990s, towns and cities in Maryland, Vermont, and elsewhere have likewise expanded noncitizen voting. *See, e.g.*, Takoma Park, Md., Mun. Charter, art. VI, § 601(a); Vt. Act No. M-5 (H.177, Montpelier) (eff. June 24, 2021); *Lacy v. San Francisco*, 312 Cal. Rptr. 3d 391, 395-96 (Cal. Ct. App. 2023) (upholding San Francisco law allowing noncitizen parents to vote in schoolboard elections). At the

very least, this extensive history refutes plaintiffs' assertion that noncitizens "have been almost universally excluded from voting and governing." Br. 15.

c. Plaintiffs' counterarguments fail.

As shown above, no deeply rooted tradition supports plaintiffs' efforts to constitutionalize the exclusion of noncitizens from local voting and officeholding. And they offer no persuasive support for a different conclusion. *See* JA 2-17, 44-69. They admit that the Constitution does "not provide or require a definition of citizenship," and that "a number of early states" at the Founding "did allow noncitizens the right to vote." JA 65-67; *see* Br. 21 & n.6. So plaintiffs try to flip the burden by arguing that the history of noncitizen voting was "haphazard," and that the District must present "contrary historical evidence" "to show that this right is *not* 'deeply-rooted' in our history." JA65 (emphasis added); *see* JA 67-68.

Plaintiffs have it backwards. The burden unquestionably falls on challengers to show that an asserted right is fundamental, and plaintiffs here have barely tried to carry that burden. *See Abigail*, 495 F.3d at 702-04, 711 (rejecting substantive-due-process claim because "Alliance has not provided evidence" that its right was "deeply rooted"). Indeed, even if the history of noncitizen voting were "haphazard," this would at most suggest that no deeply rooted tradition exists either way, which is enough by itself to refute plaintiffs' claim. *See, e.g.*, *Doe v. City of Lafayette*, 377 F.3d 757, 771 (7th Cir. 2004) (en banc) (finding no fundamental right

"to enter parks for enjoyment" given the "oblique" history on that topic and the "dearth of historical sources" cited by the plaintiff).

Straining to find a textual foothold, plaintiffs say that the term "People" in the Constitution really meant "citizens" because the Preamble and Supremacy Clause and the Declaration of Independence used those terms "interchangeably." JA 64-66. But a right cannot be deemed "fundamental" on the theory that it "could be found *somewhere* in the Constitution," *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 235 (2022)—much less *somewhere* in the Declaration of Independence. That is particularly so since neither the Declaration nor the Preamble nor the Supremacy Clause confers enforceable legal rights. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324 (2015) (Supremacy Clause); *Heller*, 554 U.S. at 579-80 (Preamble); *Rhode Island v. Massachusetts*, 37 U.S. 657, 680 (1838) (Declaration). Moreover, plaintiffs' argument is beside the point because the Constitution's guarantee of certain rights to "citizens" does not invariably make those rights *exclusive* or preclude the citizens themselves from extending such rights to others by statute. Plaintiffs' contrary assertions find no support in the Constitution's text or history. *See* Neuman, *supra* at 145 (noting that "popular sovereignty in the United States" has never "restricted political power by a rigid definition of the People, and certainly not by the legal category of national citizenship").

Equally flawed is plaintiffs' reliance on snippets of judicial decisions discussing "popular sovereignty," JA 64-65, or a "right" of citizens "to be governed by their citizen peers," JA 14 (internal quotation marks omitted). Dicta cannot create fundamental unenumerated rights. *See Hutchins*, 188 F.3d at 536-37. And that is especially true of the dicta that plaintiffs recite, none of which can sensibly be read in context to give citizens an unenumerated monopoly on local voting and officeholding. *See, e.g.*, *Chisholm v. Georgia*, 2 U.S. 419, 453 (1793) (Wilson, J.) (defining "a State" as "a complete body of free *persons* united together for their common benefit" in holding that citizens of one state could sue another state without consent (emphasis added)), *abrogated by* U.S. Const. amend. XI.

