# United States Court of Appeals
### FOR THE DISTRICT OF COLUMBIA CIRCUIT

————

Argued March 14, 2025                    Decided June 20, 2025

No. 24-7050

STACIA HALL, ET AL.,
APPELLANTS

v.

DISTRICT OF COLUMBIA BOARD OF ELECTIONS,
APPELLEE

————

Consolidated with 24-7065

————

Appeals from the United States District Court
for the District of Columbia
(No. 1:23-cv-01261)

————

*Christopher J. Hajec* argued the cause and filed the briefs for appellants/cross-appellees.

*Bryan J. Leitch*, Assistant Attorney General, Office of the Attorney General for the District of Columbia, argued the cause for appellee/cross-appellant. With him on the briefs were *Brian L. Schwalb*, Attorney General, *Caroline S. Van Zile*, Solicitor General, *Ashwin P. Phatak*, Principal Deputy Solicitor General,

2

and *Carl J. Schifferle*, Deputy Solicitor General.

Before: PILLARD and CHILDS, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the court filed by *Senior Circuit Judge* RANDOLPH.

RANDOLPH, *Senior Circuit Judge*: Seven District of Columbia citizen-voters filed a complaint challenging the constitutionality of the Local Resident Voting Rights Amendment Act of 2022, 69 D.C. Reg. 14,601 (Dec. 2, 2022), a D.C. law permitting noncitizens to vote in municipal elections. The district court, without reaching the merits, held that the plaintiffs lacked standing to sue and dismissed the complaint. We reverse.

**I.**

In 2022, the District of Columbia Council, the legislative body for the District, passed the Local Resident Voting Rights Amendment Act (LRVRAA).[1] Prior to its passage, only "citizen[s] of the United States" who were at least eighteen years old on Election Day were eligible to vote in D.C. elections, both at the federal and local levels. *See* D.C. Code § 1-1001.02(2) (2022). The LRVRAA removed the citizenship requirement for "local election[s]," defined as elections for municipal office or involving a D.C. ballot measure. *Id.* § 1-1001.02(34). Instead, any individual who had "maintained a residence in the District for at least 30 days preceding the next election" and "d[id] not claim voting residence or right to vote in any [other] state, territory, or country" could vote in a D.C. local election. *Id.* § 1-

---

[1] The LRVRAA was enacted on November 21, 2022. After Congress's thirty-day review period elapsed without action, *see* D.C. Code § 1-206.02(c)(1), the law went into effect on February 23, 2023.

3

1001.02(2)(C). And because status as a D.C. voter is the chief prerequisite to holding elected office, the LRVRAA had the effect of opening D.C.'s municipal offices to noncitizens. *See id.* § 1-204.21(c)(1)(A) (mayor); *id.* § 1-301.83(a)(1) (attorney general); *id.* § 1-204.02(1) (D.C. Council member); *id.* § 1-1001.04(a)(1) (Board of Elections member). The District of Columbia Board of Elections administers the D.C. voting rolls and is therefore responsible for implementing the LRVRAA. *See id.* § 1-1001.05(a)(1).

Stacia Hall and six other plaintiffs brought this suit in D.C. Superior Court, seeking declaratory and injunctive relief against the Board's enforcement of the LRVRAA. Hall and her co-plaintiffs are D.C. residents and U.S. citizens who are registered to vote in the District.[2] In addition, Hall was a candidate for D.C. Mayor in 2022, and Ralph Chittams, another plaintiff, was a candidate for the D.C. Council in 2018. Plaintiffs argue that the LRVRAA violates the federal constitution by impermissibly diluting their votes, discriminating against U.S. citizens and individuals born in the United States in violation of the Fifth Amendment Equal Protection Clause, and transgressing the "constitutional right to citizen self-government." J.A.14–16.

The Board removed the case to federal court and then moved to dismiss, arguing that the plaintiffs lacked standing and had failed to state a claim. While that motion was pending before the district court, the plaintiffs submitted a new declaration from Hall that, "[a]t the time this lawsuit was filed," she "was planning to run for public office" in D.C., though she noted that her plans had changed multiple times. J.A. 95.

---

[2] We accept the complaint's well-pleaded allegations as true for the purposes of this motion to dismiss. *See Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011).