The weakness of plaintiffs' theory is underscored by the cases they rely on most heavily: *Foley v. Connelie*, 435 U.S. 291 (1978), *Ambach v. Norwick*, 441 U.S. 68 (1979), and *Cabell v. Chavez-Salido*, 454 U.S. 432 (1982). JA 13-14, 46. Those decisions held that states *may*, consistent with equal protection, impose citizenship requirements for police officers, *Foley*, 435 U.S. at 292; schoolteachers, *Ambach*, 441 U.S. at 69; and probation officers, *Cabell*, 454 U.S. at 445. But they did not declare such laws *constitutionally mandated*, much less hold that each citizen possesses an individual right to invalidate extensions of the franchise to noncitizens. *See, e.g.*, *Toll v. Moreno*, 458 U.S. 1, 12 n.17 (1982) (noting the permissive nature of these decisions). In fact, the Court in *Ambach* acknowledged that New York City

allowed "aliens who are parents" to "vote for and sit on certain local school boards," and it suggested that the city had "a rational basis" for doing so, 441 U.S. at 81 n.15—an observation that would be unthinkable if citizens had an unenumerated right "to vote in elections in which only citizens vote," Br. 17.

### 2. The Voting Act passes rational-basis review.

Because plaintiffs have not invoked a fundamental right, the Voting Act need only satisfy rational-basis review. *Glucksberg*, 521 U.S. at 721. Under that standard, laws are presumptively constitutional and challengers have the "burden to negative every conceivable basis which might support the law." *Gordon v. Holder*, 721 F.3d 638, 656 (D.C. Cir. 2013) (internal quotation marks omitted). Plaintiffs therefore "must plausibly allege facts showing that no reasonably conceivable state of facts could provide a rational basis for the challenged policy." *Sanchez v. Off. of State Superint. of Educ.*, 45 F.4th 388, 396 (D.C. Cir. 2022).

Plaintiffs here have not come close meeting this demanding test. In enacting the Voting Act, the Council reasonably concluded that allowing "non-citizen residents to have a voice in the government that makes decisions directly affecting them and their families" would improve democracy in the District. Comm. Rep. 3. As the Council explained, noncitizen residents "are essential to the fabric of our community," they "are impacted by local laws just as much as citizen residents are," and they pay tens of millions of dollars in federal, state, and local taxes. *Id.* at 3-4.

The Council thus concluded that such residents, "like citizens, deserve the opportunity to have a voice in the issues that affect them." *Id.* at 4.

The Council's choice was rational and unquestionably related to the legitimate interest in expanding democratic participation. Representative governments have "a strong—even compelling—interest in ensuring that the governed have an effective voice in the process of deciding who will govern them." *Utah Republican Party v. Cox*, 892 F.3d 1066, 1085 (10th Cir. 2018). And the Voting Act advances that interest by affording all qualified residents—both citizen and noncitizen alike—the opportunity "to participate in electing the representatives who make decisions on their behalf." Comm. Rep. at 4. The Council, moreover, rationally concluded that this logic extends beyond lawful-permanent residents, because including all noncitizens was "easier to administer for the Board" and because "immigration status" does not determine a person's "investment in the community." *Id.* at 7-8; *see Fireside Nissan, Inc. v. Fanning*, 30 F.3d 206, 220 (1st Cir. 1994) (noting that "administrative convenience" is a rational basis for legislative action). The Voting Act thus cannot plausibly be said to have no conceivable rational basis.

## B.     Plaintiffs' equal-protection claims lack merit.

The Court should also reject plaintiffs' equal-protection claims. "Vote dilution" is a term of art that "refers to the idea that each vote must carry equal weight." *Rucho v. Common Cause*, 588 U.S. 684, 709 (2019). But it does not

invariably condemn the dilutive consequences of laws expanding the franchise. *May v. Town of Mountain Vill.*, 132 F.3d 576, 580-84 (10th Cir. 1997); *Duncan v. Coffee County*, 69 F.3d 88, 94-95 (6th Cir. 1995); *see Election Integrity Project Cal., Inc. v. Weber*, 113 F.4th 1072, 1087 (9th Cir. 2024) ("The crux of a vote dilution claim is *inequality* of voting power—not diminishment of voting power *per se*.").  As plaintiffs admit, challenges to "franchise expansions" are "typically scrutinized under a rational basis standard," Br. 24, and the reason is simple: "overinclusiveness is less of a constitutional evil than underinclusiveness." *Sutton v. Escambia Cnty. Bd. of Educ.*, 809 F.2d 770, 775 (11th Cir. 1987) (rejecting vote-dilution claim where extending franchise was rational).  Here, plaintiffs have provided no sound reason to apply heightened scrutiny or to conclude that the Voting Act's expansion of the franchise lacks any conceivable rational basis.