4

The district court dismissed the suit for lack of standing. It first noted that "voter dilution can support standing" if the voter plaintiffs "allege facts showing disadvantage to themselves as individuals." *Hall v. D.C. Bd. of Elections*, No. 23-1261, 2024 WL 1212953, at *3 (D.D.C. Mar. 20, 2024) (second excerpt quoting *Baker v. Carr*, 369 U.S. 186, 206 (1962)). For example, a voter may have standing if the government draws classifications that "irrationally favor[]" certain counties, promotes "arbitrary distinction[s]" between individuals, or relies on a flawed census to apportion representation. *Id.* (first excerpt quoting *Baker*, 369 U.S. at 208). But the district court emphasized that "not every alleged dilution of voting rights gives rise to an injury that would support a finding of standing." *Id.* at *4. It faulted the plaintiffs here for not identifying "any sort of disadvantage as individual voters," since the LRVRAA will not cause the plaintiffs' votes to be "treated differently than noncitizens' votes," counted towards a different election, or devalued through a discriminatory gerrymander. *Id.* The district court thus concluded that the plaintiffs had raised nothing more than a "generalized grievance which is insufficient to confer standing." *Id.*

The plaintiffs timely appealed, and the Board cross-appealed to preserve its merits arguments.

## II.

### A.

Under Article III of the U.S. Constitution, federal courts may only resolve "[c]ases" and "[c]ontroversies." U.S. Const. art. III § 2, cl. 1. We enforce this limit in part through the doctrine of standing, "an essential and unchanging part of the case-or-controversy requirement." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Standing separates those disputes

5

"that are of the justiciable sort referred to in Article III," and thus "appropriately resolved through the judicial process," from other disputes that more properly belong with the legislature. *Id.* (second excerpt quoting *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990)). The "irreducible constitutional minimum" of standing comprises (1) an injury-in-fact that is (2) traceable to the defendant's conduct and (3) redressable by a favorable decision of the court. *Id.* at 560–61. The plaintiff, as the party invoking federal jurisdiction, "bears the burden" of establishing these three essential elements. *Id.* at 561.

This case concerns the injury-in-fact requirement: the plaintiff's injury must be "concrete, particularized, and actual or imminent." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). The injury must demonstrate "a personal stake in the outcome of the controversy." *Gill v. Whitford*, 585 U.S. 48, 65 (2018) (quoting *Baker*, 369 U.S. at 204). A plaintiff lacks standing if he seeks to vindicate merely a "general interest common to all members of the public." *Lujan*, 504 U.S. at 575 (quoting *Ex parte Levitt*, 302 U.S. 633, 634 (1937)). Such a dispute does not constitute an Article III case or controversy, since the plaintiff's interest in resolving the dispute is "plainly undifferentiated" and "common to all members of the public." *Id.* (quoting *United States v. Richardson*, 418 U.S. 166, 177 (1974)).

This distinction—between particularized injuries and generalized grievances—ensures "that federal courts exercise 'their proper function in a limited and separated government.'" *TransUnion*, 594 U.S. at 423 (quoting John G. Roberts, Jr., *Article III Limits on Statutory Standing*, 42 Duke L.J. 1219, 1224 (1993)). A court empowered to conduct "general legal oversight of the Legislative and Executive Branches," *id.* at 423–24—or to remedy the "abstract injury" of "the generalized interest of all citizens in constitutional governance," *Schlesinger*

6

*v. Reservists Comm. to Stop the War*, 418 U.S. 208, 217 (1974)—would no longer be "exercis[ing] power that is judicial in nature," *Gill*, 585 U.S. at 65 (quoting *Lance v. Coffman*, 549 U.S. 437, 441 (2007)). Instead, it would be improperly intruding on the "activities [that] are appropriate to legislatures." *Lujan*, 504 U.S. at 560.

We review dismissals for lack of standing de novo. *See Tanner-Brown v. Haaland*, 105 F.4th 437, 443 (D.C. Cir. 2024). "In doing so, we assume the truth of all material factual allegations in [the] complaint and construe the complaint liberally, granting [plaintiffs] the benefit of all reasonable inferences that can be derived from the facts alleged." *Cato Inst. v. SEC*, 4 F.4th 91, 94 (D.C. Cir. 2021).