          1.      The Voting Act is facially neutral and rationally advances the legitimate interest of expanding democracy in the District.

Plaintiffs' claims fail first and foremost because nothing on the face of the Voting Act treats citizens differently than noncitizens, and it rationally advances legitimate governmental interests. *See, e.g.*, *Vacco v. Quill*, 521 U.S. 793, 800 (1997) ("Generally speaking, laws that apply evenhandedly to all unquestionably comply with the Equal Protection Clause." (internal quotation marks omitted)).

Facially neutral laws need only pass rational-basis review. *Kingman Park Civic Ass'n v. Bowser*, 815 F.3d 36, 42 (D.C. Cir. 2016).  A statute is "facially

neutral" when its text draws no "distinction among people based on a particular characteristic." Erwin Chemerinsky, *Constitutional Law* 726 (6th ed. 2019). So, for example, laws that state "one rule for mothers" and "another for fathers" facially "differentiate on the basis of gender." *Sessions v. Morales-Santana*, 582 U.S. 47, 58 (2017). But a statute that "does not neatly divide the sexes" is "gender-neutral on its face." *Jackson v. Thornburgh*, 907 F.2d 194, 197 (D.C. Cir. 1990) (upholding early-parole statute that "does not employ the concept of gender"). The same analysis applies to all types of classifications. *See Rothe Dev., Inc. v. U.S. Dep't of Def.*, 836 F.3d 57, 61 (D.C. Cir. 2016) (holding that "social disadvantage" was a "facially race-neutral" criterion for awarding contracts); *In re Navy Chaplaincy*, 738 F.3d 425, 428 (D.C. Cir. 2013) (deeming military policies facially neutral as to religion when none "on its face prefers any religious denomination").

Even a cursory glance at the Voting Act reveals its facial neutrality as to citizenship and national origin in local elections. The Act simply says that a "qualified voter" must be, among other things, "a citizen of the United States; except, that this subparagraph shall not apply in a local election." D.C. Code § 1-1001.02(2). This provision, while retaining a citizenship requirement for federal elections, does not single out citizens for disfavored treatment or afford noncitizens preferential treatment in local elections, and it says nothing whatsoever about national origin. Rather, as plaintiffs admit, the Act "*eliminates* the prior citizenship

requirement for voting in municipal elections." JA 2 (emphasis). In doing so, the Act removes a classification from the D.C. Code—it does not impose a classification or facially discriminate against anyone—and thus rational-basis review applies. *See Rothe*, 836 F.3d at 61-73; *Chaplaincy*, 738 F.3d at 428.

Indeed, plaintiffs' own cited case confirms that "the traditional 'rational basis' test" applies to laws that "*expand* rather than curtail the franchise." *Brown*, 722 F. Supp. at 398. After all, "*any* time voters are added to the rolls," "those already on the rolls have had their votes diluted," and yet "mere expansion of the class of persons eligible to vote does not, *per se*, imply *unconstitutional* vote dilution." *Duncan*, 69 F.3d at 94 & n.3 (emphases added). A contrary rule "would make any expansion of the voting rolls subject to attack" and impermissibly "leave the scope of the franchise static and virtually unchangeable." *Id.* at 95; *see Weber*, 113 F.4th at 1087 (recognizing that "dilution of voting power, in an absolute sense, occurs any time the total number of votes increases"). The "rational basis test" thus governs vote-dilution claims challenging an "extension of the franchise" to new voters, and plaintiffs "must demonstrate that the challenged inclusion is irrational." *Collins v. Town of Goshen*, 635 F.2d 954, 957-59 (2d Cir. 1980) (Friendly, J.) (holding it was not "a denial of equal protection" for "non-residents" to vote in water-district elections); *see Spahos v. Town of Savannah Beach*, 371 U.S. 206 (1962) (per curiam)

(summarily affirming three-judge decision upholding under rational-basis review a law allowing nonresident property owners to vote in municipal elections).

Several decisions are instructive. In *Duncan*, for example, the Sixth Circuit rejected voters' claim that a reapportionment law unconstitutionally "diluted" their votes by allowing nonresidents to vote in schoolboard elections. 69 F.3d at 90-92. The court explained that "vote dilution is a term of art" and that "[m]erely expanding the voter rolls is, standing alone, insufficient to make out a claim of vote dilution." *Id.* at 94. Rather, "the inclusion of voters *unconstitutionally* dilutes" voting power only when it is "*irrational*," which is not the case when new "voters have a substantial interest in the [relevant] election." *Id.* at 94-95 (emphases added). The Sixth Circuit thus upheld the franchise expansion in *Duncan* in significant part because the nonresident voters provided funds to their neighboring school districts through sales and property taxes. *Id.* at 96-98.