**B.**

The Supreme Court has "long recognized" that individuals can suffer voting-related injuries sufficient to support standing. *Gill*, 585 U.S. at 65. The right to vote is inherently "individual and personal in nature," and the judiciary is empowered to vindicate individualized infringements on that right. *Id.* (quoting *Reynolds v. Sims*, 377 U.S. 533, 561 (1964)). Crucially, however, a voter plaintiff must "allege facts showing disadvantage to themselves as individuals." *Id.* at 65–66 (quoting *Baker*, 369 U.S. at 206). A plaintiff therefore may demonstrate standing only by grounding a claim in his or her specific circumstances.

Vote dilution can be one example of a voting-related injury. *Gill* involved a challenge to Wisconsin's map of state legislative districts. *See id.* at 55. Plaintiffs alleged that their votes had been devalued through partisan gerrymandering. *See id.* at 66. The Supreme Court accepted that the "dilution of [plaintiffs'] votes" could be a cognizable injury in the gerrymandering context, *id.*,

7

because improperly drawn districts can cause a plaintiff's vote "to carry less weight than it would carry in another, hypothetical district," *id.* at 67. Properly pleaded, this imbalance rose to the level of an "individual voter's harm" that was sufficient to support standing. *Id.*

Not all vote-dilution claims pass muster, however. *Gill* emphasized that voting-related harms are cognizable only for voters who are directly affected, not for all voters indirectly impacted via our representative political system. *See id.* at 67–68. For example, only plaintiffs residing in an improperly gerrymandered district have standing—and then only to challenge the construction of their particular district. *Id.* Even though all Wisconsin residents were governed by the collective Wisconsin legislature—and thus indirectly impacted by the outcome of the election in each state legislative district—those plaintiffs' theory of "statewide harm" was nothing more than an "interest in the overall composition of the legislature" insufficient to support standing. *Id.* at 68. Such an indirect harm was a "nonjusticiable 'general interest common to all members of the public'" and thus a complaint more properly channeled via the legislative process. *Id.* (quoting *Levitt*, 302 U.S. at 634).

Three decades ago, our court conducted a similar analysis in *Michel v. Anderson*, 14 F.3d 623 (D.C. Cir. 1994), a case outside the gerrymandering context. There, the U.S. House of Representatives changed its rules to allow five otherwise-nonvoting delegates from the U.S. territories and the District of Columbia to participate in certain committee votes. *Id.* at 624–25. Voters from the states (as opposed to the territories and the District) brought suit, alleging that their votes had been diluted because their congressmen had lost voting power. *Id.* at 626. Before rejecting this claim on the merits, we held that the voters had "standing to raise a claim that their vote was diluted." *Id.* We reasoned that their representatives' vote share had

8

declined from 1-in-435 representatives to 1-in-440 representatives and territorial delegates. *Id.* Since the plaintiffs' votes were therefore marginally less powerful in affecting congressional decision-making, we held that they were "worth" less, a palpable loss of voting power that was a "distinct and concrete harm" suffered by each voter in the fifty states and sufficient to support standing. *Id. Michel* accordingly drew a distinction between impermissibly "abstract" harms and "widespread" but concrete injuries. *Id.* We held that, if the concreteness requirement was met, the number of potential plaintiffs did not affect the standing inquiry. Even though changes to the composition of the House equally injured all American voters, all such voters nevertheless experienced an individualized vote-dilution harm and "any of those voters could claim an injury." *Id.*

## **C.**

Those principles control this case. The plaintiffs here advance a vote-dilution claim predicated on the power of their ballots. They allege that the LRVRAA causes a "debasement or dilution of the weight of a citizen's vote" from the "expansion[] of the franchise." Compl. ¶¶ 46–47, J.A. 12 (first excerpt quoting *Reynolds*, 377 U.S. at 555). Logically and mathematically, that is true: granting the franchise to noncitizens will expand the D.C. electorate and reduce the voting power of each U.S. citizen voter in local elections.