Consider also the Tenth Circuit's decision in *May*. The court there rejected equal-protection challenges to a town charter allowing nonresidents to vote in local elections if, among other things, they owned at least 50% of a piece of land in the town. 132 F.3d at 577-78. Declining to apply "strict scrutiny," the court noted that the town charter "does not restrict the right to vote—it expands it to include nonresidents owning real property." *Id.* at 580 & n.6. This was "[o]f critical importance," the Tenth Circuit explained, because "the rational basis test" governs

"vote dilution" claims "where a law expands the right to vote." *Id.* at 580-83 & n.8 (cleaned up). Accordingly, the town charter in *May* passed constitutional muster because the nonresidents owned property in the town, they paid property taxes, and they were subject to town laws. *Id.* at 582-83.[7]

Plaintiffs here have not even alleged that the Voting Act is irrational, much less that noncitizen residents lack a substantial interest in District elections. *See* JA 2-17. As the Council sensibly concluded, noncitizen residents pay District taxes, they raise their families in the District, they send their children to District schools, they own property in the District, and they abide by and are subject to the laws of the District. *See* Comm. Rep. 3-4, 7-8. Those are substantial interests by any measure, and plaintiffs cite no case suggesting otherwise. *See, e.g., May*, 132 F.3d

---

[7]    Similar decisions abound. *See, e.g., Davis v. Linville*, 864 F.2d 127, 129-30 (11th Cir. 1989) (upholding law allowing nonresidents to vote in schoolboard elections); *Cantwell v. Hudnut*, 566 F.2d 30, 37-38 (7th Cir. 1977) (holding that alleged "dilution of plaintiffs' votes" by allowing nonresidents to vote for police and fire protection was not "violative of equal protection"); *see also Bennett v. Yoshina*, 140 F.3d 1218, 1225-27 (9th Cir. 1998) (holding that counting "blank ballots" caused "no disenfranchisement or meaningful vote dilution" as "[e]very ballot submitted was counted, and no one was deterred from going to the polls"); *Angel v. City of Fairfield*, 793 F.2d 737, 739-40 & n.3 (5th Cir. 1986) (finding no "vote dilution" from allowing "nonresidents to vote" when "all of the qualified voters were treated alike"); *Partido Nuevo Progresista v. Perez*, 639 F.2d 825, 827-28 (1st Cir. 1980) (holding that mismarked ballots had not "diluted" validly cast votes); *Powell v. Power*, 436 F.2d 84, 86-88 (2d Cir. 1970) (rejecting equal-protection claim that "illegal voting" caused "dilution" of plaintiffs' votes in primary election). *But see Locklear v. N.C. State Bd. of Elections*, 514 F.2d 1152 (4th Cir. 1975).

at 582-83 (deeming it "rational" to expand "the political process" to include those who paid local taxes and were subject to local laws).

Contrary to plaintiffs' assertions, nothing in the Tennessee district court's decision in *Brown* supports their claim. JA 12. In *Brown*, after decades of intentional discrimination against and disenfranchisement of minority residents, a city sought to dilute minority residents' votes by amending its charter to allow nonresident property owners to vote in local elections, regardless of their percentage of ownership. 722 F. Supp. at 382-88, 397-99. In striking that amendment down as "irrational," the *Brown* court noted that the charter had "no limitation on the number of people who can 'vote' on a piece of property" and "no limitation as to any minimum property value required for the exercise of the franchise." *Id.* at 399. As a result, dozens of nonresidents with only a fractional interest in a small, cheap plot of land could determine the outcome of citywide elections, which "does not further any rational government interest." *Id.* at 399 & n.24.