The claimed injury is hardly abstract, as each voter experiences a direct reduction in the strength of his or her "individual and personal" vote. *Gill*, 585 U.S. at 65 (quoting *Reynolds*, 377 U.S. at 561). The plaintiffs are seeking relief relating to their home jurisdiction and concerning an election in which they will participate. Unlike the statewide theories of harm rejected in *Gill*, the plaintiffs here do not complain of a

9

harm in a different election that indirectly affects them, nor do they assert claims merely about the composition of the D.C. municipal government writ large. Their claims turn exclusively on their individual votes and the power attached to those votes in the D.C. local elections. Said differently, this case concerns "a real controversy with real impact on real persons." *TransUnion*, 594 U.S. at 424 (quoting *Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29, 87 (2019) (Gorsuch, J., concurring in the judgment)).

Nor is it dispositive that the plaintiffs' injuries are "shared by all citizen voters." Board Br. 26. The litmus test is not numerosity but concreteness. Under *Michel*, simply because "all voters in the states suffer[ed] [an] injury . . . d[id] not make it an 'abstract' one"—and *Michel* endorsed a type of injury "suffered by every American voter." 14 F.3d at 626. As long as "each person can be said to have suffered a distinct and concrete harm," *id.*, we do not hold it against some plaintiffs that they may have company. The alternative would be to render government action unreviewable as long as it disadvantages everyone equally. But if, for example, a municipality made all residents ineligible to vote, surely those individuals would have standing to sue. Here, the injury the plaintiffs assert relates to their specific votes in elections in which they intend to participate. That injury is enough to confer standing.

The Board relies on two decisions of our court, neither of which alter our analysis.

First, *Hudson v. Haaland*, 843 F. App'x 336 (D.C. Cir. 2021), rejected a challenge to a tribal election on standing grounds. The plaintiff claimed that changes to certain voting procedures affected the "potency" of his vote, but we noted in dicta that "the power of Hudson's vote was the same as those cast by all other voters." *Id.* at 338. Since the plaintiff did not

10

lose voting power "relative to" other tribal members, he had not alleged "the sort of vote dilution theory that courts have found to support standing." *Id.*

But *Hudson*—an unpublished judgment deciding that the underlying issues were "moot," *id.*—differs in several important respects from this case. Most crucially, *Hudson* did not involve an expansion of the tribal electorate. Instead, the plaintiff challenged modifications to vote-counting procedures, new quorum requirements, and a shift from single-member districts to two-member districts. *Id.* at 337. But none of those changes altered his voting power relative to the rest of the electorate. He could still participate in the same election, with the same electorate, and with the same share of representation in government. And though *Hudson* never cited *Michel*, its emphasis on the "power of Hudson's vote," his alleged "loss of voting power," and the "potency" of each ballot, *id.* at 338, only reinforces *Michel*'s holding that our vote-dilution analysis turns on whether a plaintiff voter has suffered an individualized loss of electoral influence.[3]

The Board also relies on *Daughtrey v. Carter*, 584 F.2d 1050 (D.C. Cir. 1978), which involved a challenge to President Carter's pardons of Vietnam War draft dodgers. There, the plaintiffs "allege[d] that their voting rights [were] diluted by the unlawful entry into the United States . . . and the resulting

_____

[3] *Hudson* also drew on Eleventh Circuit caselaw holding that vote-dilution claims require a "point of comparison." 843 F. App'x at 338 (quoting *Wood v. Raffensperger*, 981 F.3d 1307, 1314 (11th Cir. 2020)). Our circuit has not formally adopted that test, and we do not do so here. But to the extent it is relevant, *Michel* suggests that plaintiffs may compare their current voting power with a prior state to show a change. In any event, the facts of *Hudson* render it distinguishable from this case.

11

exercise of full political rights" by formerly ineligible individuals. *Id.* at 1055. We held that the plaintiffs lacked standing, but not because expansions of the franchise can never support standing. Instead, conducting an "[a]d hoc scrutiny of the facts," we found that the plaintiffs "reside[d] in various localities across the United States" and thus did not plead vote dilution "in any particular election or in any particular geographical area," nor as part of any "identifiable group of voters whose votes are disfavored." *Id.* at 1056 (first excerpt quoting *Harrington v. Bush*, 553 F.2d 190, 206 (D.C. Cir. 1977)). Since "[a]t best" the *Daughtrey* plaintiffs' supposed harms covered "elections for any office" occurring "anywhere in the United States," the "dilution of voting rights they ha[d] alleged [wa]s . . . diffuse, minute, and indeterminable." *Id.* They failed to identify any "'discrete factual context' within which 'concrete injury' occurred," making the asserted injuries merely "speculative" and lacking the requisite "personal stake" to support standing. *Id.* at 1056–57 (first quoting *Baker*, 369 U.S. at 204; second excerpt quoting *Am. Soc. of Travel Agents, Inc. v. Blumenthal*, 566 F.2d 145, 149 (D.C. Cir. 1977); and then quoting *Baker*, 369 U.S. at 204).