No such irrationality exists here. The Voting Act extends the franchise only to qualified noncitizen *residents*—i.e., those whose "principal or primary home" is "fixed" in the District, D.C. Code § 1-1001.02(16)—all of whom the Council reasonably found have a substantial interest in District matters. *See supra* pp. 48-49. Nor does the Act allow for the fragmentation of votes based on trivial interests, as each qualified citizen and each qualified noncitizen continues to have only one vote

per person in local elections. *See Wise v. Circosta*, 978 F.3d 93, 100 n.8 (4th Cir. 2020) (en banc) (observing that "no vote is diluted" when each "qualified person gets one vote and each vote is counted equally" (cleaned up)); *Weber*, 113 F.4th at 1087 ("Vote dilution in the *legal* sense occurs only when disproportionate weight is given to some votes[.]").  And in any event, the expansion of the electorate in this case was not a thinly veiled effort to perpetuate decades of intentional discrimination against any historically disenfranchised group. *Cf. Brown*, 722 F. Supp. at 382-88.

> 2.  Plaintiffs have alleged nothing to suggest that the Voting Act was enacted for the purpose of harming protected classes.

The Voting Act is constitutional regardless of its alleged impact.  Facially neutral laws are not subject to heightened scrutiny unless they have both the effect *and* purpose of discriminating against a protected class.  *See, e.g.*, *Rothe*, 836 F.3d at 71-73.  The "hallmarks" of a protected class are "a history of discrimination, immutable characteristics, and political disenfranchisement." *Hedgepeth*, 386 F.3d at 1154.  And the intent to discriminate against such groups must reflect more than mere "awareness of consequences" or "foreseeability."  *Rothe*, 836 F.3d at 72 (internal quotation marks omitted).  Claimants must instead show that the challenged law was enacted "because of, not merely in spite of, its adverse effects upon an identifiable group"—a showing that cannot be made when a law "can be readily and logically explained on grounds other than discriminatory purpose." *United States v. Johnson*, 40 F.3d 436, 439-41 (D.C. Cir. 1994) (internal quotation marks omitted)

(upholding "disparate penalties" for crack-cocaine and powder-cocaine offenses despite statistical evidence of racially disparate impact).

The same principles govern vote-dilution claims brought under the Constitution. *See Alexander v. S.C. State Conf. of the NAACP*, 601 U.S. 1, 38-39 (2024). As the Supreme Court has explained, equal protection "prohibits *intentional* vote dilution." *Abbott v. Perez*, 585 U.S. 579, 586 (2018) (emphasis added) (internal quotation marks omitted). It does not prohibit all facially neutral laws that happen to have a dilutive effect on some individuals' voting power. *See, e.g.*, *Mobile v. Bolden*, 446 U.S. 55, 71 n.17 (1980) (plurality op.) (explaining that legislatures are not "presumed to have 'intended'" vote dilution "simply because that was a foreseeable consequence"), *superseded on other grounds by statute as noted in Thornburg v. Gingles*, 478 U.S. 30, 35 (1986). Claimants calling for heightened scrutiny thus cannot simply allege that a law has the *effect* of diluting their votes; they must establish that the *purpose* of the law was to dilute their votes. *Alexander*, 601 U.S. at 38-39 (recognizing that plaintiffs "pressing a [constitutional] vote-dilution claim" must show that the challenged law "has the purpose *and* effect of diluting the minority vote" (internal quotation marks omitted)).

Here, plaintiffs have alleged no facts establishing that the Voting Act was enacted for the purpose of discriminating against, or diluting the votes of, a constitutionally protected class. To the contrary, plaintiffs assert that "no inquiry

into legislative purpose is needed," JA 13, and that the Act allegedly "dilutes the votes" only of "U.S. citizens" and "native-born U.S. citizens," JA 15-16. According to plaintiffs, the Act's "primary motive" was to "aid" foreign-born District residents by allowing some of them to vote in local elections, and this "intentional expansion" of the local electorate "by its necessary operation" "decreases the voting power" of District residents "who were born in the United States." JA 3, 7-9.

But those allegations at most suggest that dilution was a potentially foreseeable consequence—not that the Act was enacted *because of* that alleged consequence. *See Bolden*, 446 U.S. at 71 n.17 (declining to presume intentional vote dilution "simply because" it was "foreseeable"). After all, intentionally expanding the electorate does not mean a legislature acted with the specific intent to unconstitutionally dilute the votes of those already on the rolls. *See, e.g.*, *May*, 132 F.3d at 580-83; *Duncan*, 69 F.3d at 94-95. And plaintiffs offer no factual support for any fleeting assertions to the contrary, *see* JA 13-16, which the Court need not accept, *see Hemp Indus.*, 36 F.4th at 288, and which are wrong anyways since the Act is more accurately explained on nondiscriminatory grounds. *See* Comm. Rep. 2 (seeking to "improve[] access to democracy for all District residents"). Indeed, it strains reason to think that the Council created the Voting Act for the invidious purpose of harming groups (U.S. citizens and native-born Americans) who plaintiffs

admit previously comprised the *entirety* of the District's electorate, *see* JA 2-3, and who even now comprise roughly 99.9% of that electorate, *see* Br. 16-17.