This case stands in sharp contrast to *Daughtrey*. The plaintiffs here are all D.C. residents and have identified the specific jurisdiction in which they believe they will lose voting power. *Daughtrey* stands for the proposition that generalized assertions about new voters are not sufficient to bring suit. Plaintiffs instead must identify specific factual situations—jurisdictions, elections, offices—in which they believe their vote will be devalued. But hardening *Daughtrey* into a bright-line rule that changes to the electorate can never support standing would render expansions of the franchise as categorically unreviewable. We decline to set out such an expansive rule.

12

**D.**

One issue remains. The Board urges us to find that, even if the plaintiffs' vote-dilution injury is cognizable, they failed to properly plead an intent to vote in future elections. When a plaintiff seeks prospective relief based on a potential future injury, "'some day' intentions—without any description of concrete plans, or indeed even any specification of *when* the some day will be—do not support a finding of the 'actual or imminent' injury that our cases require." *Lujan*, 504 U.S. at 564 (emphasis in original); *cf. Nader v. FEC*, 725 F.3d 226, 229 (D.C. Cir. 2013) (candidate statements that he "may run for office again" were "too speculative" to confer candidate-based standing).

While close, we believe the complaint contains sufficient factual allegations to conclude that at least one plaintiff—Stacia Hall—intends to vote in future D.C. elections.[4] To be sure, it would have been far simpler if the plaintiffs had stated as much. But the complaint alleges that each plaintiff was a "registered voter in the District of Columbia." Compl. ¶¶ 13–19, J.A. 4. The complaint explains that it wishes to vindicate "Plaintiffs' fundamental right to vote." *Id.* ¶ 57, J.A. 15. Hall's February 2024 declaration states that, as of 2022, she "wanted to continue fighting to serve the District and knew that part of that effort

---

[4] We look only to the allegations in the complaint and Hall's February 2024 declaration. Hall and another plaintiff, Richard Heller, submitted additional declarations appended to their reply brief in this court. In both declarations, they aver that they intend to vote in the 2026 election. But "[i]n determining whether the [plaintiffs] have standing, the court may not consider on appeal supplemental declarations filed after entry of the judgment appealed." *Swanson Grp. Mfg. LLC v. Jewell*, 790 F.3d 235, 240 (D.C. Cir. 2015); *see also Frito-Lay, Inc. v. Willoughby*, 863 F.2d 1029, 1035–36 (D.C. Cir. 1988).

13

would be to run for public office again." J.A. 94. While these statements do not explicitly allege a future voting intention, on a motion to dismiss we "grant[] plaintiff[s] the benefit of all inferences that can be derived from the facts alleged," *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005)), and we "presum[e] that general allegations embrace those specific facts that are necessary to support the claim," *Lujan*, 504 U.S. at 561 (quoting *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 889 (1990)). Hall's general allegations allow us to reasonably infer that she, if not also her co-plaintiffs, intends to vote in future D.C. elections. And only one plaintiff need have standing for this lawsuit to proceed. *See Mendoza v. Perez*, 754 F.3d 1002, 1010 (D.C. Cir. 2014).[5]

\* \* \*

Since the plaintiffs have made a plausible showing of a particularized injury to their vote, we reverse and remand. The Board's cross-appeal is dismissed as moot.[6]

*So ordered.*

---

[5] Of course, the plaintiffs must support their standing with the "manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. The standing inquiry will ultimately turn on their ability to support the allegations and inferences we today assume arguendo.

[6] Given our holding that the plaintiffs have standing as voters, we express no view on their candidate and "citizen self-government" theories of standing.