Nor have plaintiffs plausibly alleged any discriminatory animus against a protected class. In arguing otherwise, plaintiffs advance the remarkable claim that "U.S. citizens" and "native-born Americans" are constitutionally "protected classes." JA 56-61. That is not so. A protected class is a group that has "historically been relegated to such a position of political powerlessness" that it needs "extraordinary protection from the majoritarian political process." *United States v. Cohen*, 733 F.2d 128, 135 (D.C. Cir. 1984) (en banc) (Scalia, J.) (internal quotation marks omitted). U.S. citizens cannot plausibly be described in those terms, and neither can native-born Americans generally since they always or almost always qualify as citizens. *See Citizens Awareness Network, Inc. v. United States*, 391 F.3d 338, 354-55 (1st Cir. 2004) (suggesting it would be "absurd" to treat citizens as "a suspect class"). As plaintiffs themselves admit, it would be a "rare event" for "[c]itizens and the American-born" to be "burdened based on these characteristics," JA 61—which just confirms that they are not the sort of historically subjugated groups that deserve "the 'suspect class' designation," *Cohen*, 733 F.2d at 135.

Plaintiffs offer no viable basis to conclude otherwise, moreover, and cannot muster a single constitutional decision embracing their flawed theory. *See SECSYS, LLC v. Vigil*, 666 F.3d 678, 687-88 (10th Cir. 2012) (Gorsuch, J.) (rejecting "novel

claim" with "no antecedents in our lengthy equal protection tradition"). Discrimination *against noncitizens* often triggers strict scrutiny because "[a]liens as a class are a prime example of a 'discrete and insular' minority" deserving "heightened judicial solicitude," *Graham v. Richardson*, 403 U.S. 365, 372 (1971)— not because *citizens* are a protected class, *see Mathews v. Diaz*, 426 U.S. 67, 78 & n.12 (1976) (indicating that laws may, consistent with equal protection, validly "treat certain aliens more favorably than citizens"). Also irrelevant is the fact that American-born persons sometimes bring employment-discrimination claims based on "national origin" under Title VII of the Civil Rights Act, 42 U.S.C. § 2000e-2(a)(1). JA 58-59. No statute can expand the universe of constitutionally protected classes, and nothing in Title VII can be read to suggest that every person born in America somehow belongs to a disenfranchised group warranting heightened constitutional scrutiny. *See United Steelworkers of Am., AFL-CIO-CLC v. Weber*, 443 U.S. 193, 206 n.6 (1979) ("Title VII . . . was not intended to incorporate and particularize the commands of the Fifth and Fourteenth Amendments.").

\*     \*     \*

Plaintiffs' claims lack merit. They cannot invent new unenumerated rights without historical or legal basis, or claim discrimination and vote dilution from a facially neutral law that has no discriminatory or dilutive purposes. Such challenges fly in the face of settled constitutional law, and this Court should reject them.

## CONCLUSION

This Court should affirm the dismissal of plaintiffs' suit for lack of standing or, alternatively, affirm the judgment of dismissal on the merits and remand with instructions to dismiss with prejudice.

Respectfully submitted,

BRIAN L. SCHWALB
Attorney General for the District of Columbia

CAROLINE S. VAN ZILE
Solicitor General

ASHWIN P. PHATAK
Principal Deputy Solicitor General

CARL J. SCHIFFERLE
Deputy Solicitor General

/s/ Bryan J. Leitch
BRYAN J. LEITCH
Assistant Attorney General
D.C. Bar Number 1016484
Office of the Solicitor General

Office of the Attorney General
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-6524 (office)
(202) 741-0649 (fax)
bryan.leitch@dc.gov

October 2024

61

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation in Federal Rule of Appellate Procedure 28.1(e)(2)(B)(i) an appellee's principal and response brief in cross-appeals because the brief contains 14,866 words, excluding exempted parts. This brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Times New Roman 14-point font.

/s/ Bryan J. Leitch
BRYAN J. LEITCH